**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| STEVE SNYDER-HILL, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, RONALD MCDANIEL, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, and DAVID MULVIN, | |
| Plaintiffs, | |
| v. | Case No. _____ |
| THE OHIO STATE UNIVERSITY, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

Plaintiffs, Steve Snyder-Hill, John Doe 1, John Doe 2, John Doe 3, Ronald McDaniel, John Doe 4, John Doe 5, John Doe 6, John Doe 7, and David Mulvin, by and through their counsel, state the following as their Complaint against Defendant, The Ohio State University:

## PRELIMINARY STATEMENT AND INTRODUCTION

1.      This is a civil rights case brought by former students of The Ohio State University ("OSU") who are among the potentially thousands of male students sexually assaulted, abused, molested and/or harassed by OSU physician and athletic team doctor, Dr. Richard Strauss.

2.      Defendant OSU employed Dr. Strauss to provide medical care and treatment to its students and student-athletes, making him an assistant professor of medicine and the official sports team doctor. OSU also employed Dr. Strauss to serve as a physician at OSU's Student Health Services.

3.      Dr. Strauss used his position of trust and confidence at OSU to sexually abuse male students and student-athletes on a regular basis throughout his 20-year tenure at the university, from 1978 through 1998.

4.      Dr. Strauss's sexual abuse of OSU students included fondling their testicles and penises, digitally penetrating their rectums, touching their bodies in other inappropriate ways, making inappropriate comments about their bodies, and asking improper, sexualized questions—all in the guise of providing needed medical evaluation and care.

5.      Dr. Strauss's inappropriate touching was a frequent topic of discussion and well known among OSU's student-athletes, trainers, coaches, and athletic directors. This was reflected in their various nicknames for Dr. Strauss, including "Dr. Balls," "Dr. Nuts," "Dr. Jelly Paws," "Dr. Soft Hands," and "Dr. Cough."

6.      OSU learned about Dr. Strauss's inappropriate sexual conduct as early as his first year of employment there. When an attending physician at Student Health Services asked a wrestling team captain why he came to Student Health Services instead of seeing Dr. Strauss, the wrestler explained that Dr. Strauss had examined his genitals for 20 minutes and appeared to be trying to get him excited.[1]

7.      Throughout Dr. Strauss's 20-year tenure at OSU, OSU administrators, coaches, physicians, and other employees were repeatedly informed about Dr. Strauss's sexual abuse of OSU students.

---

[1] *Former OSU wrestler says Richard Strauss molested him in late 1970s, earliest such allegation*, July 19, 2018, https://www.cnn.com/2018/07/18/us/former-osu-wrestler-richard-strauss-molestation-allegation/index.html (last visited July 22, 2018).

8.     Instead of taking action to stop Dr. Strauss's serial sexual abuse, OSU not only turned a blind eye to it, but facilitated the abuse.

9.     For example, OSU required its student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports and maintain their athletic scholarships—even after student-athletes complained to their coaches about the ways Dr. Strauss touched them during medical examinations. And at least one coach threatened athletes with having to see Dr. Strauss if they did not listen to the coach.

10.     OSU administrators and employees at Student Health Services also facilitated Dr. Strauss's abuse. For example, after a student lodged a complaint detailing Dr. Strauss's inappropriate sexual touching and comments during an examination, the Director of Student Health Services legitimized the abuse by telling the student that no one had complained about Dr. Strauss before and that Dr. Strauss had said the examination was medically appropriate.

11.     OSU's institutional indifference to the rights and safety of its students—who, collectively, were exposed to decades of sexual abuse by Dr. Strauss—is staggering.

12.     And it is not limited to the abuse inflicted by Dr. Strauss. OSU's culture of institutional indifference to the rights and safety of its students has permitted serial sexual predators and harassers to thrive at the university for the last four decades. There have been at least two OSU employees since Dr. Strauss who are alleged to have systematically committed sexual abuse and/or facilitated rampant sexual harassment—a former Director of OSU's Marching Band, Jonathan Waters, and an assistant diving coach, Will Bohonyi.

13.     In 2014, after OSU investigated a complaint against Jonathan Waters alleging a sexualized culture within the Marching Band, OSU found that "there was a sexually hostile

environment for students in the Marching Band of which the University had notice and failed to adequately address."[2]

14. In response to its findings of sexual harassment within the Marching Band, OSU adopted a new plan for combatting sexual misconduct so that it could become "a national leader" in preventing and responding to sexual misconduct.[3]

15. Far from becoming a national leader on this issue, OSU is an example of what not to do. After receiving a report during a meet in 2014 that assistant diving coach Will Bohonyi was sexually abusing a minor in OSU's Diving Club, OSU allegedly sent the victim, not Bohonyi, home from the meet.[4] In addition, OSU allegedly has failed to take action to address hundreds of naked photographs of the victim that Bohonyi forced her to take at age 16 and that have been in OSU's possession for approximately four years.[5]

16. In 2018, OSU dissolved its comprehensive sexual assault prevention and response unit, after revelations that OSU employees within the unit failed to handle students' reports of sexual assault properly and told some victims that they were "lying" and "delusional."[6]

---

[2] *See* Letter from Meena Morey Chandra, Regional Director, Reg. XV, Office for Civil Rights, U.S. Dep't Educ., to Dr. Michael V. Drake, President, Ohio State University, 2 (Sept. 11, 2014) (describing results of OSU's investigation of alleged sexual harassment within Marching Band), https://www2.ed.gov/documents/press-releases/ohio-state-letter.pdf (last visited July 24, 2018) (hereinafter "OCR Findings Letter").

[3] *Ohio State announces comprehensive plan to combat sexual misconduct and relationship violence*, September 17, 2015, https://news.osu.edu/ohio-state-announces-comprehensive-plan-to-combat-sexual-misconduct-and-relationship-violence/ (last visited July 21, 2018) (hereinafter "OSU Plan").

[4] *See Prior v. USA Diving, Inc., et al.*, S.D. Indiana, Case No. 1:18-cv-2113, Complaint ¶¶ 267-75, ECF Doc. No. 1, accessible at https://www.courtlistener.com/recap/gov.uscourts.insd.85736/gov.uscourts.insd.85736.1.0_2.pdf (hereinafter "Diving Complaint").

[5] *Id*. at ¶¶ 176-80, 260-61.

[6] *Ohio State closes 'failed' program, takes another hard look at Title IX policies*, June 24, 2018, accessible at http://www.dispatch.com/news/20180624/ohio-state-closes-failed-program-takes-

17. It is not surprising that, within this ingrained culture of institutional indifference, OSU succeeded in keeping Dr. Strauss's two decades of serial sexual abuse buried until this year.

18. Plaintiffs have filed this lawsuit in the hope that OSU will fulfill its goal of becoming "a national leader" in preventing and responding to sexual misconduct by making the systemic changes needed to ensure that students can obtain their education in a safe environment, free from sexual harassment and abuse by OSU employees. Plaintiffs are also seeking compensation for their injuries caused by OSU's failure to take appropriate action to stop Dr. Strauss's known sexual predation, in violation of Title IX of the Education Amendments of 1972.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 because the matters in controversy arise under the laws of the United States. Specifically, Plaintiffs assert claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred within this district.

## PARTIES

21. Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

22. Because this Complaint addresses issues of sexual harassment and abuse, which are matters of the utmost intimacy, with the exception of certain Plaintiffs who have agreed to be

---

another-hard-look-at-title-ix-policies (last visited July 21, 2018); *see also*, *A broken system at Ohio State*, July 10, 2018, accessible at https://www.insidehighered.com/news/2018/07/10/ohio-state-closes-sexual-assault-unit-after-complaints-mismanagement-poor-reporting (last visited July 21, 2018).

publicly identified, the names of the Plaintiffs have been withheld from this Complaint to protect their identities.[7]

23.     Plaintiff Steve Snyder-Hill is an adult male and a resident of Ohio. He attended The Ohio State University from 1991 through 2000. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during an examination in 1995.

24.     Plaintiff John Doe 1 is an adult male and a resident of Ohio.  He attended The Ohio State University from 1980 through 1984. John Doe 1 was a member of OSU's track and field team from 1980 through 1984. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1980 through 1984.

25.     Plaintiff John Doe 2 is an adult male and a resident of Connecticut.  He attended The Ohio State University from 1984 through 1989. John Doe 2 was a member of OSU's basketball team from 1984 through 1989. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1984 through 1989.

26.     Plaintiff John Doe 3 is an adult male and a resident of Ohio.  He attended The Ohio State University from 1984 through 1989. John Doe 3 was a member of OSU's tennis team from 1984 through 1989. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1984 through 1989, and was a minor the first time this occurred.

27.     Plaintiff Ronald McDaniel is an adult male and a resident of Illinois.  He attended The Ohio State University from 1981 through 1987. McDaniel was a member of OSU's tennis

---

[7] The plaintiffs withholding their identities in this Complaint will file a motion to use pseudonyms, as needed, and will seek an order of the Court regarding disclosure of their identities and the conditions for disclosure.

team from 1981 through 1986. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss twice during examinations from 1982 through 1983.

28.     Plaintiff John Doe 4 is an adult male and a resident of California.  He attended The Ohio State University from 1982 through 1986.  John Doe 4 was a member of OSU's tennis team from 1982 through 1986. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1982 through 1986.

29.     Plaintiff John Doe 5 is an adult male and a resident of Maryland. He attended The Ohio State University from 1986 through 1990. John Doe 5 was a member of OSU's tennis team from 1986 through 1990. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1986 through 1990.

30.     Plaintiff John Doe 6 is an adult male and a resident of New York. He attended The Ohio State University from 1984 through 1988. John Doe 6 was a member of OSU's soccer team from 1984 through 1986. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1984 through 1986.

31.     Plaintiff John Doe 7 is an adult male and a resident of Florida. He attended The Ohio State University from 1982 through 1986. He was a member of OSU's tennis team from 1982 through 1986. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1982 through 1986.

32.     Plaintiff David Mulvin is an adult male and a resident of Ohio. He attended The Ohio State University from 1975 through 1979. He was a member of OSU's wrestling team from 1975 through 1979. He was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during an examination in 1978.

33.     Defendant The Ohio State University ("OSU") was at all relevant times and continues to be a public university organized and existing under the laws of the State of Ohio.

34.     Defendant OSU receives, and at all relevant times received, federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq*.

## COMMON FACTUAL ALLEGATIONS

35.     Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

36.     OSU employed Dr. Strauss from approximately 1978 through 1998. Dr. Strauss served in various positions at OSU, including, but not limited to: assistant professor of medicine; attending physician; team physician for OSU athletics; and part-time physician with OSU's Student Health Services. He retired as a professor emeritus in 1998.

37.     Dr. Strauss served as team physician for OSU athletics from approximately July 1, 1981, through June 30, 1995, where he had regular contact with male student-athletes in baseball, cheerleading, cross country, fencing, football, gymnastics, ice hockey, lacrosse, soccer, swimming, tennis, track and field, volleyball, and wrestling.

38.     Beginning his very first year of employment at OSU—and spanning his entire two-decade tenure—Dr. Strauss preyed on male students, fondling, groping, sexually assaulting, and harassing them. He did so with OSU's knowledge and support.

39.     OSU's requirement that student-athletes undergo annual physical exams with Dr. Strauss, in order to participate in OSU athletics and maintain their scholarships, facilitated his abuse. OSU also installed Dr. Strauss as a treating physician at OSU Health Services, which

allowed him to prey on other male students as well. All in all, he is estimated to have abused well over 1,000 OSU students.

40.     No matter the illness or injury, Dr. Strauss's modus operandi during medical appointments was always the same.

41.     He required students to remove their pants so that he could perform invasive and medically unnecessary examinations of their genitals and rectum.

42.     He groped and fondled students' genitalia, often without gloves.

43.     He performed unnecessary rectal examinations and digitally penetrated students' anuses.

44.     He pressed his erect penis against students' bodies.

45.     He moaned while performing testicular exams.

46.     He made inappropriate and medically unnecessary comments about students' bodies, including comments on their physical appearance, heritage, skin tone, and physique. And he took pictures of students, purportedly for a musculature book he was writing.

47.     One student-athlete's experience exemplifies the pattern of Dr. Strauss's sexual predation. The student recalled a physical exam with Dr. Strauss: "I'm sitting, and he straddled my thigh, mounted my thigh. Rubbed on my thigh. I was just frozen." Dr. Strauss then told the athlete to undress so that he could check, purportedly, for a hernia. Dr. Strauss proceeded to inspect the student's penis "in detail."[8]

---

[8] *Former Ohio State athlete says he was sexually assaulted twice by former team doctor Richard Strauss*, April 6, 2018, https://www.thelantern.com/2018/04/former-ohio-state-athlete-says-he-was-sexually-assaulted-twice-by-former-team-doctor-richard-strauss/ (last visited July 26, 2018).

48.    The next year, the student-athlete received his physical, yet again, from Dr. Strauss. Most of the 20-minute exam involved Dr. Strauss inspecting the student's genitalia.[9]

49.    The following year, the student-athlete received his physical from a different doctor.  That physical lasted five minutes. There was no hernia test. The doctor did not make the student fully undress. Afterward, the student was perplexed: "Is that it?"[10]

50.    The student-athlete felt at the time that Dr. Strauss's behavior was wrong. But Dr. Strauss's authority as a medical professional and OSU's official team doctor caused the student to doubt his instincts. And Dr. Strauss's elevated position at OSU made him feel powerless to stop the abuse. He felt OSU was "feeding" Dr. Strauss students.

51.    Only after OSU publicly announced in 2018 that it was investigating allegations of sexual misconduct raised against Dr. Strauss (the "Investigation") did the student realize that his discomfort had been justified, his instincts correct: Dr. Strauss had sexually abused him. He was relieved to learn that he wasn't "crazy" for thinking something had been wrong.[11]

52.    The insidious nature of sexual abuse by a healthcare provider explains the student-athlete's struggle to come to terms with Dr. Strauss's abuse—and why this struggle is all too common among victims of physician-patient abuse. Although Dr. Strauss's victims felt that his exams were medically inappropriate and deeply uncomfortable, many of them did not realize these exams constituted illegal sexual abuse and harassment until after OSU recently publicized its Investigation.

---

[9] *Id.*

[10] *Id.*

[11] *Id*.

53.　　And not until after OSU's publicized its Investigation in 2018 did Dr. Strauss's victims learn that OSU was not only aware of his abuse but facilitated it.

54.　　OSU played a key role in normalizing and perpetuating Dr. Strauss's serial sexual abuse.

55.　　For instance, when Plaintiff Steve Snyder-Hill, a former OSU student sexually assaulted by Dr. Strauss, lodged a complaint about Dr. Strauss's misconduct, the director of OSU Student Health Services, Ted W. Grace, M.D., told him—incorrectly—that OSU had "never received a complaint about Dr. Strauss before."[12]

56.　　In fact, OSU had received many complaints about Dr. Strauss before.

57.　　OSU learned of the abuse within Dr. Strauss's very first year of employment, in 1978. That year, Dr. Strauss fondled Plaintiff David Mulvin, a wrestling team captain, during a medical exam. Mulvin reported the sexual assault to a doctor at OSU Student Health Services.[13]

58.　　The doctor did nothing.[14]

59.　　OSU did nothing.[15]

60.　　Students also informed OSU coaching staff, including track and field coach Frank Zubovich and tennis coach John Daly, that Dr. Strauss's examinations made them uncomfortable.

61.　　Neither Zubovich nor Daly took any corrective action in response to the athletes' complaints about Dr. Strauss.

---

[12] *Complaint from former Ohio State student details abuse by Strauss in 1995*, July 19, 2018, http://www.dispatch.com/news/20180719/complaint-from-former-ohio-state-student-details-abuse-by-strauss-in-1995 (last visited July 26, 2018).

[13] *Former OSU wrestler says Richard Strauss molested him in late 1970s, earliest such allegation*, July 19, 2018, https://www.cnn.com/2018/07/18/us/former-osu-wrestler-richard-strauss-molestation-allegation/index.html (last visited July 22, 2018).

[14] *Id.*

[15] *Id.*

62.     Nor did anyone at OSU take corrective or disciplinary action against Dr. Strauss.

63.     Dr. Strauss's inappropriate touching during medical exams was such common knowledge that OSU coaching staff, trainers, and student-athletes knew him as "Dr. Jelly Paws," "Dr. Nuts," "Dr. Soft Hands," and "Dr. Cough"—names that reflect his sexual predation.

64.     OSU coaching staff, including tennis coach John Daly, regularly joked about Dr. Strauss's sexual abuse of male athletes. Daly threatened student-athletes that they would have to see Dr. Strauss, if they did not do what the coach asked. He also laughed about it being a student's "turn to see Dr. Strauss."

65.     On information and belief, Dr. Strauss's abuse was well-known and discussed openly among OSU administrators, staff, and student-athletes.

66.     Rather than take the flood of complaints about Dr. Strauss seriously, OSU continued to require students to be treated by him, thereby supplying him an endless trough of victims.

67.     Indeed, OSU told student-athletes that if they wanted to keep their scholarships or continue playing for OSU, they had to go to Dr. Strauss for their annual physical exams and medical treatment.

68.     Many of Dr. Strauss's victims were student-athletes on full scholarship, making them particularly vulnerable to his abuse.  OSU's requirement that athletes be examined and treated by Dr. Strauss forced them into an impossible Hobson's choice: either suffer sexual abuse or forego their scholarships and educations.

69.     OSU's requirement also put student-athletes in the unbearable position of choosing between their physical health in the short term and their psychological, emotional, and physical well-being in the long-term.

70.     For instance, one student-athlete—an All-American wrestler—recalled that whenever he was injured, he had to decide: "Is this injury bad enough that I'm going to get molested for it?"[16]

71.     Dr. Strauss's abuse—which OSU allowed to continue unchecked throughout his long tenure—traumatized many victims for decades. Indeed, some victims continue to be afraid to see doctors to this day, causing them to neglect their health and to receive dangerous diagnoses late.

72.     Dr. Strauss did not limit his abuse to the privacy of the exam room.  He reigned over the locker rooms of Larkins Hall, the former OSU recreation center, where—in full view of OSU coaching staff and other employees—he harassed male student-athletes.

73.     He read the newspaper naked in the male locker room, so that he could stare at student-athletes' bodies.

74.     He showered with student-athletes for hours at a time and several times a day.

75.     On one occasion, he finished showering and was preparing to leave the locker room when one of his "favored" wrestlers began to shower. Dr. Strauss undressed and joined the wrestler in the shower.[17]

76.     Yet again, male student-athletes complained to OSU about Dr. Strauss's misconduct.

77.     Yet again, OSU had an opportunity to stop the abuse, but did nothing.

78.     And so Dr. Strauss continued to terrorize OSU students with impunity.

---

[16] *Ex-athletes say Ohio State doc groped, ogled men for years*, July 7, 2018, https://www.sfgate.com/news/education/article/Ex-athletes-say-Ohio-State-doc-groped-ogled-men-13053149.php (last visited July 26, 2018).

[17] *See John Doe, et al. v. The Ohio State University*, S.D. Ohio No. 2:18-cv-00692, Complaint, ECF Doc. No. 1 (July 16, 2018) ("Class Action Complaint"), ¶¶ 36-37.

79. Following Dr. Strauss's lead, other OSU employees took full advantage of OSU's indifference to sexual harassment and abuse.

80. For instance, some trainers were so "touchy feely" with the student-athletes that the athletes developed a practice of informing each other about which trainers to avoid.

81. A cohort of "voyeurs" flocked to Larkins Hall to gawk at the OSU student-athletes and masturbate while watching them shower.[18]

82. One wrestling head coach, Russ Hellickson, described the toxic culture at OSU as a "cesspool of deviancy."[19] He recalled that, "Coaching my athletes in Larkins Hall was one of the most difficult things I ever did."[20]

83. At times, Coach Russ Hellickson had to physically drag the voyeurs out of Larkins Hall.[21] Though he pleaded with OSU to move the athletes to a private building,[22] his pleas fell on deaf ears. Yet again, OSU did nothing to stop the abuse and harassment.

84. During the 1994-1995 academic year, student-athletes complained to then-Athletic Director Andy Geiger about the sexual deviant behavior in Larkins Halls, including that of Dr. Strauss. Geiger promised to look into the situation, but OSU did nothing to make the athletes safer.[23]

---

[18] *'A cesspool of deviancy': New claims of voyeurism test Jordan denials*, July 6, 2018, https://www.politico.com/story/2018/07/06/jim-jordan-harassment-ohio-state-wrestling-699192 (last visited July 26, 2018).

[19] *Id*.

[20] *Id*.

[21] *Id*.

[22] *Id*.

[23]  *See* Class Action Complaint, *supra* n.17, at ¶¶ 26-29.

85.     On information and belief, OSU never took legal or disciplinary action against Dr. Strauss.

86.     On information and belief, in 1997, OSU scheduled a hearing to address allegations of sexual misconduct against Dr. Strauss, and some former OSU student-athletes were asked to testify.[24]

87.     In 1998, after the hearing was scheduled to occur, Dr. Strauss retired from OSU without explanation. And OSU bestowed the honorary title of professor emeritus on him.

88.     Dr. Strauss committed suicide in 2005. The effects of his abuse, and OSU's complicity in it, survive in the lives of his victims.

### OSU'S PATTERN OF INDIFFERENCE TO SEXUAL HARRASSMENT AND ABUSE

89.     OSU's culture of indifference to the safety and well-being of its students has caused sexual violence to flourish at OSU for the last four decades. This toxic culture, which has drawn the attention and censure of the federal government, continues to thrive to this day.

90.     On June 23, 2010, the United States Department of Education's Office for Civil Rights ("OCR") initiated a review of OSU's compliance with Title IX. With the federal government peering over its shoulder, OSU rushed to revise its sexual abuse policies and procedures.[25] Nevertheless, on September 11, 2014, after a four-year-long review of OSU, OCR announced that the university had violated Title IX.[26]

91.     Specifically, OCR found that OSU's policies and procedures were confusing and inconsistent, failed to designate timeframes for the completion of major stages of sexual abuse

---

[24] *See supra* n.8.

[25] OCR Findings Letter, *supra* n.2, at 24.

[26] *Id.* at 1.

investigations, and failed to ensure that complainants were afforded equal opportunity to participate in the grievance process, in violation of Title IX.[27]

92.　　OCR also found that students were confused about how and where to report incidents of sexual harassment and assault.[28]

93.　　OCR likewise found that OSU's procedures "inappropriately suggest and, in some instances, seem to require that parties work out alleged sexual harassment directly with the accused harasser prior to filing a complaint with the University."[29]

94.　　In some cases, OCR was unable even to reach a determination about whether OSU adequately responded to complaints because OSU's complaint files were so sloppy and indecipherable.[30]

95.　　In order to close the federal government's review, OSU entered into a resolution agreement with OCR. That agreement required OSU, in part, to disseminate information to educate students and staff about Title IX's prohibition against sexual abuse and harassment, and how to report incidents.　It also required OSU to revise its policies and procedures to eliminate the requirement that students "work out" sexual harassment and abuse directly with their abuser.　And it required OSU to provide mandatory training on sexual abuse to students and staff.[31]

96.　　After the federal government initiated its investigation into OSU's practices, OSU began its own investigation into a sexual harassment complaint concerning its Marching Band.

---

[27] *Id.* at 1, 9, 26.

[28] *Id.* at 10.

[29] *Id.* at 25.

[30] *Id.* at 19, 27.

[31] *Id.* at 27-29; *see also* Resolution Agreement, Ohio State University, OCR Docket #15-10-6002, accessible at https://www2.ed.gov/documents/press-releases/ohio-state-agreement.pdf (last visited July 24, 2018).

97.     OSU's internal investigation found that the Marching Band's culture facilitated sexual harassment and created a sexually hostile environment for its students.[32]  Students in the Marching Band were called sexual nicknames, like "Boob Job" and "Twinkle Dick," and pressured to participate in an annual nude Marching Band tradition.[33]  Students felt that the Marching Band's culture was sexualized and an "old guys" club, and that it operated under a "culture of intimidation," which culminated in at least one known sexual assault as well as sexual harassment.[34]  Most damningly, the investigation found that OSU had notice of the hostile environment but had failed to do anything about it.[35]

98.     A year after OCR found OSU non-compliant with Title IX, the university launched an initiative designed to "ensure Ohio State is a national leader" in preventing and responding to sexual abuse.[36]

99.     If only OSU's actions were as good as its words.

100.    In 2014, during a diving meet, OSU received a report that OSU assistant diving coach Will Bohonyi was sexually abusing a minor in OSU's Diving Club.  Inexplicably, OSU allegedly sent the victim—not the perpetrator—home from the meet.[37]

---

[32] Ohio State University Investigation Report, July 22, 2014, Complaint against Jonathan Waters, Director of the OSU Marching Band, 1, accessible at http://www.documentcloud.org/documents/1235398-osu-investigation-report-complaint-against.html (last visited July 21, 2018) (hereinafter "OSU Investigation Report").

[33] *Id.* at 4-5.

[34] *Id.* at 11-12.

[35] OCR Findings Letter, *supra* n.2, at 2; OSU Investigation Report at 1.

[36] OSU Plan, *supra* n.3.

[37] Diving Complaint, *supra* n.4, ¶¶ 272, 274-75.

101.    OSU then allegedly failed to take action to address the hundreds of naked photographs of the victim engaged in sexual acts that Coach Bohonyi had forced her to take.[38] These photographs—child pornography—have allegedly sat in OSU's possession for some four years.[39]

102.    Revelations of OSU's ongoing culture of abuse continue to accumulate. For instance, in June of this year, OSU was forced to shutter its sexual assault prevention and response unit after concerns emerged that unit employees had told victims of abuse they were "lying," "delusional," and had "an active imagination."[40] Other victims were denied services because they would not disclose the identity of their attackers.[41] OSU indicated that the unit also failed to document and report sexual assaults in a timely way.[42]

103.    Despite all evidence to the contrary—a federal investigation finding Title IX violations, victim complaints, internal reports, witnesses, and more—OSU persists in claiming it is and has been "a leader" on issues of sexual abuse.[43]  The victims of its four decades of indifference beg to differ.

---

[38] *Id.* at ¶¶ 176-180, 260-62.

[39] *Id.* at ¶ 180.

[40] *Ohio State closes sexual-assault center, fires 4 after complaints*, June 20, 2018, http://www.dispatch.com/news/20180619/ohio-state-closes-sexual-assault-center-fires-4-after-complaints (last visited July 26, 2018); *A Broken System at Ohio State*, July 10, 2018, https://www.insidehighered.com/news/2018/07/10/ohio-state-closes-sexual-assault-unit-after-complaints-mismanagement-poor-reporting (last visited July 26, 2018); *see also Ohio State dissolves Sexual Civility and Empowerment unit*, June 19, 2018, accessible at https://news.osu.edu/ohio-state-dissolves-sexual-civility-and-empowerment-unit/ (last visited July 17, 2018).

[41] *See supra* n.40, *A Broken System at Ohio State*.

[42] *Id.*

[43] *Ohio State closes 'failed' program, takes another hard look at Title IX policies*, June 24, 2018, http://www.dispatch.com/news/20180624/ohio-state-closes-failed-program-takes-another-hard-look-at-title-ix-policies (last visited July 26, 2018).

## SPECIFIC FACTUAL ALLEGATIONS

104.     Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

### STEVE SNYDER-HILL

105.     Steve Snyder-Hill (then named Steve Hill) was a student at OSU from 1991 through 2000.

106.     Snyder-Hill was examined by Dr. Strauss once, on or about January 5, 1995, at OSU's Student Health Services ("Student Health").

107.     Snyder-Hill went to Student Health to have a lump in his chest checked.

108.     The triage nurse there recommended that Snyder-Hill see Dr. Strauss, which he did.

109.     Dr. Strauss told Snyder-Hill that he needed to remove all of his clothes, so that Dr. Strauss could perform a full medical exam.

110.     Snyder-Hill complied with this request.

111.     Dr. Strauss made inappropriate comments to Snyder-Hill and asked inappropriate questions about Snyder-Hill's sexual and personal desires. These comments and questions including asking Snyder-Hill if he was gay, whether he had trouble sleeping with just one person, and whether he desired to do something else; and telling Snyder-Hill that he worked with AIDS patients and was the doctor for the athletic department.

112.     When Dr. Strauss told Snyder-Hill that he needed to check Snyder-Hill's testicles, Snyder-Hill said this was not necessary because his regular doctor had recently done this.

113.     Dr. Strauss insisted that both testicular and rectal examinations were necessary, and he performed both on Snyder-Hill, before checking the lump in Snyder-Hill's chest. The rectal exam involved Dr. Strauss digitally penetrating Snyder-Hill's rectum with his finger.

114.    Snyder-Hill thought Dr. Strauss's examination was unorthodox and was very uncomfortable throughout the examination. Snyder-Hill felt intimidated and became afraid to voice a concern.

115.    This escalated when Dr. Strauss asked Snyder-Hill to lay down on the table, then leaned over to check the lump in Snyder-Hill's chest. Dr. Strauss pushed his pelvic area up against Snyder-Hill's side and held it there. Snyder-Hill could feel Dr. Strauss's erect penis pressed against him. Dr. Strauss kept himself pressed against Snyder-Hill for a prolonged time while examining his chest.

116.    Snyder-Hill was shocked by this and could not look Dr. Strauss in the eyes during the exam and afterwards. Snyder-Hill felt very intimidated by Dr. Strauss.

117.    The examination by Dr. Strauss weighed heavily on Snyder-Hill afterwards. He felt very uncomfortable and upset, and thought the examination was inappropriate. He also felt guilty that he had let Dr. Strauss touch him. He thought Dr. Strauss's topics of conversation were flirty and that, if Snyder-Hill had given Dr. Strauss a signal to proceed, Dr. Strauss would have acted on it.

118.    The next day, on January 6, 1995, Snyder-Hill called Student Health to lodge a complaint about Dr. Strauss. He spoke with a nurse, who took notes on his verbal complaint. The complaint is memorialized in a "Patient Comment" form dated January 6, 1995.

119.    The nurse who took the complaint told Snyder-Hill that someone would get back to him. Snyder-Hill said he wanted to speak with the top person at Student Health.

120.    Later that same month, Ted Grace, M.D., Director of Student Health, called Snyder-Hill. Dr. Grace said he had spoken with Dr. Strauss about Snyder-Hill's complaint, that Dr. Strauss

20

denied rubbing against Snyder-Hill with an erection, and that Dr. Strauss said he was just doing his job during the examination.

121.    During a telephone conversation with Dr. Grace on January 24, 1995, Snyder-Hill demanded that changes be made so that other students would not experience what he had experienced with Dr. Strauss. Snyder-Hill said that Dr. Grace was taking Dr. Strauss's side and that Snyder-Hill felt helpless and powerless in this situation, because it was his word against Dr. Strauss's. Snyder-Hill also voiced concern about where his complaint would go or be retained, in case Dr. Strauss acted this way with another patient. Snyder-Hill demanded that students have the ability to opt out of testicular and rectal examinations and to request that someone else be present in the room during examinations (to avoid a situation where it would be the doctor's word against the student's). He also demanded that he be notified if there were any similar incidents with Dr. Strauss in the future and requested that Dr. Grace document their conversation in writing.

122.    Dr. Grace wrote a letter to Snyder-Hill dated January 26, 1995, in which he said that "we had never received a complaint about Dr. Strauss before, although we have had several positive comments." The letter also assured Snyder-Hill that "[a]ny future complaints would include consideration of all prior complaints of a similar nature."

123.    Dr. Grace also stated in the letter that "all patient comments—both positive and negative—are maintained in a quality assurance file that is available for review by the Joint Commission on Accreditation of Healthcare Organizations." Dr. Grace's letter attempted to address Snyder-Hill's concern about the proper retention of the complaint, but discounted Snyder-Hill's complaint of sexual abuse by referencing "both positive and negative" comments.

124.    The letter also mentioned suggestions from Snyder-Hill about improvements to Student Health that resulted in a new form that "asks every patient if he or she would like to have

a chaperone present during the office visit," and provides an opportunity for students to opt out of potential genital exams or touching in certain areas.

125.     Snyder-Hill felt that his concerns had been addressed indirectly and assumed that these changes would prevent Dr. Strauss from abusing other students.

126.     Neither Dr. Grace nor any other OSU administrator or employee informed Snyder-Hill of any formal OSU grievance procedure to complain about Dr. Strauss.

127.     Dr. Strauss's personnel file contains no mention of Snyder-Hill's complaint, or any disciplinary action or internal investigation stemming from the complaint.[44]

128.     Upon information and belief, OSU did not discipline Dr. Strauss in any way based on Snyder-Hill's complaint.[45]

129.     Snyder-Hill suffered emotional and psychological damages because of the unchecked abuse perpetrated by Dr. Strauss. To this day, he is extremely uncomfortable with physicians, particularly when getting testicular or rectal examinations.

130.     Snyder-Hill heard nothing further about sexual abuse by Dr. Strauss until July, 2018, when he saw Dr. Strauss's photograph in media reports and recognized his face. Until seeing these media reports, Snyder-Hill did not know about the magnitude or scope of Dr. Strauss's abuse of OSU students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

131.     Snyder-Hill was traumatized by learning the news about Dr. Strauss's serial sexual abuse, OSU's knowledge about it and failure to take appropriate action to stop it, and Dr. Strauss's

---

[44] *Former Ohio State student says he filed sexual assault complaint about Strauss in the 90's*, July 16, 2018, available at https://www.nbcnews.com/video/ohio-state-wrestlers-share-emotional-descriptions-of-alleged-abuse-1275836995600 (last visited July 17, 2018).

[45] *Id.*

death by suicide. He feels that OSU has robbed him of the ability to ever get closure on the sexual abuse he suffered at the hands of Dr. Strauss and to confront his abuser.

132.    If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, Snyder-Hill would not have been abused by Dr. Strauss.

## JOHN DOE 1

133.    John Doe 1 was a member of Defendant OSU's track and field team from 1980 through 1984, and had a full athletic scholarship.

134.    John Doe 1 relied on his scholarship to attend college.

135.    As a requirement of receiving his scholarship, John Doe 1 was told that he had to see Dr. Strauss for annual physicals.

136.    Prior to his first physical with Dr. Strauss in his freshman year, John Doe 1 heard rumors about Dr. Strauss's inappropriate examinations.  Upperclassmen warned John Doe 1 that Dr. Strauss was "creepy" and they called him "Dr. Nuts" because he fondled athletes during exams. One senior on the track and field team told their coach, Frank Zubovich, that he would not see Dr. Strauss again, but the coach did nothing.

137.    John Doe 1 saw Dr. Strauss at least two or three times per year for his OSU-mandated annual physicals and for treatment of his injuries.

138.    During each and every exam, Dr. Strauss told John Doe 1 to drop his pants. Then Dr. Strauss touched John Doe 1's genitals, under the guise of performing a hernia check.

139.    Dr. Strauss frequently commented on John Doe 1's athletic prowess and his defined collarbone.

140.    Sometimes trainers or physical therapists witnessed Dr. Strauss's abuse of John Doe 1.

141.    Even with witnesses present, Dr. Strauss inappropriately touched John Doe 1, but he was more aggressive when witnesses were not present.

142.    Though the exams made him extremely uncomfortable, John Doe 1 was not sure whether Dr. Strauss's conduct was inappropriate.

143.    After the first two visits with Dr. Strauss, John Doe 1 told Coach Zubovich that he did not want to see Dr. Strauss again. And he continued to tell his coach the same after each visit.

144.    His coach did nothing.

145.    Without support from the people entrusted to protect him, John Doe 1 resorted to trying to avoid Dr. Strauss on his own.

146.    He avoided seeking medical care so that he would not have to see him.

147.    He made sure never to complain about a groin injury.

148.    He also tried to seek treatment at different clinics on campus.

149.    John Doe 1's teammates also had to see Dr. Strauss several times a year.

150.    No matter what the injury was, Dr. Strauss performed testicular exams on them at every opportunity.  For instance, a wrist injury resulted in a testicular exam.

151.    It was also known among the athletes that Dr. Strauss would try to cover any appointment an athlete made to address a sexually transmitted disease.

152.    Dr. Strauss commented on the students' hair, eyes, eyebrows, facial structure, and skin tone.

153.    Dr. Strauss also rubbed their skin.

154.    He also instructed them to make certain movements in a jockstrap so that he could ogle their bodies. For instance, he would pretend to perform a scoliosis exam so that he could stare at their bodies.

24

155.    On multiple occasions, John Doe 1 complained to his teammates about Dr. Strauss's inappropriate exams, in front of OSU coaches.

156.    John Doe 1's teammates teased each other about having to see Dr. Strauss and made jokes about trying to avoid him, in front of their coaches.

157.    Sometimes a coach would promise to look into it.

158.    But the coaches did nothing.

159.    To John Doe 1's knowledge, his coaches never investigated his or his teammates' concerns.

160.    Nor did the coaches take any corrective action against Dr. Strauss or attempt to ensure that others did.

161.    John Doe 1 was never informed or made aware of any formal OSU grievance procedure to complain about Dr. Strauss.

162.    The students were left to fend for themselves.

163.    They devised ways to reduce their exposure to Dr. Strauss's abuse.

164.    For instance, instead of turning their heads to cough during a testicular exam, they coughed directly on Dr. Strauss, hoping to force him to back away.

165.    They also developed a practice called "avoidance, escape, or dodge," to try to avoid Dr. Strauss.

166.    But Dr. Strauss was not the only abuser. Several of the trainers were "touchy feely" with the track and field athletes.

167.    John Doe 1 and his teammates tried to avoid those trainers because of the way the trainers touched them. He and his teammates also felt that those trainers would protect Dr. Strauss at the expense of the athletes.

168.    John Doe 1 and many of his friends were black athletes from the inner city, dependent on their full scholarships for their educations.

169.    They felt terrified of losing their scholarships if they spoke up about Dr. Strauss's misconduct.

170.    They felt that Dr. Strauss and the trainers were untouchable.

171.    Until seeing news coverage of the OSU investigation in 2018, John Doe 1 did not realize that Dr. Strauss's misconduct was sexual abuse. Nor did he realize the magnitude or scope of Dr. Strauss's abuse of OSU students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

172.     If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe 1 would not have been abused by Dr. Strauss.

## **JOHN DOE 2**

173.    John Doe 2 was a member of OSU's basketball team from 1984 through 1989, and had an athletic scholarship.

174.    John Doe 2 relied on his scholarship to attend college.

175.    John Doe 2 saw Dr. Strauss for one of his required annual physicals and for treatment of illnesses.

176.    John Doe 2's recollection is that he was examined by Dr. Strauss at OSU a total of four times, once for a physical and three times for treatment at OSU's walk-in clinic.

177.    In the winter of 1985, when John Doe 2 was 18 years old, he saw Dr. Strauss for a physical.

178.    John Doe 2 also saw Dr. Strauss three times during walk-in clinic hours, twice for cold-related symptoms sometime between 1987 and 1988.

179.    No matter the reason for John Doe 2's visit, Dr. Strauss asked him to drop his pants and found a reason to touch his genitals.

180.    When John Doe 2 saw Dr. Strauss for his physical, Dr. Strauss's hands lingered on his genitals for what seemed like an inappropriate amount of time. Dr. Strauss also rubbed John Doe 2's arms during the exam.

181.    During a visit to the walk-in clinic in 1988, Dr. Strauss told John Doe 2 to "roll over" during the exam and take off his pants. John Doe 2 complied, and Dr. Strauss began to perform a rectal exam. John Doe asked "What's this for?" and Dr. Strauss said, "Just want to check down here." After Dr. Strauss began to digitally penetrated his rectum, John Doe 2 told him to stop, got up from the examining table, and left. John Doe 2 never returned to see Dr. Strauss again.

182.    John Doe 2 felt extremely embarrassed and did not report Dr. Strauss's misconduct at the time.

183.    John Doe 2 was also fearful that he would lose his scholarship if he complained.

184.    John Doe 2 was never informed or made aware of any formal OSU grievance procedure to complain about Dr. Strauss.

185.    Other players called Dr. Strauss "Dr. Nuts" and "Dr. Cough" because of his invasive and inappropriate exams.

186.    Until reading news coverage of the OSU investigation in 2018, John Doe 2 did not realize that Dr. Strauss's misconduct was sexual abuse. Nor did he realize the magnitude or scope of Dr. Strauss's abuse of OSU students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

187.    If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe 2 would not have been abused by Dr. Strauss.

27

188.    Because of Dr. Strauss's abuse and OSU's failure to address it, John Doe 2 avoids going to doctors and feels anxious and uncomfortable with doctors. Because of his experiences with Dr. Strauss, after leaving OSU, John Doe 2 did not get another physical from a doctor until 2013. A couple of years ago, John Doe 2 had lost 45 pounds without any explanation, but refused to see a doctor until his family finally got him to do so. John Doe 2 then learned he had a thyroid issue.

189.    John Doe 2 has also struggled with alcohol abuse, which got significantly worse while he was a student at OSU.

### JOHN DOE 3

190.    John Doe 3 was a member of Defendant OSU's Tennis team from 1984 through 1989.

191.    Upon arriving as a freshman, John Doe 3 quickly learned that Dr. Strauss was notorious for his inappropriate sexual touching during medical exams. Upperclassmen on the tennis team called Dr. Strauss "Dr. Nuts" and "Dr. Balls" because of his intrusive examinations and his insistence on performing testicular exams on the players, no matter the injury or illness at issue.

192.    John Doe 3 was subjected to his first "exam" by Dr. Strauss when he was only 17 years old.  He was shocked by the examination. No prior medical examination had ever made him feel so uncomfortable.

193.    He continued to have to see Dr. Strauss multiple times a year over the next four years for his annual OSU-required physicals, as well as for medical treatment of his illnesses and injuries when Dr. Strauss was the assigned physician at the OSU Health Center's open clinic hours. John Doe 3 estimates that Dr. Strauss sexually assaulted him dozens of times.

194.    No matter the reason for the visit, Dr. Strauss always required John Doe 3 to remove his pants and underwear. Dr. Strauss then performed a purported "testicular exam," in which he groped John Doe 3's testicles and penis for an extended period of time and stared at his genitals. Dr. Strauss had a distinct, creepy smile on his face during each examination of John Doe 3.

195.    These "testicular exams" sometimes lasted for 15-20 minutes.

196.    When John Doe 3 was treated at the OSU Health Center, Dr. Strauss usually had training staff assist him. On occasion, these training staff observed Dr. Strauss perform the unwarranted 15-20 minute testicular exams on John Doe 3.

197.    Dr. Strauss's exams made John Doe 3 extremely uncomfortable, confused, and embarrassed. He did not know whether there was a medical purpose to the sexual touching.

198.    And he did not know what to do about Dr. Strauss's conduct, particularly because he was a minor when the abuse began.

199.    As a result, John Doe 3 did not make a formal report to OSU about Dr. Strauss's misconduct. But he regularly discussed Dr. Strauss's "creepy" behavior and uncomfortable exams with other tennis players, in front of coaches and staff.

200.    John Doe 3 was never informed or made aware of any formal OSU grievance procedure to complain about Dr. Strauss.

201.    If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe 3 would not have been abused by Dr. Strauss.

202.    Because of Dr. Strauss's abuse and OSU's failure to address it, John Doe 3 continues to feel dread every time he has to see a doctor for medical care. John Doe 3 has a hernia for which he has not sought treatment because of his anxiety with doctors. He has also has put off

having a vasectomy because of anxiety over seeing a doctor for a procedure relating to his genitalia.

203.    Until reading news coverage of the OSU investigation in 2018, John Doe 3 did not realize that Dr. Strauss's misconduct was sexual abuse. Nor did he realize the magnitude or scope of Dr. Strauss's abuse of OSU students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

204.    While John Doe 3 was an OSU student, he trusted that OSU would not allow him to be harmed. So, even though he felt uncomfortable during Dr. Strauss's examinations, John Doe 3 assumed those examinations were medically necessary and legitimate.

## RONALD MCDANIEL

205.    Ronald McDaniel was a member of Defendant OSU's tennis team from 1981 through 1986, and had an athletic scholarship.

206.    McDaniel relied on his scholarship to attend college.

207.    McDaniel was treated by Dr. Strauss in the doctor's Larkins Hall office at OSU on at least two occasions.

208.    The first occasion was during McDaniel's freshman year at OSU, in or about the winter of 1982, when McDaniel's coach, John Daly, told him to go to Larkins Hall to see one of the team doctors for cold-related symptoms.  This is where he encountered Dr. Strauss for the first time.

209.    During the winter 1982 examination, when McDaniel complained of swollen adenoids and a cold, Dr. Strauss told McDaniel that he needed conduct a full medical examination and instructed McDaniel to remove his pants.

210.    McDaniel complied with Dr. Strauss's request. During the examination, under the guise of performing a needed medical evaluation to screen for hernias and structural damage, Dr. Strauss rubbed and massaged McDaniel's testicles and penis in what seemed like a sexual manner.

211.    Dr. Strauss also asked personal questions about McDaniel's nationality and stared up and down at his body.

212.    McDaniel felt very uncomfortable about how Dr. Strauss had conducted his examination, and he expressed his discomfort afterwards with more senior athletes and one of the head team trainers, named Jim.

213.    The athletes and trainer laughed and told McDaniel that their nickname for Dr. Strauss was "Dr. Nuts" because, no matter what injury or illness an athlete had, Dr. Strauss would always examine their testicles.

214.    Some athletes also told McDaniel that, during examinations, Dr. Strauss would try to rub them like a girlfriend does and sometimes stuck a finger up their rectums.

215.    McDaniel soon learned that Dr. Strauss's inappropriate touching during medical examinations was well known and openly discussed among athletes, trainers, coaches, and the athletic director.

216.    In McDaniel's experience, Dr. Strauss's inappropriate genital examinations were a running joke among trainers, coaches, and administrators, including, but not limited to: athletic director Hugh Hindman; associate information director Steve Snapp; and co-head athletic trainer Billy Hill. He often heard the trainers, coaches, and administrators joke and laugh about the athletes' complaints about Dr. Strauss's medical examinations.

217.    In or about the fall of 1983, McDaniel sustained an ankle injury while running, and Coach Daly told him to go to Larkins Hall again to see a team doctor for medical treatment.

31

218.    McDaniel did not want to go to Larkins Hall and risk seeing Dr. Strauss again, given his first experience, but felt that his athletic scholarship would be at risk if he disobeyed his coach's instruction.

219.    McDaniel complied with his coach's instruction and went to Larkins Hall. He assumed that if he had to see Dr. Strauss again, the doctor would have no reason to conduct a testicular exam for an ankle injury.

220.    During the fall 1983 examination, Dr. Strauss again instructed McDaniel to remove his shorts so that Dr. Strauss could perform a full medical examination.

221.    McDaniel asked why he needed to "drop his shorts" for an ankle injury. Dr. Strauss grabbed the waistband of McDaniel's shorts to try to pull them down.

222.    Dr. Strauss advised McDaniel that he had to check him for a hernia.

223.    McDaniel refused to take his shorts off.

224.    McDaniel then left Dr. Strauss's office. He decided he would never get examined by Dr. Strauss again because he felt violated.

225.    McDaniel told Coach Daly about Dr. Strauss's inappropriate medical examination and said he would never again get medical treatment from Dr. Strauss.

226.    Coach Daly said, "Okay" and that was it.

227.    Coach Daly did not follow up on McDaniel's complaint about Dr. Strauss. To McDaniel's knowledge, Coach Daly did not take any corrective action against Dr. Strauss or ensure that others did.

228.    McDaniel was never informed or made aware of any formal OSU grievance procedure to complain about Dr. Strauss.

229. Because of the unchecked abuse perpetrated by Dr. Strauss, McDaniel avoided physical examinations involving his testicles and was extremely uncomfortable about seeing doctors for medical treatment that might involve a testicular exam.

230. This had significant consequences for McDaniel, who had a bike accident in or around the spring of 1999 in which he suffered a blow to the area near his testicles. McDaniel chose to endure the pain rather than seek immediate medical attention, due to his experience with Dr. Strauss at OSU.

231. After six to eight months of continuing and increasing pain, McDaniel felt forced to obtain a medical consult and was, in turn, diagnosed with a benign testicular tumor. The tumor had grown to enormous proportions because of the delay in getting his testicle evaluated, and McDaniel suffered medical complications and pain as a result of the delay in getting treatment. Both medical providers who treated McDaniel were troubled by the fact that McDaniel had waited so long to get medical attention for this issue.

232. If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, McDaniel would not have been abused by Dr. Strauss and would not be plagued by a fear of medical examinations that ultimately resulted in delayed treatment of a testicular tumor.

233. Until hearing media reports in early July, 2018, McDaniel did not know about the magnitude or scope of Dr. Strauss's abuse of OSU students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

## **JOHN DOE 4**

234. John Doe 4 was a member of OSU's tennis team from 1982 through 1986, and had a full athletic scholarship.

235. John Doe 4 relied on his scholarship to attend college.

236. John Doe 4's coach, John Daly, required John Doe 4 to get an annual physical with Dr. Strauss to continue playing with the team and receiving his scholarship.

237. Before his first physical with Dr. Strauss, John Doe 4 heard rumors from other student-athletes about Dr. Strauss's inappropriate examinations, including that Dr. Strauss was a creep and fondled the athletes' testicles.

238. John Doe 4 had annual physicals with Dr. Strauss in the doctor's Larkins Hall office three of his four years at OSU.

239. Coach Daly scheduled John Doe 4's physicals with Dr. Strauss and told John Doe 4 when to go.

240. During these physicals, Dr. Strauss made inappropriate comments, including "drop your trousers" and "let's see what we're working with." John Doe 4 felt that Dr. Strauss spent an unnecessarily long time "examining" his genitals. Dr. Strauss also made sexual moaning sounds while examining John Doe 4's genitals.

241. John Doe 4's physicals with Dr. Strauss were unlike any physical John Doe 4 had undergone previously or since then.

242. Each year, John Doe 4 tried to avoid getting his annual physical so that Dr. Strauss would not fondle him.

243. John Doe 4 felt very uncomfortable with Dr. Strauss's conduct after his first physical. In his sophomore year, John Doe 4 told Coach Daly that he did not want to attend any additional physicals with Dr. Strauss. Coach Daly said the physical with Dr. Strauss was mandatory, not a choice.

244. Each year, Coach Daly told John Doe 4 that he had to get his physical with Dr. Strauss, or he would not be able to continue playing at OSU.

34

245.    John Doe 4 feared that his scholarship would be at risk if he did not comply with Coach Daly's instructions.

246.    Coach Daly often joked and laughed about sending tennis players, including John Doe 4, to see Dr. Strauss as punishment.

247.    Coach Daly also threatened tennis players that, if they did not do what he told them, he would send them to Dr. Strauss and "you're gonna get groped."

248.    Other tennis players often joked that Dr. Strauss would be particularly excited for John Doe 4's physical because John Doe 4 was known to be "well-endowed." These comments were made in Coach Daly's presence on numerous occasions.

249.    Other tennis players hated being treated by Dr. Strauss. They often teased each other about having to see Dr. Strauss, in front of Coach Daly and team trainers.

250.    To John Doe 4's knowledge, Coach Daly did not follow up on John Doe 4's complaints about Dr. Strauss, or take any corrective action against Dr. Strauss or ensure that others did.

251.    John Doe 4 was never informed or made aware of any formal OSU grievance procedure to complain about Dr. Strauss.

252.    Though John Doe 4 had felt uncomfortable about Dr. Strauss's conduct during examinations and had complained to Coach Daly about this, John Doe 4 did not understand that he had been sexually abused by Dr. Strauss until hearing media reports in 2018 about Dr. Strauss's sexual misconduct at OSU.

253.    John Doe 4 did not know about the magnitude or scope of Dr. Strauss's abuse of OSU students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct, until hearing media reports about this in 2018.

254.    If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe 4 would not have been abused by Dr. Strauss.

255.    Because of the unchecked abuse perpetrated by Dr. Strauss and endorsed by OSU staff, John Doe 4 now fears for the safety of his children when he sends them to doctors.

## JOHN DOE 5

256.    John Doe 5 was a member of OSU's tennis team from 1986 through 1990, and had a partial athletic scholarship and Pell Grant.

257.    John Doe 5 relied on his scholarship and grant to attend college.

258.    John Doe 5 saw Dr. Strauss for his annual physicals. He also saw Dr. Strauss approximately four times per year for medical treatment, including one occasion on which he had mononucleosis.

259.    No matter the reason for John Doe 5's appointment, including when John Doe 5 had mononucleosis, Dr. Strauss always performed a genital exam on him. Dr. Strauss' hands lingered on John Doe 5's penis and testicles for what felt like an inappropriate amount of time. During the exams, Dr. Strauss also looked at John Doe 5's penis and testicles from every angle.

260.    Dr. Strauss's conduct made John Doe 5 very uncomfortable.

261.    Dr. Strauss's conduct made John Doe 5 so uncomfortable that, in his senior year, he purposely did not shower prior to his physical with Dr. Strauss, so that he would smell bad and Dr. Strauss's exam might be shorter.

262.    John Doe 5 also saw Dr. Strauss for the removal of a wart on his penis.  After the removal, Dr. Strauss required three follow-up visits that John Doe 5 felt were medically unnecessary.

36

263.    John Doe 5 did not want to continue receiving his physicals and medical treatment from Dr. Strauss, but felt he had to do so or would risk losing his scholarship and his ability to play on OSU's tennis team.

264.    John Doe 5 was never informed or made aware of any formal OSU grievance procedure to complain about Dr. Strauss.

265.    John Doe 5's teammates joked about Dr. Strauss's inappropriate conduct during exams, which they had also experienced.

266.    Until reading media reports in 2018 about OSU's investigation, John Doe 5 did not realize that his experience with Dr. Strauss was sexual abuse.

267.     Until reading media reports in 2018 about OSU's investigation, John Doe 5 did not know about the magnitude or scope of Dr. Strauss's abuse of OSU students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

268.    If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe 5 would not have been abused by Dr. Strauss.

269.    Dr. Strauss's unchecked abuse has had a lasting impact on John Doe 5. Because of Dr. Strauss's abuse, John Doe 5 hates seeing doctors for medical treatment. He has to get screened frequently for prostate cancer because it runs in his family, and he finds the screening very difficult. When John Doe 5 has to have surgery, he instructs medical staff to put him to sleep because he "doesn't want to know what happens."

270.    Now a tennis teacher, John Doe 5 enforces a no-touch policy with his students, because of his experience with Dr. Strauss.

## JOHN DOE 6

271.    John Doe 6 was a member of OSU's soccer team from 1984 through 1986.

272.     John Doe 6 saw Dr. Strauss three to four times per year, for three years, for annual physicals and medical treatment.

273.     No matter the reason for John Doe 6's visit, Dr. Strauss always told him to drop his pants and then spent an inordinate amount of time on his genitalia, fondling John Doe 6's penis and testicles.

274.     Dr. Strauss spent more time looking at John Doe 6's genitals at each visit than did the doctors who treated him for a triple hernia in 2015.

275.     John Doe 6 was never informed or made aware of any grievance procedure to complain to OSU about Dr. Strauss.

276.     John Doe 6 was too embarrassed and ashamed to report the misconduct he endured.

277.     John Doe 6 felt that he had to return again and again to Dr. Strauss because OSU required annual physicals.

278.     Though Dr. Strauss's exams made John Doe 6 very uncomfortable at the time, he trusted Dr. Strauss because Dr. Strauss was OSU's team doctor. John Doe 6 did not realize that his experience with Dr. Strauss was sexual abuse until he read media coverage of OSU's investigation in 2018.

279.     Until reading media coverage in 2018 about OSU's investigation, John Doe 6 did not know about the magnitude or scope of Dr. Strauss's abuse of OSU students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

280.     If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe 6 would not have been abused by Dr. Strauss.

281.     Dr. Strauss's abuse has had a lasting impact on John Doe 6. Because of Dr. Strauss's abuse, John Doe 6 is extremely uncomfortable in locker rooms and doctors' offices. His

body tenses during medical exams, and he feels stressed and anxious when his genitals are examined.

## JOHN DOE 7

282.   John Doe 7 was a member of Defendant OSU's tennis team from 1982 through 1986, and had a full athletic scholarship.

283.   John Doe 7 depended on his full scholarship to attend college.

284.   As a requirement of receiving his scholarship, John Doe 7 had to get an annual physical from Dr. Strauss. This is something his coach, John Daly, told John Doe 7 he had to do.

285.   John Doe 7 also had to see Dr. Strauss to obtain medical treatment for illnesses and injuries, regardless of the nature of the ailment.

286.   For example, Coach Daly instructed John Doe 7 to see Dr. Strauss for a broken ankle during his freshman year. John Doe 7 felt at the time that it was strange for him to see Dr. Strauss for a broken ankle because he needed to see an orthopedic specialist.

287.   Coach Daly also directed John Doe 7 to see Dr. Strauss whenever John Doe 7 was sick with the flu.

288.   During each of John Doe 7's medical appointments, Dr. Strauss groped John Doe 7's penis and testicles.

289.   Regardless of the reason for the visit, Dr. Strauss would tell John Doe 7 to drop his trousers and turn around. Dr. Strauss would then examine John Doe 7's genitals, without wearing medical gloves.

290.   Dr. Strauss's conduct made John Doe 7 extremely uncomfortable.

291.   But because Dr. Strauss was a physician, and John Doe 7 was so young, he was too scared during his freshman and sophomore years to question Dr. Strauss's conduct.

292.    Eventually, in his junior year, John Doe 7 asked Dr. Strauss why he was examining John Doe 7 in such an inappropriate way.  Dr. Strauss laughed at him and continued the "exam."

293.    During these appointments, Dr. Strauss would always ask John Doe 7 about his tennis matches, seemingly to prolong his time with John Doe 7.

294.    On several occasions, John Doe 7 asked Dr. Strauss, "Are you done now?  Can I get dressed now?" to end the exam.

295.    John Doe 7 felt very uncomfortable with Dr. Strauss's conduct and told Coach Daly that he did not want to be treated by Dr. Strauss anymore.

296.    Coach Daly told John Doe 7 that he had to see Dr. Strauss, or else he could not play tennis at OSU.

297.    Coach Daly also told John Doe 7 that he had to see Dr. Strauss, or else he could lose his athletic scholarship.

298.    John Doe 7 was afraid to complain further because he relied on his scholarship to go to school and was therefore afraid to "make waves."

299.    John Doe 7 tried to put off his annual physicals with Dr. Strauss, but Coach Daly forced him to go.

300.    John Doe 7 grew so uncomfortable with Dr. Strauss's conduct that he avoided seeking medical care when he was sick and instead tried to treat himself. For example, when John Doe 7 had the flu, he would buy over-the-counter medication from a drugstore and try to recover on his own, rather than risk another examination by Dr. Strauss.

301.    Coach Daly threatened tennis players, including John Doe 7, with having to see Dr. Strauss.

302.     Coach John Daily regularly joked about Dr. Strauss's misconduct in the presence of team members and training staff. Coach Daly would saying things like "work hard or you will be sent to Dr. Strauss."

303.     Some players called Dr. Strauss a "weirdo" and often discussed his inappropriate conduct in front of Coach Daly. Coach Daly just laughed.

304.     To John Doe 7's knowledge, Coach Daly did not follow up on John Doe 7's or any other players' concerns about Dr. Strauss, or take any corrective action against Dr. Strauss or ensure that others did.

305.     John Doe 7 was never informed or made aware of any formal grievance procedure to complain to OSU about Dr. Strauss.

306.     Until hearing about the OSU investigation in 2018, John Doe 7 did not realize how widespread Dr. Strauss's abuse of OSU students was, or about OSU's role in permitting it.

307.     John Doe 7 also did not recognize that the experiences he endured with Dr. Strauss were sexual abuse, until he heard about the OSU investigation in 2018.

308.     If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, John Doe 7 would not have been abused by Dr. Strauss.

309.     Because of Dr. Strauss's unchecked abuse, John Doe 7 now fears for the safety of his children going to college and playing sports.

## DAVID MULVIN

310.     David Mulvin was a member of Defendant OSU's wrestling team from 1975-1979. Mulvin was captain of OSU's wrestling team in 1978.

311.     Mulvin was treated by Dr. Strauss on one occasion, in or around 1978, in Larkins Hall.

41

312.     Mulvin sought treatment for a fungal infection caused by a genital burn from his protective wrestling gear.

313.     Dr. Strauss took Mulvin into a "closet," off the training room area in Larkins Hall, where they were secluded.

314.     Dr. Strauss inspected Mulvin's penis, including pulling and groping, for at least 20 minutes and for what felt like a century. Dr. Strauss appeared to be trying to perform masturbation on Mulvin, and Dr. Strauss appeared frustrated when his actions did not cause Mulvin to become erect. Dr. Strauss moaned during the examination.

315.     Mulvin became frustrated with the length and intrusiveness of Dr. Strauss's exam. He asked Dr. Strauss if he could just give him his prescription, like every other doctor had given him in the past without such an intrusive exam.

316.     Dr. Strauss did not allow Mulvin to leave. Instead, referring to Mulvin's penis, Dr. Strauss replied, "Doesn't this thing ever work?"

317.     Mulvin was shocked and horrified by Dr. Strauss's question. He asked, "What do you mean?"

318.     Dr. Strauss responded, "Does it ever get hard?"

319.     Mulvin felt disturbed and replied, "Yeah, for my girlfriend." He then dressed and left the room, stating, "I'm all through here."

320.     Mulvin then immediately went to OSU's student health center to seek a prescription cream for a fungal infection that had developed from the burn.

321.     The attending health center physician asked Mulvin why he was seeking treatment at the health center, rather than seeing Dr. Strauss.

322. Mulvin reported to the physician that Dr. Strauss had examined his genitals for 20 minutes and that he believed Dr. Strauss was trying to sexually excite him. Mulvin told the physician that he had this fungal infection before, and the exam typically lasted no longer than a minute and did not include an inspection of his penis, but Dr. Strauss had groped his penis the entire time.

323. The physician responded, "That seems really odd.  It's not normal."

324. The physician then told Mulvin that he would make a note of Mulvin's report and pass it along. The physician then examined Mulvin. The exam lasted no more than a minute. The physician did not touch or inspect his penis at any time during the examination. The physician wrote Mulvin a prescription, which was what Mulvin had expected a physician to do.

325. Mulvin does not know if the physician noted Mulvin's complaint, reported it, or took any other action.

326. Mulvin reported Dr. Strauss's conduct to the health center physician because he believed that the physician was Dr. Strauss's boss and that he would take action on his complaint.

327. Mulvin did not report the abuse to his coach because he feared that he would be blamed for the abuse, rather than Dr. Strauss.

328. Mulvin was never informed or made aware of any formal grievance procedure to complain to OSU about Dr. Strauss.

329. Mulvin and his teammates sometimes talked about Dr. Strauss's inappropriate behavior. Mulvin recalls telling other teammates to be careful around Dr. Strauss and other teammates relaying their uncomfortable experiences with Dr. Strauss. Mulvin never discussed this in front of his coaches because he felt like they would view him as less of a man.

330.    Because of the unchecked abuse perpetrated by Dr. Strauss, Mulvin has avoided seeing a male physician ever since.

331.    Mulvin has also spent decades blaming himself for Dr. Strauss's misconduct, believing that it was his fault.

332.    Until hearing media reports about OSU's investigation in 2018, Mulvin did not recognize that Dr. Strauss's inappropriate behavior was sexual abuse, nor did he realize that Dr. Strauss had sexually abused other students.

### CLAIM FOR RELIEF

### COUNT I
**Violation of Title IX**
**20 U.S.C. § 1681(a),** *et seq.*

333.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

334.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

335.    Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part 106. 34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

336.    As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

337.    Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

338.    Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties.

339.    Defendant OSU receives, and at all relevant times received, federal financial assistance and is therefore subject to Title IX.

340.    Title IX requires OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

341.    Dr. Strauss was an OSU employee whose actions were carried out as an assistant medical professor, athletic team doctor, and physician at OSU.

342.    Dr. Strauss's sexual assault, abuse, molestation, and harassment of Plaintiffs (and other OSU students)—which included, among other things, fondling their testicles, fondling their penises, digitally penetrating their rectums, rubbing his erect penis on their bodies, and making inappropriate sexualized comments—was sex discrimination under Title IX.

343.    OSU was therefore required to promptly investigate and address Plaintiffs' (and other OSU students') allegations, reports and/or complaints of unwelcome, inappropriate touching and comments by Dr. Strauss.

344.    OSU had actual knowledge of the serial sexual assault, abuse, and molestation committed by Dr. Strauss.

345.    Specifically, OSU was notified about Dr. Strauss's sexual assault, abuse, and molestation through OSU employees with authority to take corrective action to address it. These

45

OSU employees include, but are not limited to: former Director of Student Health Services, Ted Grace, M.D.; former Athletic Director and Assistant University Vice President Andy Geiger; former Athletic Director Hugh Hindman; former Associate Sports Information Director Steve Snapp; former Assistant Athletic Director Richard Delaney; former Co-Head Athletic Trainer Billy Hill; former Head Wrestling Coach Russ Hellickson; former Head Tennis Coach John Daly; and former Head Track and Field Coach Frank Zubovich.

346.    Former head wrestling coach Russell Hellickson publicly stated in 2018 that, during his tenure at OSU, it was widely known that Dr. Strauss was engaging in improper sexual conduct with students. Coach Hellickson also publicly stated in 2018 that he reported Dr. Strauss's sexual misconduct to higher authorities at OSU, but they did nothing.

347.    After Plaintiff Snyder-Hill notified former Director of Student Health Services, Dr. Ted Grace, about Dr. Strauss's sexual abuse, Dr. Grace assured Snyder-Hill that OSU would document and retain any future complaints about Dr. Strauss. But OSU's personnel file on Dr. Strauss does not even mention Snyder-Hill's complaint.

348.    Throughout Dr. Strauss's 20-year tenure at OSU, students, student-athletes, and coaches conveyed complaints and concerns to OSU administrators and employees about Dr. Strauss's inappropriate sexual conduct.

349.    Given the magnitude of Dr. Strauss's abuse—involving students and student-athletes he evaluated and treated over two decades—it would be implausible for OSU to claim that it did not know about Dr. Strauss's sexual abuse.

350.    Nonetheless, OSU did nothing to address the complaints and concerns about Dr. Strauss.

351.    OSU's failure to respond promptly and adequately to allegations of Dr. Strauss's abuse constitutes sex discrimination, in violation of Title IX.

352.    By its acts and omissions, OSU acted with deliberate indifference to the sexual abuse and harassment that Plaintiffs and other OSU students were experiencing. OSU's deliberate indifference included, without limitation:

      a.    Failing to respond to allegations of Dr. Strauss's sexual assault, abuse, and molestation;

      b.    Failing to promptly and adequately investigate allegations of Dr. Strauss's sexual assault, abuse, and molestation;

      c.    Failing to adequately investigate Plaintiff Snyder-Hill's complaint about Dr. Strauss's conduct;

      d.    Requiring male athletes to see Dr. Strauss for annual physicals and medical treatment, despite widespread knowledge and complaints about Dr. Strauss's abuse;

      e.    Threatening to withdraw scholarship funds if male athletes refused to get physicals and/or medical treatment from Dr. Strauss;

      f.    Threatening male athletes' participation in OSU sports if they refused to get physicals and/or medical treatment from Dr. Strauss;

      g.    Allowing Dr. Strauss (and other sexual predators) to roam freely in Larkins Hall;

      h.    Allowing Dr. Strauss to work as a physician in Student Health Services, despite widespread knowledge and complaints about Dr. Strauss's abuse of male student-athletes;

      i.     Failing to adequately supervise Dr. Strauss, after learning that he posed a substantial risk to the safety of male students and student-athletes; and

      j.     Failing to take corrective action to prevent Dr. Strauss from sexually assaulting, abusing, and molesting other students.

353.   OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Dr. Strauss's sexual misconduct caused Plaintiffs (and other OSU students) to experience further sexual harassment and/or made them liable or vulnerable to it.

354.   OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Dr. Strauss's sexual misconduct created a sexually hostile environment that effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care.

355.   As a direct and proximate result of OSU's violation of Plaintiffs' rights under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from performing daily activities and obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and have incurred and continue to incur expenses for medical and psychological care.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Enter judgment in favor of Plaintiffs on their claim for discrimination under Title IX;

(b) Enter judgment against Defendant The Ohio State University;

(c) Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

(d)  Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

(e)  Award Plaintiffs pre-judgment and post-judgment interest;

(f)  Award Plaintiffs their court costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988(b); and

(g)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,


/s/ Scott E. Smith
SCOTT E. SMITH (0003749)
Scott Elliott Smith, LPA
5003 Horizons Drive, Suite 100
Columbus, Ohio 43220
Phone:   614.846.1700
Fax:       614.486.4987
E-Mail:  ses@sestraillaw.com


/s/ Jack Landskroner
JACK LANDSKRONER (0040906)
HANNAH KLANG (0090470)
Landskroner Grieco Merriman, LLC
1360 W. 9th Street, Suite 200
Cleveland, Ohio 44113
Phone:  216.522.9000
Fax:      216.522.9007
E-Mail: jack@lgmlegal.com
E-Mail: hannah@lgmlegal.com

   */s/ Adele P. Kimmel*
Adele P. Kimmel
(*pro hac vice application pending*)
PUBLIC JUSTICE, P.C.
1620 L Street, NW, Suite 630
Washington, DC 20036
Phone: (202) 797-8600
Fax: (202) 232-7203
E-mail: akimmel@publicjustice.net

Attorneys for Plaintiffs