**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEVE SNYDER-HILL, et al., | ) | Case No. 2:18-cv-00736 |
| | ) | |
| Plaintiffs, | ) | Judge Michael H. Watson |
| | ) | |
| v. | ) | Magistrate Judge Deavers |
| | ) | |
| THE OHIO STATE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT THE OHIO STATE UNIVERSITY'S**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendant The Ohio State University hereby moves this Court to dismiss all claims asserted against it in plaintiffs' Complaint. The grounds for this Motion are set forth more fully in the accompanying Memorandum in Support.

MICHAEL DeWINE
ATTORNEY GENERAL OF OHIO

By:    /s/ Michael H. Carpenter
       Michael H. Carpenter (0015733) (Trial Attorney)
       Timothy R. Bricker (0061872)
       David J. Barthel (0079307)
       Stephen E. Dutton (0096064)
       CARPENTER LIPPS AND LELAND LLP
       280 Plaza, Suite 1300
       280 North High Street
       Columbus, OH 43215
       E-mail: carpenter@carpenterlipps.com
                bricker@carpenterlipps.com
                barthel@carpenterlipps.com
                dutton@carpenterlipps.com

Special Counsel for Defendant The Ohio State University

<u>**MEMORANDUM IN SUPPORT**</u>

**I.**     <u>**INTRODUCTION.**</u>

Plaintiffs are former students who attended The Ohio State University ("Ohio State"), a public land grant institution, between 1975 and 2000, and are suing Ohio State for the conduct of Dr. Richard Strauss.

By way of background, in March 2018, a former wrestler reported allegations related to Dr. Richard Strauss to Ohio State. From the start, Ohio State took these allegations seriously. In rapid response, by April 5, 2018, Ohio State announced it was retaining an outside law firm to oversee an independent investigation into the allegations. To date, the investigators have conducted confidential interviews of more than 335 former students and university staff believed to have information concerning the allegations related to Dr. Strauss. The independent investigators additionally are investigating factually what university leaders in place at the time of the alleged events may have known. In this regard, they have interviewed over 95 individuals who worked at the university during the relevant time period, including athletic department, medical center, and student health center staff, as well as faculty. Former administrators, human resources professionals, and legal counsel also have been interviewed. The investigators remain in regular communication with the Franklin County Prosecutor's Office. In furtherance of their determination to understand what occurred, and who knew about it at the time, Ohio State and its current leaders continue to encourage persons possessing information related to Dr. Strauss to contact the investigators. That independent investigation continues and Ohio State remains committed to appropriately addressing its factual findings, whatever they may be.

Separate from the independent investigation, however, plaintiffs have filed the instant legal proceeding. In their Complaint in this lawsuit, plaintiffs assert they were injured due to the alleged conduct of Dr. Strauss between 1978 and 1995, at least 23 years ago, and that they have

2

legal rights and remedies pursuant to Title IX, Chapter 20 U.S.C. Section 1681 *et seq.* ("Title IX"). The instant Motion is ***not*** directed towards plaintiffs' claims of injury. Rather, in this Motion, while respectful of plaintiffs and their claimed injuries, Ohio State maintains that plaintiffs' proffered legal cause of action is legally deficient on its face and should be dismissed.

First, and without exception, every civil legal claim is subject to a statute of limitations, *i.e.*, a defined time period within which a civil claim must be brought or else be barred. The Supreme Court of the United States has observed that a statute of limitations is "designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974) (quoting *Order of Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 348-349 (1944)).

The statute of limitations for a Title IX claim, such as asserted by plaintiffs in Count I, is two years. The acts alleged in plaintiffs' Complaint occurred decades ago. Plaintiffs attended Ohio State between 1975 to 2000. They claim the abuse at issue occurred between 1978 and 1995. Dr. Strauss worked at Ohio State between 1978 and 1998, and died in 2005. Plaintiffs did not file their Complaint until July 26, 2018. Their Title IX claims are barred by the applicable two-year statute of limitations and should be dismissed with prejudice.

In filing this Motion to Dismiss, Ohio State is not ignoring or being dismissive of plaintiffs' factual allegations. But statutes of limitations are critical attributes of our system of laws. Here, the applicable statute of limitations establishes that plaintiffs' claims are legally barred. They should be dismissed.

## II.   PLAINTIFFS' ALLEGATIONS.

Plaintiffs are former students of Ohio State who allege they attended Ohio State from 1975 to 2000 and that they were sexually assaulted, abused, molested and/or harassed by former Ohio State physician Dr. Richard Strauss while at Ohio State.  *See* Complaint (Doc. # 1) at ¶¶ 1, 23-32.  Plaintiffs allege the abuse at issue occurred between 1978 and 1995. *Id.* at ¶¶ 23-32.

Plaintiffs bring claims against Ohio State pursuant to Title IX (Count I). *See* Complaint (Doc. # 1) at ¶¶ 333-355.  Dr. Strauss worked at Ohio State from 1978 to 1998, and died in 2005. *Id.* at ¶¶ 36, 88.  Thus, plaintiffs' claims are based on acts alleged to have been committed twenty-three (23) years ago, by someone who ceased being employed at Ohio State twenty (20) years ago, and who died thirteen (13) years ago.  *See id.* at ¶¶ 23-32, 36, 88.

## III.   PLAINTIFFS' TITLE IX CLAIMS ARE BARRED BY THE APPLICABLE TWO-YEAR STATUTE OF LIMITATIONS.

A complaint is subject to dismissal under Rule 12(b)(6) if, on its face, the allegations, taken as true, show the plaintiff is not entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "If the allegations . . . show that relief is barred by the applicable statute of limitation[s], the complaint is subject to dismissal for failure to state a claim . . . ." *Jones v. Bock*, 549 U.S. 199, 215 (2007).  Dismissal under Fed. R. 12(b)(6) is proper "if it is apparent from the face of the complaint that the statute of limitation[s] has run." *Reed v. Ohio State Univ. Med. Ctr.*, No. 2:12-CV-241, 2012 WL 5378379, at *4 (S.D. Ohio Oct. 31, 2012) (citing *Pierce v. County of Oakland*, 652 F.2d 671 (6th Cir.1981)); *see also Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992).

Here, plaintiffs attempt to state claims pursuant to Title IX (Count I).  *See* Compl. at ¶¶ 333-355.  The Sixth Circuit has recognized that Title IX does not provide a statute of limitations for Title IX claims.  *See Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 728-729 (6th Cir. 1996)

4

("Neither Title VI nor Title IX provide a limitation period expressly pertaining to judicial proceedings, a failure occasioned, no doubt, by the fact that, for both statutes, private causes of action were implied by the courts"). Accordingly, courts apply "state personal injury limitation periods to Title IX and Title VI claims . . . ." *Id*. at 729. In Ohio, the statute of limitations for personal injury is two (2) years. *See* OHIO REV. CODE § 2305.10(A). Thus, the statute of limitations for a Title IX claim against an instrumentality of the State of Ohio, such as Ohio State, is two years. *See Lillard*, 76 F.3d at 729; *Giffin v. Case W. Reserve Univ.*, No. 98-3267, 1999 WL 238669 at *1-2 (6th Cir. April 13, 1999).

Even though Title IX borrows Ohio's personal injury statute of limitations, federal law determines when a Title IX claim accrues. *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 762 (5th Cir. 2015); *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006); *Anderson v. Bd. of Educ. of Fayette Cty.*, 616 F.Supp.2d 662, 668 (E.D. Ky. 2009). A Title IX claim "accrues on the date when the plaintiff knew, or through reasonable diligence should have known, of an injury giving rise to [his] cause of action." *Bowling v. Holt Pub. Sch.*, No. 1:16-CV-1322, 2017 WL 4512587, at *1 (W.D. Mich. May 26, 2017) (citing *Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001)); *Anderson*, 616 F. Supp. 2d at 668 ("The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action"), citing *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir.2005)). "This is an objective inquiry, which looks to what event should have alerted the typical lay person to protect his or her rights." *Helm v. Eells*, 642 F. App'x 558, 561 (6th Cir. 2016) (citation and quotation marks omitted).

The Southern District of Ohio and numerous other courts, including district courts within the Sixth Circuit, have held that a Title IX injury accrues when the alleged sexual abuse, assault, or harassment occurred. *See, e.g., Adams v. Ohio Univ.*, 300 F. Supp. 3d 983, 991 (S.D. Ohio

2018) (Title IX claims accrued at the time of the sexual harassment, in suit alleging it was "widely known for over a decade among faculty and students" that professor sought "sexual relationships with students and young faculty," and incoming students were warned professor was a "sexual predator"); *Bowling*, 2017 WL 4512587, at *2 (Title IX claims accrued on the date of the last sexual assault); *Anderson*, 616 F.Supp.2d at 668 (Title IX claims "accrued at the time of the alleged abusive acts" by school employees); *King-White*, 803 F.3d at 762 (Title IX claim accrued when plaintiff was abused by teacher, not when plaintiff learned nearly two years later during the teacher's criminal case that school officials allegedly had ratified and acted with deliberate indifference to the abuse); *Twersky v. Yeshiva Univ*., 993 F. Supp. 2d 429, 440-441 (S.D.N.Y.), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (Title IX claims accrued at time of sexual abuse, not when former president and chancellor admitted in news article published decades after the abuse that he and other administrators had been aware of the risk of the abuse when it was occurring); *Varnell v. Dora Consol. Sch. Dist*., No. 12-CV-905 JCH/GBW, 2013 WL 12146483, at *6-*7 & n.4 (D.N.M. May 13, 2013), *report and recommendation adopted*, No. 12-CV-905 JCH/GBW, 2013 WL 12149185 (D.N.M. June 24, 2013), *aff'd*, 756 F.3d 1208 (10th Cir. 2014) (Title IX claim accrued no later than the last date the plaintiff was sexually abused by her coach, not when the plaintiff "recently" learned of the superintendent's alleged concealment of the abuse, where plaintiff "was repulsed by the sexual conduct *when it was occurring*" and the school district could not now be liable because its "failure to prevent the abuse could only occur while the abuse was ongoing"); *Johnson v. Gary E. Miller Canadian Cty. Children's Juvenile Justice Ctr*., No. CIV-09-533-L, 2010 WL 152138, at *3 (W.D. Okla. Jan. 14, 2010) (plaintiff "impliedly concede[d]" that Title IX claim "had to have accrued" when the plaintiff was a student at the school because the alleged sexual abuse by the school employee only "occurred while she was a student at the school"); *Padula v. Morris*, No. 205-CV-00411-MCE-EFB, 2008

6

WL 1970331, at *4 (E.D. Cal. May 2, 2008) (Title IX claim "accrued on the last date Plaintiffs[]

suffered an incident of sexual harassment"); *Monger v. Purdue Univ.*, 953 F. Supp. 260, 264

(S.D. Ind. 1997) (Title IX claim "accrued when [the student] knew or had reason to know of her

injury—October 29, 1997[,]" the date her professor allegedly "sexually harassed her by touching

her against her will on various parts of her body and indicating that he wanted to be with her

privately"); *Clifford v. Regents of Univ. of California*, No. 2:11-CV-02935-JAM, 2012 WL

1565702, at *6 (E.D. Cal. Apr. 30, 2012), *aff'd*, 584 F. App'x 431 (9th Cir. 2014) (Title IX claim

accrued when alleged sexual assault from hazing occurred).

Here, it is apparent from the face of plaintiffs' Complaint that the two-year limitation

period applicable to plaintiffs' Title IX claims expired long ago. Plaintiffs allege Dr. Strauss

"sexually assaulted," "abused," "molested," "harassed," "groped," "fondled," "digitally

pentrat[ed]," "rubb[ed] his erect penis on," "made inappropriate sexualized comments" to, and/or

"inappropriately touch[ed]" them between 1978 and 1995.  *See* Compl. at ¶¶ 23-32, 57, 113, 115,

117, 141, 181, 193, 194, 215, 242, 273, 288, 314, 322, 342.   Additionally, as detailed by

plaintiffs themselves in great specificity in their Complaint, each plaintiff was aware of the

alleged abusive acts at the time they occurred:

**Allegations Common To All Plaintiffs' Awareness**

- "No matter the illness or injury, Dr. Strauss's modus operandi during medical appointments was always the same. He required students to remove their pants so that he could perform invasive and medically unnecessary examinations of their genitals and rectum. He groped and fondled students' genitalia, often without gloves. He performed unnecessary rectal examinations and digitally penetrated students' anuses. He pressed his erect penis against students' bodies. He moaned while performing testicular exams. He made inappropriate and medically unnecessary comments about students' bodies, including comments on their physical appearance, heritage, skin tone, and physique. And he took pictures of students . . . ." Compl. ¶¶ 40-46.

- "Dr. Strauss's victims felt that his exams were medically inappropriate and [were] deeply uncomfortable[.]" *Id.* ¶ 52.

7

**Allegations Demonstrating Student-Athletes' Awareness**

- "Dr. Strauss's inappropriate touching was a frequent topic of discussion and well known among OSU's student-athletes, trainers, coaches, and athletic directors. This was reflected in their various nicknames for Dr. Strauss, including 'Dr. Balls,' 'Dr. Nuts,' 'Dr. Jelly Paws,' 'Dr. Soft Hands,' and 'Dr. Cough.'" *Id*. ¶ 5.

- "Students also informed OSU coaching staff, including track and field coach Frank Zubovich and tennis coach John Daly, that Dr. Strauss's examinations made them uncomfortable." *Id*. ¶ 60.

- "Dr. Strauss's inappropriate touching during medical exams was such common knowledge that OSU coaching staff, trainers, and student-athletes knew him as 'Dr. Jelly Paws,' 'Dr. Nuts,' 'Dr. Soft Hands,' and 'Dr. Cough'—names that reflect his sexual predation." *Id*. ¶ 63.

- "OSU coaching staff, including tennis coach John Daly, regularly joked about Dr. Strauss's sexual abuse of male athletes. Daly threatened student-athletes that they would have to see Dr. Strauss, if they did not do what the coach asked. He also laughed about it being a student's 'turn to see Dr. Strauss.'" *Id*. ¶ 64.

- "On information and belief, Dr. Strauss's abuse was well-known and discussed openly among OSU administrators, staff, and student-athletes." *Id*. ¶ 65.

- "Dr. Strauss did not limit his abuse to the privacy of the exam room. He reigned over the locker rooms of Larkins Hall, the former OSU recreation center, where—in full view of OSU coaching staff and other employees—he harassed male student-athletes. He read the newspaper naked in the male locker room, so that he could stare at student-athletes' bodies. He showered with student-athletes for hours at a time and several times a day. On one occasion, he finished showering and was preparing to leave the locker room when one of his "favored" wrestlers began to shower. Dr. Strauss undressed and joined the wrestler in the shower. Yet again, male student-athletes complained to OSU about Dr. Strauss's misconduct." *Id*. ¶ 72.

- "During the 1994-1995 academic year, student-athletes complained to then-Athletic Director Andy Geiger about the sexual deviant behavior in Larkins Halls, including that of Dr. Strauss. *Id*. ¶ 84.

**Plaintiff Steve Snyder-Hill's Awareness**

- "Plaintiff Steve Snyder-Hill . . . was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during an examination in 1995." *Id*. at ¶ 23.

- "Dr. Strauss made inappropriate comments to Snyder-Hill and asked inappropriate questions about Snyder-Hill's sexual and personal desires. These

comments and questions including asking Snyder-Hill if he was gay, whether he had trouble sleeping with just one person, and whether he desired to do something else; and telling Snyder-Hill that he worked with AIDS patients and was the doctor for the athletic department. When Dr. Strauss told Snyder-Hill that he needed to check Snyder-Hill's testicles, Snyder-Hill said this was not necessary because his regular doctor had recently done this. Dr. Strauss insisted that both testicular and rectal examinations were necessary, and he performed both on Snyder-Hill, before checking the lump in Snyder-Hill's chest. The rectal exam involved Dr. Strauss digitally penetrating Snyder-Hill's rectum with his finger." *Id*. at ¶¶ 111-113.

- "Snyder-Hill thought Dr. Strauss's examination was unorthodox and was very uncomfortable throughout the examination. Snyder-Hill felt intimidated and became afraid to voice a concern." *Id*. at ¶ 114.

- "This escalated when Dr. Strauss asked Snyder-Hill to lay down on the table, then leaned over to check the lump in Snyder-Hill's chest. Dr. Strauss pushed his pelvic area up against Snyder-Hill's side and held it there. Snyder-Hill could feel Dr. Strauss's erect penis pressed against him. Dr. Strauss kept himself pressed against Snyder-Hill for a prolonged time while examining his chest." *Id*. at ¶ 115.

- "Snyder-Hill was shocked by this and could not look Dr. Strauss in the eyes during the exam and afterwards. Snyder-Hill felt very intimidated by Dr. Strauss." *Id*. at ¶ 116.

- "The examination by Dr. Strauss weighed heavily on Snyder-Hill afterwards. He felt very uncomfortable and upset, and thought the examination was inappropriate. He also felt guilty that he had let Dr. Strauss touch him. He thought Dr. Strauss's topics of conversation were flirty and that, if Snyder-Hill had given Dr. Strauss a signal to proceed, Dr. Strauss would have acted on it." *Id*. at ¶ 117.

- "The next day, on January 6, 1995, Snyder-Hill called Student Health to lodge a complaint about Dr. Strauss. He spoke with a nurse, who took notes on his verbal complaint. The complaint is memorialized in a 'Patient Comment' form dated January 6, 1995." *Id*. at ¶ 118.

- "The nurse who took the complaint told Snyder-Hill that someone would get back to him. Snyder-Hill said he wanted to speak with the top person at Student Health." *Id*. at ¶ 119.

- "During a telephone conversation with Dr. Grace on January 24, 1995, Snyder-Hill demanded that changes be made so that other students would not experience what he had experienced with Dr. Strauss…. Snyder-Hill demanded that students have the ability to opt out of testicular and rectal examinations and to request that someone else be present in the room during examinations (to avoid a situation where it would be the doctor's word against the student's)." *Id*. at ¶ 121.

9

**Plaintiff John Doe 1's Awareness**

- "Plaintiff John Doe 1[,] . . . a member of OSU's track and field team[,] . . . was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1980 through 1984." *Id*. ¶ 24.

- "Prior to his first physical with Dr. Strauss in his freshman year, John Doe 1 heard rumors about Dr. Strauss's inappropriate examinations. Upperclassmen warned John Doe 1 that Dr. Strauss was 'creepy' and they called him 'Dr. Nuts' because he fondled athletes during exams. One senior on the track and field team told their coach, Frank Zubovich, that he would not see Dr. Strauss again, but the coach did nothing." *Id*. ¶ 136.

- "John Doe 1 saw Dr. Strauss at least two or three times per year for his OSU-mandated annual physicals and for treatment of his injuries. During each and every exam, Dr. Strauss told John Doe 1 to drop his pants. Then Dr. Strauss touched John Doe 1's genitals, under the guise of performing a hernia check. Dr. Strauss frequently commented on John Doe 1's athletic prowess and his defined collarbone." *Id*. ¶¶ 137-139.

- "Even with witnesses present, Dr. Strauss inappropriately touched John Doe 1, but he was more aggressive when witnesses were not present." *Id*. ¶ 141.

- "After the first two visits with Dr. Strauss, John Doe 1 told Coach Zubovich that he did not want to see Dr. Strauss again. And he continued to tell his coach the same after each visit." *Id*. ¶ 143.

- "Without support from the people entrusted to protect him, John Doe 1 resorted to trying to avoid Dr. Strauss on his own. He avoided seeking medical care so that he would not have to see him. He made sure never to complain about a groin injury. He also tried to seek treatment at different clinics on campus." *Id*. ¶¶ 145-148.

- John Doe 1's teammates also had to see Dr. Strauss several times a year. No matter what the injury was, Dr. Strauss performed testicular exams on them at every opportunity. For instance, a wrist injury resulted in a testicular exam. It was also known among the athletes that Dr. Strauss would try to cover any appointment an athlete made to address a sexually transmitted disease. Dr. Strauss commented on the students' hair, eyes, eyebrows, facial structure, and skin tone. Dr. Strauss also rubbed their skin. He also instructed them to make certain movements in a jockstrap so that he could ogle their bodies. For instance, he would pretend to perform a scoliosis exam so that he could stare at their bodies." *Id*. ¶¶ 149-154.

- "On multiple occasions, John Doe 1 complained to his teammates about Dr. Strauss's inappropriate exams, in front of OSU coaches. John Doe 1's teammates teased each other about having to see Dr. Strauss and made jokes about trying to

avoid him, in front of their coaches." *Id.* ¶¶ 155-156.

- "The students were left to fend for themselves. They devised ways to reduce their exposure to Dr. Strauss's abuse. For instance, instead of turning their heads to cough during a testicular exam, they coughed directly on Dr. Strauss, hoping to force him to back away. They also developed a practice called 'avoidance, escape, or dodge,' to try to avoid Dr. Strauss." *Id.* ¶¶ 162-165.

**<u>Plaintiff John Doe 2's Awareness</u>**

- "Plaintiff John Doe 2[,] . . . a member of OSU's basketball team[,] . . . was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1984 through 1989." *Id.* ¶ 25.

- "John Doe 2 saw Dr. Strauss for one of his required annual physicals and for treatment of illnesses. John Doe 2's recollection is that he was examined by Dr. Strauss at OSU a total of four times, once for a physical and three times for treatment at OSU's walk-in clinic. In the winter of 1985, when John Doe 2 was 18 years old, he saw Dr. Strauss for a physical. John Doe 2 also saw Dr. Strauss three times during walk-in clinic hours, twice for cold-related symptoms sometime between 1987 and 1988." *Id.* ¶¶ 175-177.

- "No matter the reason for John Doe 2's visit, Dr. Strauss asked him to drop his pants and found a reason to touch his genitals. When John Doe 2 saw Dr. Strauss for his physical, Dr. Strauss's hands lingered on his genitals for what seemed like an inappropriate amount of time. Dr. Strauss also rubbed John Doe 2's arms during the exam." *Id.* ¶¶ 179-180.

- "During a visit to the walk-in clinic in 1988, Dr. Strauss told John Doe 2 to 'roll over' during the exam and take off his pants. John Doe 2 complied, and Dr. Strauss began to perform a rectal exam. John Doe asked 'What's this for?' and Dr. Strauss said, 'Just want to check down here.' After Dr. Strauss began to digitally penetrated his rectum, John Doe 2 told him to stop, got up from the examining table, and left. John Doe 2 never returned to see Dr. Strauss again. John Doe 2 felt extremely embarrassed[.]" *Id.* ¶¶ 181-182.

- "Other players called Dr. Strauss 'Dr. Nuts' and 'Dr. Cough' because of his invasive and inappropriate exams." *Id.* ¶ 185.

**<u>Plaintiff John Doe 3's Awareness</u>**

- "Plaintiff John Doe 3[,] . . . a member of OSU's tennis team[,] . . . was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1984 through 1989[.]" *Id.* ¶ 26.

- "Upon arriving as a freshman, John Doe 3 quickly learned that Dr. Strauss was notorious for his inappropriate sexual touching during medical exams.

11

Upperclassmen on the tennis team called Dr. Strauss 'Dr. Nuts' and 'Dr. Balls' because of his intrusive examinations and his insistence on performing testicular exams on the players, no matter the injury or illness at issue." *Id.* ¶ 191.

- "John Doe 3 was subjected to his first 'exam' by Dr. Strauss when he was only 17 years old. He was shocked by the examination. No prior medical examination had ever made him feel so uncomfortable." *Id.* ¶ 192.

- "No matter the reason for the visit, Dr. Strauss always required John Doe 3 to remove his pants and underwear. Dr. Strauss then performed a purported 'testicular exam,' in which he groped John Doe 3's testicles and penis for an extended period of time and stared at his genitals. Dr. Strauss had a distinct, creepy smile on his face during each examination of John Doe 3. These 'testicular exams' sometimes lasted for 15-20 minutes." *Id.* ¶¶ 194-195.

- "Dr. Strauss's exams made John Doe 3 extremely uncomfortable, confused, and embarrassed." *Id.* ¶ 197.

- "[H]e regularly discussed Dr. Strauss's 'creepy' behavior and uncomfortable exams with other tennis players, in front of coaches and staff." *Id.* ¶ 199.

## Plaintiff Ronald McDaniel's Awareness

- "Plaintiff Ronald McDaniel[,] . . . a member of OSU's tennis team[,] . . . was sexually assaulted, abused, molested and/or harassed by Dr. Strauss twice during examinations from 1982 through 1983." *Id.* ¶ 27.

- "McDaniel was treated by Dr. Strauss in the doctor's Larkins Hall office at OSU on at least two occasions. The first occasion was during McDaniel's freshman year at OSU, in or about the winter of 1982, when McDaniel's coach, John Daly, told him to go to Larkins Hall to see one of the team doctors for cold-related symptoms. This is where he encountered Dr. Strauss for the first time. During the winter 1982 examination, when McDaniel complained of swollen adenoids and a cold, Dr. Strauss told McDaniel that he needed conduct a full medical examination and instructed McDaniel to remove his pants." *Id.* ¶¶ 207-209.

- "McDaniel complied with Dr. Strauss's request. During the examination, . . . Dr. Strauss rubbed and massaged McDaniel's testicles and penis in what seemed like a sexual manner. Dr. Strauss also asked personal questions about McDaniel's nationality and stared up and down at his body." *Id.* ¶¶ 210-211.

- "McDaniel felt very uncomfortable about how Dr. Strauss had conducted his examination, and he expressed his discomfort afterwards with more senior athletes and one of the head team trainers, named Jim. The athletes and trainer laughed and told McDaniel that their nickname for Dr. Strauss was 'Dr. Nuts' because, no matter what injury or illness an athlete had, Dr. Strauss would always examine their testicles. Some athletes also told McDaniel that, during

12

examinations, Dr. Strauss would try to rub them like a girlfriend does and sometimes stuck a finger up their rectums." *Id.* ¶¶ 212-214.

- "McDaniel soon learned that Dr. Strauss's inappropriate touching during medical examinations was well known and openly discussed among athletes, trainers, coaches, and the athletic director. In McDaniel's experience, Dr. Strauss's inappropriate genital examinations were a running joke among trainers, coaches, and administrators, including, but not limited to: athletic director Hugh Hindman; associate information director Steve Snapp; and co-head athletic trainer Billy Hill. He often heard the trainers, coaches, and administrators joke and laugh about the athletes' complaints about Dr. Strauss's medical examinations." *Id.* ¶¶ 215-216.

- "In or about the fall of 1983, McDaniel sustained an ankle injury while running, and Coach Daly told him to go to Larkins Hall again to see a team doctor for medical treatment. McDaniel did not want to go to Larkins Hall and risk seeing Dr. Strauss again, given his first experience . . . *Id.* ¶¶ 217-218.

- McDaniel complied with his coach's instruction and went to Larkins Hall. He assumed that if he had to see Dr. Strauss again, the doctor would have no reason to conduct a testicular exam for an ankle injury. During the fall 1983 examination, Dr. Strauss again instructed McDaniel to remove his shorts so that Dr. Strauss could perform a full medical examination. McDaniel asked why he needed to 'drop his shorts' for an ankle injury. Dr. Strauss grabbed the waistband of McDaniel's shorts to try to pull them down. Dr. Strauss advised McDaniel that he had to check him for a hernia. McDaniel refused to take his shorts off. McDaniel then left Dr. Strauss's office. He decided he would never get examined by Dr. Strauss again because he felt violated.'" *Id.* ¶¶ 219-224.

## Plaintiff John Doe 4's Awareness

- "Plaintiff John Doe 4[,] . . . a member of OSU's tennis team[,] . . . was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1982 through 1986." *Id.* ¶ 28.

- "Before his first physical with Dr. Strauss, John Doe 4 heard rumors from other student-athletes about Dr. Strauss's inappropriate examinations, including that Dr. Strauss was a creep and fondled the athletes' testicles." *Id.* ¶ 237.

- "During these physicals, Dr. Strauss made inappropriate comments, including 'drop your trousers' and 'let's see what we're working with.' John Doe 4 felt that Dr. Strauss spent an unnecessarily long time 'examining' his genitals. Dr. Strauss also made sexual moaning sounds while examining John Doe 4's genitals. John Doe 4's physicals with Dr. Strauss were unlike any physical John Doe 4 had undergone previously or since then." *Id.* ¶¶ 240-241.

- "Each year, John Doe 4 tried to avoid getting his annual physical so that Dr. Strauss would not fondle him. John Doe 4 felt very uncomfortable with Dr.

Strauss's conduct after his first physical. In his sophomore year, John Doe 4 told Coach Daly that he did not want to attend any additional physicals with Dr. Strauss." *Id*. ¶¶ 242-243.

- "Coach Daly often joked and laughed about sending tennis players, including John Doe 4, to see Dr. Strauss as punishment. Coach Daly also threatened tennis players that, if they did not do what he told them, he would send them to Dr. Strauss and 'you're gonna get groped.'" Id. ¶¶ 246-247.

- "Other tennis players often joked that Dr. Strauss would be particularly excited for John Doe 4's physical because John Doe 4 was known to be 'well-endowed.' . . . Other tennis players hated being treated by Dr. Strauss. They often teased each other about having to see Dr. Strauss, in front of Coach Daly and team trainers." *Id*. ¶¶ 248-249.

**Plaintiff John Doe 5's Awareness**

- "Plaintiff John Doe 5[,] . . . a member of OSU's tennis team[,] . . . was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1986 through 1990." *Id*. ¶ 29.

- "John Doe 5 saw Dr. Strauss for his annual physicals. He also saw Dr. Strauss approximately four times per year for medical treatment, including one occasion on which he had mononucleosis. No matter the reason for John Doe 5's appointment, including when John Doe 5 had mononucleosis, Dr. Strauss always performed a genital exam on him. Dr. Strauss' hands lingered on John Doe 5's penis and testicles for what felt like an inappropriate amount of time. During the exams, Dr. Strauss also looked at John Doe 5's penis and testicles from every angle. Dr. Strauss's conduct made John Doe 5 very uncomfortable. Dr. Strauss's conduct made John Doe 5 so uncomfortable that, in his senior year, he purposely did not shower prior to his physical with Dr. Strauss, so that he would smell bad and Dr. Strauss's exam might be shorter." *Id*. ¶¶ 258-261.

- "John Doe 5 also saw Dr. Strauss for the removal of a wart on his penis. After the removal, Dr. Strauss required three follow-up visits that John Doe 5 felt were medically unnecessary. John Doe 5 did not want to continue receiving his physicals and medical treatment from Dr. Strauss . . . ." *Id*. ¶¶ 262-263.

- "John Doe 5's teammates joked about Dr. Strauss's inappropriate conduct during exams, which they had also experienced." *Id*. ¶ 265.

**Plaintiff John Doe 6's Awareness**

- "Plaintiff John Doe 6[,] . . . a member of OSU's soccer team[,] . . . was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1984 through 1986" *Id*. ¶ 30.

- "John Doe 6 saw Dr. Strauss three to four times per year, for three years, for annual physicals and medical treatment. No matter the reason for John Doe 6's visit, Dr. Strauss always told him to drop his pants and then spent an inordinate amount of time on his genitalia, fondling John Doe 6's penis and testicles. Dr. Strauss spent more time looking at John Doe 6's genitals at each visit than did the doctors who treated him for a triple hernia in 2015." *Id*. ¶¶ 272-274.

- "Dr. Strauss's exams made John Doe 6 very uncomfortable at the time . . . ." *Id*. ¶ 278.

### Plaintiff John Doe 7's Awareness

- "Plaintiff John Doe 7[,] . . . a member of OSU's tennis team[,] . . . was sexually assaulted, abused, molested and/or harassed by Dr. Strauss numerous times during annual and other examinations from 1982 through 1986." *Id*. ¶ 31.

- "John Doe 7 was a member of Defendant OSU's tennis team from 1982 through 1986 . . . ." *Id*. ¶ 282.

- "During each of John Doe 7's medical appointments, Dr. Strauss groped John Doe 7's penis and testicles. Regardless of the reason for the visit, Dr. Strauss would tell John Doe 7 to drop his trousers and turn around. Dr. Strauss would then examine John Doe 7's genitals, without wearing medical gloves. Dr. Strauss's conduct made John Doe 7 extremely uncomfortable." *Id*. ¶¶ 288-290.

- "Eventually, in his junior year, John Doe 7 asked Dr. Strauss why he was examining John Doe 7 in such an inappropriate way. Dr. Strauss laughed at him and continued the 'exam.'" *Id*. ¶ 292.

- "John Doe 7 felt very uncomfortable with Dr. Strauss's conduct and told Coach Daly that he did not want to be treated by Dr. Strauss anymore." *Id*. ¶ 295.

- "John Doe 7 grew so uncomfortable with Dr. Strauss's conduct that he avoided seeking medical care when he was sick and instead tried to treat himself. For example, when John Doe 7 had the flu, he would buy over-the-counter medication from a drugstore and try to recover on his own, rather than risk another examination by Dr. Strauss." *Id*. ¶ 300.

- "Coach Daly threatened tennis players, including John Doe 7, with having to see Dr. Strauss. Coach John Daily regularly joked about Dr. Strauss's misconduct in the presence of team members and training staff. Coach Daly would say[] things like 'work hard or you will be sent to Dr. Strauss.'" *Id*. ¶¶ 301-302.

- Some players called Dr. Strauss a 'weirdo' and often discussed his inappropriate conduct . . . ." *Id*. 303.

**Plaintiff David Mulvin's Awareness**

- "Plaintiff David Mulvin[,] . . . a member of OSU's wrestling team[,] . . . was sexually assaulted, abused, molested and/or harassed by Dr. Strauss during an examination in 1978." *Id.* ¶ 32.

- "Mulvin was treated by Dr. Strauss on one occasion, in or around 1978, in Larkins Hall. Mulvin sought treatment for a fungal infection caused by a genital burn from his protective wrestling gear. Dr. Strauss took Mulvin into a 'closet,' off the training room area in Larkins Hall, where they were secluded. Dr. Strauss inspected Mulvin's penis, including pulling and groping, for at least 20 minutes and for what felt like a century. Dr. Strauss appeared to be trying to perform masturbation on Mulvin, and Dr. Strauss appeared frustrated when his actions did not cause Mulvin to become erect. Dr. Strauss moaned during the examination. Mulvin became frustrated with the length and intrusiveness of Dr. Strauss's exam. He asked Dr. Strauss if he could just give him his prescription, like every other doctor had given him in the past without such an intrusive exam. Dr. Strauss did not allow Mulvin to leave. Instead, referring to Mulvin's penis, Dr. Strauss replied, 'Doesn't this thing ever work?' Mulvin was shocked and horrified by Dr. Strauss's question. He asked, 'What do you mean?' Dr. Strauss responded, 'Does it ever get hard?' Mulvin felt disturbed and replied, 'Yeah, for my girlfriend.' He then dressed and left the room, stating, 'I'm all through here.'" *Id.* ¶¶ 311-319.

- "Mulvin then immediately went to OSU's student health center to seek a prescription cream for a fungal infection that had developed from the burn. The attending health center physician asked Mulvin why he was seeking treatment at the health center, rather than seeing Dr. Strauss. Mulvin reported to the physician that Dr. Strauss had examined his genitals for 20 minutes and that he believed Dr. Strauss was trying to sexually excite him. Mulvin told the physician that he had this fungal infection before, and the exam typically lasted no longer than a minute and did not include an inspection of his penis, but Dr. Strauss had groped his penis the entire time. The physician responded, 'That seems really odd. It's not normal.' . . . The physician then examined Mulvin. The exam lasted no more than a minute. The physician did not touch or inspect his penis at any time during the examination. The physician wrote Mulvin a prescription, which was what Mulvin had expected a physician to do." *Id.* ¶¶ 320-324.

- "Mulvin and his teammates sometimes talked about Dr. Strauss's inappropriate behavior. Mulvin recalls telling other teammates to be careful around Dr. Strauss and other teammates relaying their uncomfortable experiences with Dr. Strauss. Mulvin never discussed this in front of his coaches because he felt like they would view him as less of a man." *Id.* ¶ 329.

Plaintiffs also plead the following determinative facts: Dr. Strauss stopped working at Ohio State in 1998 and Dr. Strauss died in 2005. *Id.* at ¶¶ 36, 88.

16

Taken as true, the above facts demonstrate that the two-year statute of limitations for plaintiffs to bring their Title IX claims expired in 1997 at the latest. *See* Complaint (Doc. # 1) at ¶¶ 23-32 (alleging most recent act of abuse occurred in 1995).  Plaintiffs did not file their Complaint until July 26, 2018.  *See generally id.*  Thus, plaintiffs' Title IX claims were filed over two decades after the applicable two-year statute of limitations had expired.  As a matter of law, their claims are time-barred and should be dismissed with prejudice.  *See Giffin*, 1999 WL 238669 at *1-2 (affirming dismissal of Title IX claim that "was filed after the two-year statutory period had run"); *American Pipe & Const. Co.*, 414 U.S. at 554.

## IV.   CONCLUSION.

Plaintiffs' claims are based on acts alleged to have been committed at least twenty-three (23) years ago, by a person who stopped working at Ohio State twenty (20) years ago, and who died thirteen (13) years ago.  As such, plaintiffs' Title IX claims are barred by the applicable two-year statute of limitations.  For this reason, plaintiffs' Complaint should be dismissed with prejudice in its entirety.

Respectfully submitted,

MICHAEL DeWINE
ATTORNEY GENERAL OF OHIO

By:     /s/ Michael H. Carpenter
        Michael H. Carpenter (0015733) (Trial Attorney)
        Timothy R. Bricker (0061872)
        David J. Barthel (0079307)
        Stephen E. Dutton (0096064)
        CARPENTER LIPPS AND LELAND LLP
        280 Plaza, Suite 1300
        280 North High Street
        Columbus, OH 43215
        E-mail: carpenter@carpenterlipps.com
                bricker@carpenterlipps.com
                barthel@carpenterlipps.com
                dutton@carpenterlipps.com

        Special Counsel for Defendant The Ohio State
        University

18

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically on September 7, 2018. Notice was sent by operation of the Court's electronic filing system to all other counsel who have entered an appearance and any parties who have entered an appearance through counsel. The parties may access this filing through the Court's ECF system.

/s/ Michael H. Carpenter
Trial Attorney for
Defendant The Ohio State University