THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BRIAN GARRETT, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>THE OHIO STATE UNIVERSITY,<br><br>  Defendant. | Case No. 2:18-cv-00692<br><br>Judge Michael H. Watson<br><br>Chief Magistrate Judge Elizabeth P. Deavers |
| STEVE SNYDER-HILL, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>THE OHIO STATE UNIVERSITY,<br><br>  Defendant. | Case No. 2:18-cv-00736<br><br>Judge Michael H. Watson<br><br>Chief Magistrate Judge Elizabeth P. Deavers |

**MOTION FOR CLARIFICATION OF THE COURT'S MAY 24, 2019
ORDER PERMITTING DISCOVERY**

Pursuant to Federal Rule of Civil Procedure 26(c), the *Snyder-Hill* Plaintiffs and the *Garrett* Plaintiffs respectfully move this Court to enter an Order clarifying its May 24, 2019 Order (the "Order") to state that, during the during the pendency of the mediation, Plaintiffs may seek discovery from OSU employees or former employees who refused to cooperate with Perkins Coie's investigation. We conferred with Defendant, who does not have a position on the motion at this time.

**MEMORANDUM IN SUPPORT**

The Perkins Coie report (the "Report") made clear that a number of OSU's former employees with highly relevant information refused to cooperate with the investigation ("Non-Cooperative Witnesses"). Perkins Coie did not have the power to subpoena these witnesses. But they can be subpoenaed in this litigation. Plaintiffs move this Court to clarify that Plaintiffs may subpoena and depose certain Non-Cooperative Witnesses during the pendency of the mediation.

At this early stage in the litigation, the Report has effectively served as the definitive account of OSU's responsibility for Dr. Strauss's abuse. But the Report is necessarily incomplete, because certain critical witnesses refused to cooperate with the investigation. Plaintiffs seek to depose certain Non-Cooperative Witnesses—Plaintiffs have currently identified six such witnesses—for two reasons. *First*, the mediation is grounded on the incomplete Report. Plaintiffs expect these witnesses will further establish OSU's knowledge and deliberate indifference, and further weaken OSU's asserted statute of limitations defense—all of which inform the mediation. *Second,* the Report made clear that many potential witnesses have already died or become unable to give testimony. Plaintiffs are concerned that if they cannot promptly depose elderly Non-Cooperative Witnesses, their testimony may become unavailable.

The Court's May 24, 2019 Order **denied** Defendant's motion for a stay of discovery. The Court further stated that it "encourages the parties to focus their efforts on mediation, and any discovery pursued should be narrowly tailored for the purposes of mediation." Dkt. 70. Plaintiffs believe the testimony of these Non-Cooperative Witnesses will aid the mediation effort. It will also further public transparency about OSU's role in Strauss's abuse, a goal OSU has professed to share. Finally, it would gravely prejudice Plaintiffs if those Non-Cooperative

2

Witnesses are not promptly deposed and become unable to provide their testimony due to the passage of time.

OSU should support this motion, consistent with its repeated public statements, and motion to this Court, that it wants a full investigation and wants the public to know the full story. *See* Dkt. 52 (seeking Order permitting the public release of those portions of the Report based on information from files obtained from the State Medical Board of Ohio).  Perkins Coie repeatedly sought to interview these Non-Cooperative Witnesses.  That firm did not have the power to compel non-parties to cooperate.  But this Court has that power, and OSU should join us in asking this Court to exercise that power to promptly uncover the whole truth.

## FACTS AND PROCEDURAL HISTORY

### A. The Court Denies Defendant's Motion for a Stay

The *Garrett* action was filed on July 16, 2018, and the *Snyder-Hill* action was filed on July 26, 2018.  Defendant moved to dismiss both actions as untimely.  Dkt. 34.  Plaintiffs opposed the motions, explaining that Plaintiffs' Title IX claims were timely filed under both the federal discovery rule and Ohio's equitable tolling doctrine.  Dkt. 40.

On October 12, 2018, Defendants sought a stay of discovery pending the resolution of the motion to dismiss.  Dkt. 25.  Plaintiffs opposed that motion because OSU had not shown good cause to stay discovery, the motion to dismiss is not "virtually certain" to succeed, and the limited discovery proposed by the Plaintiffs at that point—before the issuance of the Perkins Coie Report—was not unduly burdensome.  Plaintiffs further argued that societal interests strongly favor proceeding with at least some discovery as the case raises matters of state-wide and national concern.  Dkt. 26.

The Court ordered the parties to mediation before Senior United States District Judge

Michael R. Barrett on March 15, 2019.  A mediation session was held on June 15, 2019.

On May 24, 2019, the Court denied OSU's motions to stay discovery.  The Order stated: "Nevertheless, the Court encourages the parties to focus their efforts on mediation, and any discovery pursued should be narrowly tailored for the purposes of mediation. The Court will hold a preliminary pretrial conference to establish case deadlines after the parties have exhausted their efforts at mediation."  Dkt. 70.

> **B.** **The Perkins Coie Report Details Non-Cooperative Witnesses With Crucial Testimony**

At the time the parties briefed Defendants' motion for a stay, the Perkins Coie report had not come out; that Report was issued on May 15, 2019.

The Report identified people who "might have information relevant to determining the 'University's knowledge' of Strauss sexual abuse of student-patients." Ex. A (Report) at 16.  Of those identified—which did not include survivors—at least 109 did not cooperate: 70 "never responded" to Perkins Coie and 39 "declined to participate in an interview." *Id.* at 17.  Some number of unidentified Non-Cooperative Witnesses refused to cooperate because Perkins Coie would not agree to their "pre-conditions."  For example, some unidentified Non-Cooperative Witnesses demanded indemnification by OSU.  Others demanded production of relevant documents before agreeing to participate in an interview, or that OSU pay their attorneys' fees. *Id.* at 10-11 & n. 4.

The Report also detailed who *could* not cooperate.  Perkins Coie sought to interview 60 witnesses they learned were deceased, their testimony lost forever. *Id.* at 17.  Other witnesses "were at a notably advanced age (late 80s or 90s) or had experienced significant health complications (e.g., stroke, dementia, Alzheimer's) such that their ability to meaningfully participate in an interview was severely limited or—practically speaking—impossible." *Id.*

4

One Non-Cooperative Witness is Dr. Ted Grace, OSU's Student Health Director beginning in 1992, and Dr. Strauss's boss. Dr. Grace spoke to Perkins Coie for 36 minutes and then refused a full interview. *Id.* at 141. The Report discusses Dr. Grace's knowledge of Dr. Strauss's abuse. *Id.* at 123-144. Yet the Report has more questions about Dr. Grace than answers:

> Given Grace's statements to the Investigative Team about the rumors he had heard about Strauss prior to arriving at OSU, it is unclear why Grace did not escalate the January 1995 complaints from Students A and B beyond Student Health for further investigation at that time, or why there was no indication whatsoever of any potential performance concerns in Strauss 1995 Performance Evaluation. Further, Grace began serving as Student Health Director at OSU in 1992; according to Grace, Strauss began "volunteering" at the Student Health Men's Clinic in or around late 1993/early 1994, and was officially appointed in July 1994. It is unclear why Grace agreed to allow Strauss to staff the Student Health Men's Clinic if he knew that Strauss was rumored to have engaged in "inappropriate sexual touching of athletes." Finally, it is unclear why Grace believed that a "self-enforcing" chaperoning requirement was an appropriate solution for Strauss, given that virtually every examination in the Men's Clinic was likely to require a genital examination, due to the nature of the services offered there.

*Id.* at 143-44. As the Report concludes, because "Grace declined to participate in a full interview with the [Perkins Coie] Investigative Team, we were unable to ask him these questions." *Id.* at 144. Plaintiffs seek the opportunity to ask him these questions.

Another such witness is Dr. John Lombardo, OSU's Medical Director/Head Team Physician. Dr. Lombardo sent a letter in November 1994 describing concerns about Dr. Strauss's abuse raised by the head fencing coach, Charlotte Remenyik. Dr. Lombardo determined that the "pervasive" rumors about Dr. Strauss were "unfounded"; yet those concerns resulted in Dr. Trent Sickles' assuming the primary role as physician for the fencers. *Id.* at 93-94. Dr. Lombardo and Dr. Sickles both refused to cooperate. As the Report explains: "Due to Lombardo and Sickles' unwillingness to participate in interviews with the Independent

5

Investigation, and given the fact that both Strauss and Remenyik are deceased, we were unable to answer a number of important questions regarding Lombardo's 'investigation.'" *Id.* at 94.

Other highly-relevant Non-Cooperative Witnesses include:

- Dr. Forrest Smith, OSU's Student Health Director, 1990-1992.  According to a nurse Perkins Coie interviewed, Smith received reports that Dr. Strauss would "show up to the Student Health Center with male students and request access to an examination room" without adhering to "normal scheduling protocols and recordkeeping." *Id*. at 121-22.  Smith dismissed those concerns. *Id.* at 122.  When Perkins Coie requested an interview, "Smith's counsel informed us that Smith was 'not interested in speaking' with the Investigative Team. We explained we had reason to believe that Smith received reports concerning Strauss, but Smith's counsel informed us that Smith would not be 'voluntarily' cooperating with the Independent Investigation." *Id.* at 122.

- Dr. William Malarkey was an OSU Department of Medicine physician and co-author, with Dr. Strauss, of several published research studies on weight loss in athletes.  A student-athlete who participated in a research study with Dr. Strauss told Perkins Coie that Dr. Strauss would conduct a hernia exam on an "almost daily" basis as part of his participation in the study. *Id.* at 68.  As the Report explains: "We were unable to obtain additional clarification or information about these studies because Strauss' only living co-author-Malarkey— declined to participate in an interview with the Investigative Team." *Id.* at 69-70.

- Roger Miller was an OSU Student Health physician who witnessed a student complaining about Strauss and calling him a "pervert."  Mr. Miller was involved in OSU's response to that complaint. *Id.* at 132-139.  "Roger Miller did not respond to numerous requests from the Investigative Team to participate in an interview." *Id.* at 126 n. 329.

The Perkins Coie report does not reveal the identity of most of the Non-Cooperative witnesses.  Undoubtedly there will be more Non-Cooperative Witnesses (i) with information highly relevant to the mediation, and (ii) at risk of death or infirmity.[1]

---

[1] Plaintiffs subpoenaed Perkins Coie for documents concerning the Non-Cooperative Witnesses.  Perkins Coie refused to provide this information.  Plaintiffs' entitlement to this information will be the subject of separate motion practice.

**ARGUMENT**

There is a strong presumption under the Federal Rules that discovery will proceed during the pendency of a motion to dismiss. Unless it is a "virtual certainty" that OSU will prevail on its motion to dismiss—which it most certainly is not—a stay of discovery is unwarranted. *See Boddie v. PNC Bank, NA*, No. 2:12-cv-158, 2012 WL 4088683, at *2 (S.D. Ohio Sept. 17, 2012) (citation omitted); *Osman v. Mission Essential Pers., LLC*, No. 2:11-cv-577, 2012 WL 1831706, at *2 (S.D. Ohio May 18, 2012).

The Court's denial of Defendant's stay motion conformed with these principles. Plaintiffs do not seek full discovery at this point, recognizing the Court's statement that the parties should focus on mediation. Deposing a few of the Non-Cooperative Witnesses will support the resolution of this action, preserve testimony from witnesses who might otherwise become unavailable, and impose little burden. As detailed below, Plaintiffs have currently identified just six OSU Non-Cooperative witnesses whose testimony is necessary at this stage.

I. **The Perkins Coie Report Is Missing the Testimony of Essential Witnesses; Such Testimony Will Aid the Resolution of this Case**

The Perkins Coie Report identified numerous OSU witnesses with information Perkins Coie considered highly probative to OSU's knowledge and how they responded. Perkins Coie implored the Non-Cooperative Witnesses to cooperate. They refused. As a result, the Report admits to having many unanswered questions.

The missing pieces are crucial to the ongoing mediation. The mediation, for example, is informed by OSU's pending statute of limitations motion, OSU's primary (and really, only) defense in this case. But as detailed in Plaintiffs' motion to dismiss, Plaintiffs' Title IX claims did not accrue until they (i) knew or should have known they were abused and (ii) knew or should have known of OSU's role in causing that abuse. *See Sowers v. Bradford Area Sch. Dist.*,

7

694 F. Supp. 125, 132 (W.D. Pa. 1988), *aff'd,* 869 F.2d 591 (3d Cir. 1989), *vacated on other grounds,* 490 U.S. 1002 (1989). The Non-Cooperative Witnesses, including two different Student Health Directors, will likely testify that they ignored and hid complaints about Dr. Strauss. Such testimony would establish that even if the Plaintiffs did have reason to investigate OSU's conduct at the time, their efforts would have been futile.[2] Such testimony would also support Plaintiffs' argument that the statute of limitations should be equitably tolled because OSU "engaged in a course of conduct to conceal evidence" of the abuse and the university's role in facilitating it. *See Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 475 (6th Cir. 2013).

If Plaintiffs are to resolve this case at this early stage, they need transparency, closure, and the best possible understanding of the key facts. Many of these facts will be answerable with the aid of a subpoena. Plaintiffs recognize that an early resolution can have value and mediations can be successful even before discovery is complete. But the mediation cannot exist in a vacuum. Deposing the Non-Cooperative Witnesses is essential to a fuller understanding of OSU's culpability.

In addition, as OSU previously agreed, the public has a strong interest in learning how and to what extent this major public university facilitated an employee's serial sexual abuse of university students for two decades.

---

[2] *See, e.g., United States v. Kubrick*, 444 U.S. 111, 122 (1979) (claim does not accrue because "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain."); *T.R. v. Boy Scouts of Am.*, 181 P.3d 758, 763-64 (Or. 2008) ("[W]hen a duty to investigate exists, the statute of limitations only begins to run if the investigation would have disclosed the necessary facts," and the party asserting limitations defense "must prove that an investigation would have disclosed those facts."); *see also Piotrowski v. City of Houston*, 51 F.3d 512, 517 (5th Cir. 1995) (statute of limitations tolled "[w]hen a defendant controls the facts surrounding causation such that a reasonable person could not obtain the information even with a diligent investigation").

## II. Courts Routinely Refuse to Delay Depositions Where There is a Risk the Deponent Will Become Unavailable

Plaintiffs further seek to depose the Non-Cooperative witnesses to ensure that no further witnesses will join those who have already passed away (60 people, by the Report's count) or lose their ability to give meaningful testimony. The events at issue began in the late 1970s. Those who were middle-aged then are now elderly. Many of the Non-Cooperative Witnesses identified above are likely senior citizens; public records searches indicate that Dr. Malarkey, for example, is now 80 years old.

Courts repeatedly permit depositions of those who are elderly or facing health complications. *See In re Scrap Metal Antitrust Litig.*, No. 1:02-CV-0844, 2002 WL 31988168, at *5 (N.D. Ohio Nov. 7, 2002) (denying discovery stay due to concerns about "witnesses becoming unavailable" because "several of the potential witnesses are elderly"); *Emsat Advanced Geo-Location Tech., LLC v. Cellco P'ship*, No. 4:08-CV-816, 2009 WL 10690283, at *2 (N.D. Ohio May 22, 2009) ("a stay may prejudice Plaintiffs' ability to offer testimony from certain witnesses given the age and health of those witnesses").

OSU hid this serial abuse for decades. Any further delay risks prejudicing the Plaintiffs' case even further.

## III. The Depositions Plaintiffs Seek are Not Unduly Burdensome

From the Report, Plaintiffs have currently identified just **six** OSU Non-Cooperative Witnesses whose testimony is material and necessary at this stage in the case: Grace, Lombardo, Sickles, Smith, Malarkey, and Miller. Six depositions are not unduly burdensome in the context of one of the largest sex abuse scandals in U.S. history. OSU spent $6 million to hire Perkins Coie to investigate this matter. Perkins Coie conducted 600 interviews of 520 people. Ex. A at 18. Questioning six more witnesses—or 1% of Perkins Coie's work—is not unduly burdensome.

## CONCLUSION

Deposing OSU employees or former employees who refused to fully cooperate with Perkins Coie's investigation will support the mediation and preserve testimony. Plaintiffs respectfully ask the Court to clarify its May 24, 2019 Order to permit such discovery.

DATED:  July 26, 2019

EMERY CELLI BRINCKERHOFF
 & ABADY LLP

By: /s/ Ilann M. Maazel
Ilann M. Maazel (admitted *pro hac vice*)
Debra L. Greenberger (admitted *pro hac vice*)
600 Fifth Avenue
New York, New York 10020
Phone: (212) 763-5000
Fax: (212) 763-5001
E-Mail: imaazel@ecbalaw.com
E-Mail: dgreenberger@ecbalaw.com

SCOTT ELLIOTT SMITH, LPA
Scott E. Smith (0003749)
Brian R. Noethlich (0086933)
5003 Horizons Drive, Suite 100
Columbus, Ohio 43220
Phone: (614) 846-1700
Fax: (614) 486-4987
E-Mail:ses@sestraillaw.com
E-Mail: brn@sestriallaw.com

Adele P. Kimmel (admitted *pro hac vice*)
PUBLIC JUSTICE, P.C.
1620 L Street, NW, Suite 630
Washington, DC 20036
Phone: (202) 797-8600
Fax: (202) 232-7203
E-mail: akimmel@publicjustice.net

*2:18-cv-00736*

/s/ Simina Vourlis
by /s/ Ilann Maazel
per email authorization (5/9/19)

10

        Simina Vourlis (0046689) (Trial Attorney)
        The Law Office of Simina Vourlis
        856 Pullman Way
        Columbus, OH 43212
        (614) 487-5900
        (614) 487-5901 fax
        svourlis@vourlislaw.com

        Rex A. Sharp (admitted *pro hac vice*)
        Ryan C. Hudson (admitted *pro hac vice*)
        Scott B. Goodger (admitted *pro hac vice*)
        Larkin Walsh (admitted *pro hac vice*)
        Sarah T. Bradshaw (admitted *pro hac vice*)
        REX. A. SHARP, P.A.
        5301 W. 75th Street
        Prairie Village, KS 66208
        (913) 901-0505
        (913) 901-0419 fax
        rsharp@midwest-law.com
        rhudson@midwest-law.com
        sgoodger@midwest-law.com
        lwalsh@midwest-law.com
        sbradshaw@midwest-law.com

        *2:18-cv-00692*

## CERTIFICATE OF SERVICE

A copy of this document was served by the Court's ECF System on all counsel of record on July 26, 2019, pursuant to Fed. R. Civ. P. 5(b)(2)(E).

        /s/ *Ilann M. Maazel*
          Ilann M. Maazel