# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  September 14, 2022

Mr. David John Barthel
Mr. Timothy Raymond Bricker
Mr. Michael Hiram Carpenter
Carpenter, Lipps & Leland
280 N. High Street, Suite 1300
Columbus, OH 43215

Ms. Marissa Benavides
Ms. Debra L. Greenberger
Mr. Ilann Margalit Maazel
Emery Celli Brinckerhoff Abady Ward & Maazel
600 Fifth Avenue
Tenth Floor
New York, NY 10020

Ms. Alexandra Zoe Brodsky
Ms. Adele P. Kimmel
Public Justice
1620 L. Street, N.W., Suite 630
Washington, DC 20036

Mr. Roger A. Cooper
Ms. Sarah Braude Gutman
Ms. Charity E. Lee
Mr. Mitchell A. Lowenthal
Cleary, Gottlieb, Steen & Hamilton
One Liberty Plaza
New York, NY 10006

Mr. James Patrick Davy
P.O. Box 15216
Pennsylvania, PA 19125

Mr. Michael L. Dillard Jr.
Arnold Clifford
115 W. Main Street, Fourth Floor
Columbus, OH 43215

Mr. David A. Lebowitz
Kaufman Lieb Lebowitz & Frick
18 E. 48th Street
Suite 802
New York, NY 10017

Mr. Seth Massey
Ms. Alexandra Rose
Ms. Arianna M. Scavetti
Weil, Gotshal & Manges
2001 M Street, N.W., Suite 600
Washington, DC 20005

Mr. Scott E. Smith
Scott Elliot Smith
5003 Horizons Drive
Suite 101
Columbus, OH 43220

Mr. Tad Thomas
Thomas Law Offices
9418 Norton Commons Boulevard, Suite 200
Louisville, KY 40059

Ms. Caroline Hickey Zalka
Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153

           Re:  Case Nos. 21-3981/21-3991, *Steve Snyder-Hill, et al v. The Ohio State Univ.*
                  Originating Case No. : 2:18-cv-00736

Dear Counsel,

    The court today announced its decision in the above-styled case.

    Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                    Yours very truly,

                    Deborah S. Hunt, Clerk

                    Cathryn Lovely
                    Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0214p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT
_____

STEVE SNYDER-HILL; RONALD MCDANIEL; DAVID
MULVIN; WILLIAM BROWN; KURT HUNTSINGER;
WILLIAM RIEFFER; STEVE HATCH; KELLY REED;
MELVIN ROBINSON; DOUGLAS WELLS; JAMES KHALIL;
JERROLD L. SOLOMON; JOSEPH BECHTEL; MICHAEL
MURPHY; JOHN DAVID FALER; MATT MCCOY; GARY
AVIS; ROBERT SCHRINER; MICHAEL MONTGOMERY;
JOHN DOES 1–22, 25, 27, 29–37, 39–47, 49, 52, 54, 56–
60, 62–64, and 66–77 (21-3981); TIMOTHY MOXLEY;
RYAN CALLAHAN; JOHN JACKSON, JR.; JAMES
CARROLL; JEFFREY ROHDE; PATRICK MURRAY;
EVERETT ROSS; JOHN DOES 78–95 and 97–105 (21-
3991),

> Nos. 21-3981/3991

  *Plaintiffs-Appellants*,

  *v.*

THE OHIO STATE UNIVERSITY,

  *Defendant-Appellee.*

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
Nos. 2:18-cv-00736 (21-3981); 2:21-cv-03838 (21-3991)—Michael H. Watson, District Judge.

Argued:  July 26, 2022

Decided and Filed:  September 14, 2022

Before:  GUY, MOORE, and CLAY, Circuit Judges.
_____

### COUNSEL

**ARGUED:**  Ilann M. Maazel, EMERY CELLI BRINCKERHOFF ABADY WARD &
MAAZEL, New York, New York, for Appellants.  Michael H. Carpenter, CARPENTER, LIPPS
& LELAND, LLP, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Ilann M. Maazel, Debra L.

Greenberger, Marissa R. Benavides, EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL, New York, New York, Adele P. Kimmel, Alexandra Z. Brodsky, PUBLIC JUSTICE, Washington, D.C., Scott Elliot Smith, SCOTT ELLIOT SMITH, LPA, Columbus, Ohio, for Appellants.  Michael H. Carpenter, Timothy R. Bricker, David J. Barthel, CARPENTER, LIPPS & LELAND, LLP, Columbus, Ohio, for Appellee.  David A. Lebowitz, KAUFMAN LIEB LEBOWITZ & FRICK LLP, New York, New York, Caroline Hickey Zalka, Alexandra Rose, Seth Massey, WEIL, GOTSHAL & MANGES LLP, New York, New York, Arianna Scavetti, WEIL, GOTSHAL & MANGES LLP, Washington, D.C., Roger A. Cooper, Mitchell A. Lowenthal, Charity E. Lee, Sarah B. Gutman, CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, Jim Davy, ALL RISE TRIAL & APPELLATE, Philadelphia, Pennsylvania, Tad Thomas, THOMAS LAW OFFICES, Cincinnati, Ohio, for Amici Curiae.

MOORE, J., delivered the opinion of the court in which CLAY, J., joined.  GUY, J. (pp. 31–48), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

KAREN NELSON MOORE, Circuit Judge.  In his role as university physician and athletic team doctor at the Ohio State University, Dr. Richard Strauss allegedly abused hundreds of young men under the guise of performing medical examinations.  The abuse occurred between 1978 and 1998, but it did not become public until 2018.  After the allegations became public, survivors of this abuse—including the plaintiffs in these cases—brought Title IX suits against Ohio State, alleging that Ohio State was deliberately indifferent to their heightened risk of abuse. The district court found that the plaintiffs' claims were barred by the statute of limitations.

The district court erred.  The plaintiffs adequately allege that they did not know and could not reasonably have known that Ohio State injured them until 2018.  Thus, at the motion-to-dismiss stage, we cannot say that their claims accrued before then.  We **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

# I. BACKGROUND

## A. Factual Allegations[1]

### 1. Strauss's Conduct

Richard Strauss served on the Ohio State faculty starting in 1978.[2]  He soon became a team physician.  In that capacity, he "had regular contact with male student-athletes" in at least seventeen different sports.[3]  He also served as a physician at Ohio State's Student Health Center.[4]  Strauss served in these roles until 1996, when Ohio State placed him on administrative leave, investigated his conduct, and ultimately declined to renew his appointments with Student Health Services and terminated his employment agreement with the Athletics Department.[5]  It did not publicly provide reasons for these decisions.  Ohio State conducted a hearing but did not notify students or give them an opportunity to participate.[6]

Strauss remained a tenured faculty member.  When he retired in 1998, Ohio State gave him emeritus status.[7]  He opened a private men's clinic near Ohio State to treat "common genital/urinary problems," advertised the clinic in Ohio State's student newspaper, and continued

---

[1]At the motion-to-dismiss stage, we "accept all plausible well-pled factual allegations as true."  *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013).  We therefore describe the factual allegations as they are laid out in the complaints.

[2]*Snyder-Hill* R. 123 (Second Am. Compl. ("SAC") ¶¶ 126–27) (Page ID #2012); *Moxley* R. 16 (Am. Compl. ¶¶ 67–68) (Page ID #217–18).

[3]*Snyder-Hill* R. 123 (SAC ¶ 131) (Page ID #2012–13); *Moxley* R. 16 (Am. Compl. ¶ 72) (Page ID #218).

[4]*Snyder-Hill* R. 123 (SAC ¶ 132) (Page ID #2013); *Moxley* R. 16 (Am. Compl. ¶ 73) (Page ID #218–19).

[5]*Snyder-Hill* R. 123 (SAC ¶¶ 133–34) (Page ID #2013); *Moxley* R. 16 (Am. Compl. ¶¶ 74–75) (Page ID #219).

[6]*Snyder-Hill* R. 123 (SAC ¶¶ 133) (Page ID #2013); *Moxley* R. 16 (Am. Compl. ¶ 74) (Page ID #219).

[7]*Snyder-Hill* R. 123 (SAC ¶ 134, 252–56) (Page ID #2013, 2033–34); *Moxley* R. 16 (Am. Compl. ¶¶ 75, 194–98) (Page ID #219, 240–41).

to see and treat Ohio State students.[8]  The vice dean for the College of Medicine told Strauss that "there would be no problem" with this arrangement.[9]

In his roles at Ohio State, Strauss regularly abused male students during medical examinations, committing at least 1,429 sexual assaults, and 47 rapes.[10]  He "groped and fondled students' genitalia"[11]; "performed unnecessary rectal examinations and digitally penetrated students' anuses"[12]; "pressed his erect penis against students' bodies"[13]; "drugged[14] and anally raped students"[15]; "masturbated during or after the exams"[16]; and engaged in other sexually abusive behavior.  *Snyder-Hill* R. 123 (Second Am. Compl. ("SAC") ¶¶ 135–46) (Page ID #2013–14); *Moxley* R. 6 (Am. Compl. ¶¶ 81–87) (Page ID #220).  Each plaintiff alleges that Strauss abused him between 1979 and 2000; all but four were Ohio State students during this time.[17]

An independent investigation commissioned by Ohio State in 2018 and undertaken by the law firm Perkins Coie substantiates the plaintiffs' allegations of abuse.  *See* Caryn Trombino &

---

[8]*Snyder-Hill* R. 123 (SAC ¶¶ 262–63) (Page ID #2034–35); *Moxley* R. 16 (Am. Compl. ¶¶ 202–05) (Page ID #241–42).

[9]*Snyder-Hill* R. 123 (SAC ¶ 261) (Page ID #2034); *Moxley* R. 16 (Am. Compl. ¶ 203) (Page ID #241).

[10]*Snyder-Hill* R. 123 (SAC ¶¶ 1, 3) (Page ID #1988–89); *Moxley* R. 16 (Am. Compl. ¶¶ 1, 3) (Page ID #205).

[11]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 309, 345, 374, 405, 435, 468–71, 496–97, 528–30, 554, 651, 669, 706, 749–752, 767–72, 930–31, 982–84, 1026, 1081–84, 1147) (Page ID #2043, 2050, 2054, 2058, 2061, 2065, 2068, 2071, 2074, 2085, 2087, 2092, 2098, 2100–01, 2121, 2128, 2133, 2139, 2147); *Moxley* R. 16 (Am. Compl. ¶¶ 246, 248–50, 253, 268, 271, 298, 336–38, 439) (Page ID #249–251, 254, 258, 263, 279).

[12]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 308–09, 710, 733, 748–52, 770, 1516, 1681, 1890–91, 2061, 2117, 2501) (Page ID #2042–43, 2092, 2096–98, 2101, 2194, 2218, 2247–48, 2276, 2285, 2339); *Moxley* R. 16 (Am. Compl. ¶¶ 296–97, 359, 455, 583, 666) (Page ID #258, 266, 281, 300, 313).  At least two plaintiffs allege that Strauss performed this conduct while the plaintiff was unconscious.  *See Snyder-Hill* R. 123 (SAC ¶ 1122, 1947) (Page ID #2144, 2256–57).

[13]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 311, 1492, 2384, 2523) (Page ID #2043, 2191, 2322–23, 2342); *see also id.* ¶¶ 1076–78 (Page ID #2139) (Strauss rubbed his testicles against patient's thigh).

[14]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 937, 1751) (Page ID #2122, 2227).

[15]*See, e.g.*, *id.* ¶ 1947 (Page ID #2256–57).

[16]*See, e.g.*, *id.* ¶¶ 1492, 2395 (Page ID #2191, 2324).

[17]*Id.* ¶¶ 30–122 (Page ID #1996–2011); *Moxley* R. 16 (Am. Compl. ¶¶ 30–63) (Page ID #212–17).

Markus Funk, Perkins Coie LLP, *Report of the Independent Investigation: Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, (May 15, 2019) (hereinafter "Perkins Coie Report").  The Perkins Coie Report found that Strauss sexually abused at least 177 male student patients, the majority of whom were student athletes.[18]  Perkins Coie Report at 1, 43.

## 2. Ohio State's Conduct

The plaintiffs allege that Ohio State knew about, facilitated, and covered up Strauss's sexual abuse.[19]  Many students complained to Ohio State about Strauss's abuse,[20] and more than 50 members of the Athletics Department Staff knew about Strauss's inappropriate sexual conduct.[21]  Staff at the Student Health Center were also aware of and received many complaints about Strauss's examinations of male students.[22]  For example, during Strauss's first year working at Ohio State, a wrestler complained to staff at the Student Health Center "that Dr. Strauss had examined his genitals for 20 minutes and appeared to be trying to get him excited."[23]  In addition, Dr. Murphy, the head team physician had received at least five written reports about Strauss's misconduct.[24]

---

[18]This number is lower than the number of alleged instances of sexual abuse in the complaint.  The difference is explained by (1) allegations that Strauss abused some athletes more than once; and (2) certain limitations of the report, which noted:  "it is impossible for us to determine with any certainty the total number of students that Strauss sexually abused" but "that Strauss abused additional students whose accounts are not captured here."  Perkins Coie Report at 39.

[19]*Snyder-Hill* R. 123 (SAC ¶¶ 161–264, 278–79) (Page ID #2017–35, 2037–38); *Moxley* R. 16 (Am. Compl. ¶¶ 5–11) (Page ID #205–07).

[20]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 162–64, 168, 172, 198, 209, 217) (Page ID #2017–19, 2025, 2027); *Moxley* R. 16 (Am. Compl. ¶¶ 11, 13, 103–09) (Page ID #207–08, 224–25).

[21]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 167, 172) (Page ID #2018–19); *Moxley* R. 16 (Am. Compl. ¶¶ 6, 113) (Page ID #206, 225).

[22]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶ 174–176, 183–84, 186) (Page ID #2019–23); *Moxley* R. 16 (Am. Compl. ¶ 115) (Page ID #226).

[23]*Moxley* R. 16 (Am. Compl. ¶ 88) (Page ID #220).

[24]*Id.* ¶ 117 (Page ID #226–27).

The plaintiffs allege that, despite this knowledge, Ohio State took no action to prevent the abuse.[25]  At times, Ohio State falsely told student athletes, as well as some staff members, that it had not received prior complaints about Strauss or that all complaints were maintained in an appropriate file.[26]  At other times, Ohio State employees had limited conversations with Strauss about his behavior but failed to follow up, investigate, report, or meaningfully address the concerns.[27]  Despite the complaints of abuse, Strauss's supervisors rated Strauss's performance as "exceptional" and "excellent" in his evaluations and had a policy of never mentioning allegations of sexual misconduct on evaluations.[28]  All the while, Ohio State required students to be examined and treated by Strauss, often explicitly or implicitly making students feel that they risked their scholarships or athletic opportunities if they refused.[29]

The Perkins Coie Report substantiates the plaintiffs' claims that Ohio State knew of and facilitated this abuse.  The report found that although Ohio State received "persisten[t], serious[], and regular[]" complaints from students, it took "no meaningful action . . . to investigate or address the concerns until January 1996" when it quietly suspended Strauss.  Perkins Coie Report at 3; *see id.* at 87–162.

Even after Ohio State completed its perfunctory investigation in 1996, at which time it ultimately suspended and terminated Strauss, it "hid the *reason* why it was investigating Strauss and placing him on leave"; "actively concealed Dr. Strauss' abuse by not investigating or

---

[25]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 164–66, 173, 177, 184, 187, 210, 216–17, 222) (Page ID #2018–23, 2027–28); *Moxley* R. 16 (Am. Compl. ¶¶ 118, 163) (Page ID #227, 235).

[26]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 162, 221, 230, 319–25) (Page ID #2017–18, 2028, 2030, 2045–46); *Moxley* R. 16 (Am. Compl. ¶¶ 103, 162) (Page ID #224, 234).

[27]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 181–83, 188–91, 193) (Page ID #2021, 2023–25).

[28]*See, e.g.*, *id.* ¶¶ 226–29, 231 (Page ID #2029–30); *Moxley* R. 16 (Am. Compl. ¶¶ 167–70) (Page ID #236).

[29]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 199–201, 352–53, 429–30, 476) (Page ID #2025, 2051, 2061, 2065); *Moxley* R. 16 (Am. Compl. ¶¶ 141–42, 633, 720) (Page ID #232, 308, 323).

attempting to identify the students Dr. Strauss harmed"; "further concealed Dr. Strauss' abuse by destroying medical records";[30] and shredded files related to Strauss's sexual abuse.[31]

### 3. What the Plaintiffs Knew

Because the central issue at this stage is when the plaintiffs' claims accrued, the most relevant allegations relate to what the plaintiffs knew or had reason to know regarding Strauss's and Ohio State's conduct and when they knew or had reason to know it. These allegations vary among the different plaintiffs, but the plaintiffs all allege a significant gap between what they know now and what they knew before the allegations about Strauss's conduct became public.

First, most plaintiffs allege that they did not know they were abused until 2018.[32] At the time of the abuse, they were teenagers and young adults and did not know what was medically appropriate.[33] Strauss gave pretextual and false medical explanations for the abuse. For example, he stated the abuse was necessary to perform a hernia check;[34] check for muscle and bone anomalies;[35] check for STIs;[36] perform a prostate exam;[37] perform a rectal exam;[38] monitor

---

[30]*Snyder-Hill* R. 123 (SAC ¶¶ 244, 247–48) (Page ID #2032); *Moxley* R. 16 (Am. Compl. ¶¶ 186, 189–90) (Page ID #238–39). Ohio State's policy was to destroy medical records that were more than seven years old unless there was a reason to maintain them. *Snyder-Hill* R. 123 (SAC ¶ 248) (Page ID #2032). Although complaints of abuse should have given Ohio State a reason to keep the records, Ohio State nonetheless destroyed them. *Id.*

[31]*Snyder-Hill* R. 123 (SAC ¶ 2571) (Page ID #2350); *Moxley* R. 16 (Am. Compl. ¶ 918) (Page ID #355).

[32]*See Snyder-Hill* R. 123 (SAC ¶¶ 153–60) (Page ID #2016–17); *Moxley* R. 16 (Am. Compl. ¶¶ 94–101) (Page ID #222–23).

[33]*See Snyder-Hill* R. 123 (SAC ¶¶ 153–60) (Page ID #2016–17); *Moxley* R. 16 (Am. Compl. ¶¶ 97) (Page ID #222–23).

[34]*See, e.g., Snyder-Hill* R. 123 (SAC ¶¶ 554–55, 897, 993, 1368, 1463–64, 1522, 1569, 2215) (Page ID #2074–75, 2117, 2129, 2175, 2187, 2195, 2201, 2298); *Moxley* R. 16 (Am. Compl. ¶¶ 248–49, 337–38, 374, 488, 616, 666, 832) (Page ID #250–51, 263, 268–69, 285, 305, 313, 341).

[35]*See, e.g., Snyder-Hill* R. 123 (SAC ¶¶ 554–55) (Page ID #2074–75).

[36]*See, e.g., id.* ¶¶ 1300, 1552 (Page ID #2166, 2199); *Moxley* R. 16 (Am. Compl. ¶ 537) (Page ID #291–92).

[37]*See, e.g., Snyder-Hill* R. 123 (SAC ¶¶ 2211–12) (Page ID #2298); *Moxley* R. 16 (Am. Compl. ¶ 583) (Page ID #300).

[38]*See, e.g., Snyder-Hill* R. 123 (SAC ¶ 2061) (Page ID #2276); *Moxley* R. 16 (Am. Compl. ¶ 616) (Page ID #305).

a patient's testicles that were different sizes;[39] check a patient's lymph nodes;[40] or treat a skin infection on a patient's penis.[41]

Thus, the plaintiffs allege, even students who felt "very uncomfortable during Dr. Strauss' examination[s]" often "did not understand or believe that Dr. Strauss had sexually abused [them]."[42]  This was true even of many students who complained about Strauss's conduct at the time.[43]  Additionally, many students believed that because the conduct was so widely known and talked about, it could not have been abuse.[44]  Similarly, many believed that Ohio State would not have made Strauss the athletic team doctor unless his examinations were legitimate, and thus, that the conduct was medically appropriate even if it was uncomfortable.[45]

The plaintiffs allege that Ohio State witnesses, including physicians, conceded in sworn testimony that the students could not have known Strauss abused them because "patients do not know what is a 'normal exam' because patients have a 'lack of information' about what is medically appropriate."[46]  Ohio State witnesses acknowledged that this is due in part to the fact that "it is normal for patients to be naked in front of doctors and for doctors to touch them, that 'doctors are in a position of superior knowledge and authority' to patients, and that patients, including OSU students, trusted their doctor to do what was medically appropriate."[47]

The plaintiffs point to the Perkins Coie Report to support these allegations.  Perkins Coie decided that "it was essential for the Investigative Team to consult with suitably qualified medical experts" "to discern whether, and to what extent, Strauss' physical examinations of

---

[39] *See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 1222, 1224, 2183) (Page ID #2156, 2294).

[40] *See, e.g.*, *id.* ¶ 1428 (Page ID #2182); *Moxley* R. 16 (Am. Compl. ¶ 752) (Page ID #328–29).

[41] *See, e.g.*, *Moxley* R. 16 (Am. Compl. ¶ 279) (Page ID #255).

[42] *Snyder-Hill* R. 123 (SAC ¶ 391) (Page ID #2056); *see also id.* ¶¶ 444, 477, 542 (Page ID #2062, 2065, 2072); *Moxley* R. 16 (Am. Compl. ¶ 256) (Page ID #252).

[43] *See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶ 391) (Page ID #2056).

[44] *Id.* ¶¶ 451–52 (Page ID #2063).

[45] *Id.* ¶¶ 450, 480–81 (Page ID #2063, 2066).

[46] *Id.* ¶ 156 (Page ID #2016).

[47] *Id.*

student-patients exceeded the boundaries of what was appropriate or medically necessary" because the abuse "occurred in the context of a student's purported medical examination." Perkins Coie Report at 12.[48]   The Perkins Coie Report also noted that, in general, patients may have "confusion as to whether sexual abuse, in fact, occurred."  Perkins Coie Report at 11.[49]

Although most plaintiffs allege that they did not know that Strauss's conduct was abuse, nine allege that they did.  For example, plaintiffs Snyder-Hill and Reed quickly recognized Strauss's conduct as abuse and promptly complained.[50]   John Doe 9 learned the conduct was abusive when his primary care physician told him that Strauss's actions "were inappropriate and not medically necessary."[51]   John Doe 19 realized that Strauss had abused him when he learned about proper physician-patient conduct while attending medical school.[52]

Although plaintiffs differ as to whether they knew at the time that Strauss abused them, *all* allege that they could not have known about Ohio State's responsibility for the abuse.[53]   They did not have reason to know that others had previously complained to Ohio State about Strauss's conduct, let alone how Ohio State had responded to any previous complaints.[54]   Two Ohio State employees—Dr. Ted Grace, who was the director of Ohio State's Student Health Services, and Dr. Miller, who was Strauss's direct supervisor—stated that they did not know of "any way" that "any Ohio State student" could have known that Ohio State knew about Strauss's abuse and nonetheless failed to "get rid of" him.[55]   Further, each plaintiff alleges that, even if he had investigated, further inquiry would have been futile because Ohio State controlled their access to

---

[48]*See Snyder-Hill* R. 123 (SAC ¶ 157) (Page ID #2017); *Moxley* R. 16 (Am. Compl. ¶ 98) (Page ID #223).

[49]*See Snyder-Hill* R. 123 (SAC ¶ 155) (Page ID #2016).

[50]*Id.* ¶¶ 313–14, 407–12 (Page ID #2043–44, 2058–59).

[51]*Id.* ¶¶ 939–40 (Page ID #2122).

[52]*Id.* ¶ 1318 (Page ID #2168).

[53]*See, e.g., id.* ¶¶ 265–69, 272, 329 (Page ID #2035–37, 2047); *Moxley* R. 16 (Am. Compl. ¶¶ 258, 260, 285, 304, 323) (Page ID #252, 256–57, 259, 261).

[54]*See, e.g., Snyder-Hill* R. 123 (SAC ¶¶ 364, 420, 451, 482, 516, 544, 637) (Page ID #2052, 2060, 2063, 2066, 2070, 2073, 2083); *see also id.* ¶¶ 320–21, 323 (Page ID #2045–46) (Ohio State falsely informed complainant that it had not received any previous complaints about Strauss).

[55]*Snyder-Hill* R. 123 (SAC ¶¶ 265–66) (Page ID #2035); *Moxley* R. 16 (Am. Compl. ¶¶ 207–08) (Page ID #242).

information.[56]   In short, although plaintiffs allege that Ohio State administrators knew of the abuse at the time, the plaintiffs allege that *they* did not know until 2018 that Ohio State administrators knew or that they enabled and perpetuated the abuse.

In addition to the general allegations related to Ohio State's conduct—such as hiding what it knew, falsifying evaluations, and destroying records—some plaintiffs offer further specific allegations of concealment.  For example, after Snyder-Hill demanded a meeting to address Strauss's conduct, Grace sent him a letter falsely stating that Ohio State had never before received a complaint about Strauss.[57]   It had, in fact, received multiple complaints, including one just three days earlier.[58]   Grace also falsely told Snyder-Hill that all complaints would be kept in Strauss's personnel file.[59]   In reality, Strauss's personnel file had no record of Snyder-Hill's or any other complaint.[60]   And, although Grace agreed to inform Snyder-Hill about any future complaints, Grace never did, even in 1996 when the Ohio State investigator determined that Strauss had been "performing inappropriate genital exams on male students" "for years."[61]

Although the plaintiffs allege that they had no reason to know that *Ohio State* knew of Strauss's abuse, they allege varying degrees of knowledge about whether *others* knew of Strauss's conduct.  Some had never heard others discuss Strauss's conduct and did not know that Strauss had behaved similarly toward other students.[62]   Others allege that Strauss's conduct was common knowledge among student athletes, who joked about it and discussed it amongst

---

[56]*See, e.g., Snyder-Hill* R. 123 (SAC ¶¶ 335, 367, 482, 678, 740, 854, 1066) (Page ID #2048, 2053, 2066, 2088, 2096–97, 2112, 2137); *Moxley* R. 16 (Am. Compl. ¶¶ 324, 350, 366, 388, 405, 426) (Page ID #261, 265, 267, 271, 274, 277); *see also Snyder-Hill* R. 123 (SAC ¶¶ 243–48) (Page ID #2031–32) (Ohio State actively concealed information).

[57]*Snyder-Hill* R. 123 (SAC ¶¶ 320–21, 323) (Page ID #2045–46).

[58]*Id.*

[59]*Id.* ¶ 323, 334 (Page ID #2046, 2048).

[60]*Id.* ¶ 327 (Page ID #2047).

[61]*Id.* ¶¶ 319, 328 (Page ID #2045, 2047).

[62]*See, e.g., id.* ¶ 674 (Page ID #2088).

themselves.[63]   Some discussed Strauss's conduct only with other student athletes and were not aware whether their coaches knew about this conduct.[64]

Others allege that they knew that coaches or other staff were aware of Strauss's conduct. Tennis coach John Daly "regularly joked about Dr. Strauss' examinations of male athletes," and "threatened student-athletes that they would have to see Dr. Strauss, if they did not do what the coach asked."[65]   Members of other teams likewise joked and complained about Strauss's examinations in front of coaches and trainers, who treated Strauss's methods as "normal."[66]

Although most of Strauss's abuse took place in private exam rooms, Strauss abused some athletes in full view of various adults and student bystanders.  For example, one plaintiff alleges that, in full view of trainers and bystanders, Strauss instructed a player—who came to Strauss for a toe infection—to drop his pants, and then Strauss started groping the player's penis and testicles.[67]   Another plaintiff alleges that "[o]n occasion" training staff saw Strauss perform unwarranted "testicular exams" on him that would last around 15–20 minutes.[68]   Other plaintiffs allege that various trainers and staff witnessed Strauss's examinations, including those in which he touched the plaintiffs' genitals.[69]   Coaches and trainers also regularly witnessed Strauss

---

[63]*See, e.g.*, *id.* ¶¶ 170–71, 194, 442, 474, 552, 784, 836, 901, 926, 986–87, 1173, 1483 (Page ID #2019, 2025, 2062, 2065, 2074, 2103, 2110, 2118, 2120–21, 2128, 2150, 2190); *Moxley* R. 16 (Am. Compl. ¶¶ 473, 636, 673–74, 719, 736) (Page ID #283, 308, 314, 323, 326).

[64]*See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶ 389) (Page ID #2056).

[65]*Id.* ¶ 197 (Page ID #2025); *see id.* ¶¶ 876–77 (Page ID #2115); *Moxley* R. 16 (Am. Compl. ¶ 138) (Page ID #231).

[66]*See, e.g.*, *id.* ¶¶ 501–03, 661, 1297 (Page ID #2068, 2086, 2165) (swim team); *id.* ¶¶ 552, 572–77, 589, 712 (Page ID #2074, 2076–77, 2093) (track and field team); *id.* ¶ 690, 694–95 (Page ID #2090) (hockey team); *id.* ¶ 1005 (Page ID #2130) (fencing team); *id.* ¶¶ 1028, 1423 (Page ID #2133, 2181–82) (wrestling team); *id.* ¶ 1129 (Page ID #2145) (soccer team); *id.* ¶¶ 1226–30, 1340–41) (Page ID #2156–57, 2171) (gymnastics team); *id.* ¶¶ 167, 2581 (Page ID #2018, 2354) (general allegations); *see also Moxley* R. 16 (Am. Compl. ¶¶ 254, 559, 586, 618 (Page ID #251–52, 295, 300, 3055).

[67]*Snyder-Hill* R. 123 (SAC ¶ 688) (Page ID #2089).

[68]*Id.* ¶ 789 (Page ID #2104).

[69]*See, e.g.*, *id.* ¶¶ 557–58 (Page ID #2075).

showering with athletes or sitting in lockers staring at the athletes as they showered or changed.[70]

When student athletes complained, coaches typically dismissed their complaints. For example, one swimmer alleges that when he told his coach that Strauss made him uncomfortable, the coach told him to "[s]hut the fuck up and get in the water."[71] The same coach told another student "that Dr. Strauss' examinations were appropriate and there was no reason to complain."[72] Various coaches "laughed off" student complaints,[73] made excuses,[74] or ignored or brushed aside student complaints.[75]

The plaintiffs who observed Ohio State's coaches' and staff's widespread acceptance of Strauss's conduct allege that their coaches' normalization of Strauss's conduct led them to reasonably believe that it was not abuse.[76] For example, one plaintiff "stopped questioning the need for the genital examinations because Dr. Strauss always said they were necessary, and coaching staff showed no concern despite the athletes' frequent comments about the genital exams."[77]

Many likewise allege that the widespread acceptance of the abuse meant that they had no reason to know that other athletes had complained to Ohio State about the abuse or that Ohio

---

[70] *See, e.g.*, *Moxley* R. 16 (Am. Compl. ¶¶ 540–42) (Page ID #292–93).

[71] *Snyder-Hill* R. 123 (SAC ¶ 1299) (Page ID #2166); *see also Moxley* R. 16 (Am. Compl. ¶ 419) (Page ID #276) (trainers were present during examination in which Strauss repeatedly stroked patient's nipples).

[72] *Snyder-Hill* R. 123 (SAC ¶ 511) (Page ID #2069).

[73] *Id.* ¶¶ 411, 690, 1227–29, 1753 (Page ID #2058, 2090, 2156–57, 2228); *Moxley* R. 16 (Am. Compl. ¶¶ 872, 874) (Page ID #347–48).

[74] *See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶ 501) (Page ID #2068) (trainer told athlete "That's just what Dr. Strauss does"); *id.* ¶ 2085 (Page ID #2280) (trainer told athlete that "some doctors are just really into the human body").

[75] *See, e.g.*, *id.* ¶¶ 272, 1894, 1951, 2141, 2281, 2524 (Page ID #2036–37, 2248, 2257–58, 2288, 2308, 2342); *Moxley* R. 16 (Am. Compl. ¶¶ 273, 282–83, 579–80, 618, 637, 759) (Page ID #254–56, 299, 305, 308, 330).

[76] *See, e.g.*, *Snyder-Hill* R. 123 (SAC ¶¶ 695, 716–17, 795–96, 821–22, 882–83, 1014–15, 1230, 1341–42, 1758, 2090–91) (Page ID #2090–91, 2093, 2104, 2108, 2115–16, 2132, 2157, 2171–72, 2228, 2281); *Moxley* R. 16 (Am. Compl. ¶¶ 283, 348, 586–87, 761, 876) (Page ID #256, 264, 300, 330, 348).

[77] *Snyder-Hill* R. 123 (SAC ¶ 1429) (Page ID #2183).

State had covered up any abuse or student complaints.[78]  They further allege that this widespread acceptance of Strauss's conduct led them to believe that there was no reason to investigate further:  their coaches' reactions "reinforce[d] [their] reasonable belief that pursuing the matter would not be productive."[79]

## B.  Procedural History

In the years after Strauss's rampant abuse was publicly exposed, many survivors filed suit against Ohio State.  This appeal involves two of these lawsuits:  *Snyder-Hill v. Ohio State University*, No. 2:18-cv-736 (S.D. Ohio), and *Moxley v. Ohio State University*, No. 2:21-cv-3838 (S.D. Ohio).  The *Snyder-Hill* plaintiffs filed their complaint on July 26, 2018.  *Snyder-Hill* R. 1.  The district court designated the case as related to *Garrett v. Ohio State University*, No. 2:18-cv-692 (S.D. Ohio), a case that had been filed ten days earlier.  *Snyder-Hill* R. 3 (Related Case Mem.) (Page ID #57–58).  Ohio State moved to dismiss, *Snyder-Hill* R. 19 (Mot. to Dismiss) (Page ID #140–58), and the district court referred the case to mediation, *Snyder-Hill* R. 42 (Order) (Page ID #695).  After mediation was unsuccessful, the *Snyder-Hill* plaintiffs filed an amended complaint.  *Snyder-Hill* R. 123 (SAC) (Page ID #1988–2358).  Ohio State again moved to dismiss.  *Snyder-Hill* R. 128 (Mot. to Dismiss) (Page ID #2377–99).

While the motions to dismiss in *Snyder-Hill* and the related cases were pending, the *Moxley* plaintiffs filed a separate case on June 28, 2021, and amended their complaint on August 12, 2021.  *Moxley* R. 1; *Moxley* R. 16.  They designated the *Moxley* case as related to the *Snyder-Hill* case.  *Moxley* R. 1-1 (Civil Cover Sheet) (Page ID #145).  The district court consolidated *Moxley* with both *Snyder-Hill* and *Garrett*.  *Moxley* R. 10 (Related Case Mem.) (Page ID #172–73).

The district court granted Ohio State's motions to dismiss in each of the consolidated cases.  *See Garrett v. Ohio State Univ*., 561 F. Supp. 3d 747 (S.D. Ohio 2021); *Ratliff v. Ohio State Univ.*, No. 2:19-cv-4746, 2021 WL 7186198 (S.D. Ohio Sept. 22, 2021); *Snyder-Hill v. Ohio State Univ.*, No. 2:18-cv-736, 2021 WL 7186148 (S.D. Ohio Sept. 22, 2021); *Moxley v.*

---

[78] *See, e.g.*, *id.* ¶¶ 1040–41, 1135–36, 1252–53, 1352–54) (Page ID #2134–35, 2146, 2159, 2173).

[79] *Id.* ¶¶ 823, 884, 1899 (Page ID #2108–09, 2116, 2249); *see also id.* ¶ 1441 (Page ID #2184).

*Ohio State Univ.*, No. 2:21-cv-3838, 2021 WL 7186269 (S.D. Ohio Oct. 25, 2021). The district court reasoned that the plaintiffs' claims were barred by the statute of limitations because the abuse happened more than two years ago, and the plaintiffs knew or had reason to know that they were injured at the time that the abuse occurred. *See Garrett*, 561 F. Supp. 3d at 754–62; *Snyder-Hill*, 2021 WL 7186148, at *1; *Moxley*, 2021 WL 7186269, at *1. The plaintiffs timely appealed. *Snyder-Hill* R. 160 (Notice of Appeal) (Page ID #2778); *Moxley* R. 28 (Notice of Appeal) (Page ID #514).

## II. ANALYSIS

### A. Standard of Review

"We review de novo the district court's order dismissing plaintiffs' complaint pursuant to Rule 12(b)(6)." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013). "[W]e construe the complaint in a light most favorable to plaintiffs, accept all plausible well-pled factual allegations as true, and draw all reasonable inferences in plaintiffs' favor." *Id.*

Because at the motion-to-dismiss stage, we may consider only the allegations in the complaint, a 12(b)(6) motion is generally "an 'inappropriate vehicle' for dismissing a claim based upon a statute of limitations." *Id.* (quoting *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)). "However, dismissal is warranted if 'the allegations in the complaint affirmatively show that the claim is time-barred.'" *Id.* (quoting *Cataldo*, 676 F.3d at 547). "[T]he statute of limitations is an affirmative defense," and it is the defendant's burden to show that the statute of limitations has run. *Id.* (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)).

### B. Accrual Date in Title IX Claims

"Title IX does not contain its own statute of limitations." *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 728 (6th Cir. 1996). Title IX thus borrows from Ohio's two-year statute of limitations for personal injury claims. *Id.* at 729. Although state law determines the limitations period, "federal standards govern when the statute begins to run." *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003) (citing *Wilson v. Garcia*, 471 U.S. 261, 267 (1985)); *see Bishop v.*

*Child.'s Ctr. for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). This question—when did the statute start to run—is at the heart of this appeal.

### 1. Whether the Discovery Rule Applies

"The general federal rule is that 'the statute of limitations begins to run when the reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of that injury.'" *Bishop*, 618 F.3d at 536 (quoting *Campbell*, 238 F.3d at 775). In other words, absent a statutory directive to the contrary, the "discovery rule" applies, and the clock starts only when a plaintiff knows or should have known certain facts related to their injury. This contrasts with the occurrence rule, under which a claim accrues at the moment of injury.

In line with the general principle articulated in *Bishop* and elsewhere, we have long held that the discovery rule applies in the § 1983 context. *See, e.g.*, *id.* at 536–37; *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000); *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). Our application of the discovery rule in the § 1983 context guides our analysis here because "[t]he analysis concerning when the statute of limitations [for a Title IX claim] began to run is the same as [for a § 1983 claim]." *Haley v. Clarksville-Montgomery Cnty. Sch. Sys.*, 353 F. Supp. 3d 724, 734 (M.D. Tenn. 2018); *see King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759 (5th Cir. 2015) ("Title IX should be treated like § 1983 for limitations purposes." (collecting cases)).

Applying the discovery rule in Title IX cases accords with the discovery rule's purposes. The discovery rule seeks to protect plaintiffs who, through no fault of their own, lacked the information to bring a claim. We have explained that "the discovery rule is applied . . . if the cause of an injury is not apparent." *Fonesca v. Consol. Rail Corp.*, 246 F.3d 585, 588 (6th Cir. 2001); *see Hicks v. Hines, Inc.*, 826 F.2d 1543, 1544 (6th Cir. 1987). This rule "protects plaintiffs who are . . . struggling to uncover the underlying cause of their injuries from having their claims time-barred before they could reasonably be expected to bring suit." *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 140 (2d Cir. 2011).

The discovery rule recognizes that, without certain information, a plaintiff has no viable claim. "That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." *United States v. Kubrick*, 444 U.S. 111, 122 (1979). This lack of knowable information leaves the plaintiff "at the mercy of" the defendant and unable to file suit. *Id.* "To say to one who has been wronged, 'You had a remedy, but before the wrong was ascertainable to you, the law stripped you of your remedy,' makes a mockery of the law." *City of Aurora v. Bechtel Corp.*, 599 F.2d 382, 387–88 (10th Cir. 1979) (citation and emphasis omitted). The discovery rule ensures that plaintiffs in this position still have a remedy.

Applying the discovery rule in the Title IX context is also consistent with the remedial purposes of Title IX. Title IX "provides relief broadly to those who face discrimination on the basis of sex in the American education system." *Doe v. Univ. of Ky.*, 971 F.3d 553, 557 (6th Cir. 2020) (citing *NCAA v. Smith*, 525 U.S. 459, 466 n.4 (1999)). Applying the more restrictive occurrence rule would be counter to Title IX's broad remedial purpose.

Finally, we observe that other circuits that have reached this issue have applied the discovery rule in Title IX cases. *See, e.g.*, *King-White*, 803 F.3d at 762; *Doe v. Howe Mil. Sch.*, 227 F.3d 981, 988 (7th Cir. 2000); *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006); *but see Twersky v. Yeshiva Univ.*, 579 F. App'x 7, 9 (2d Cir. 2014) (order) (declining to decide whether the discovery rule applies); *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1216 (10th Cir. 2014) (same). In adopting the discovery rule in Title IX cases, we note that any contrary holding would create an unnecessary circuit split.

Ohio State's arguments urging us to reject the discovery rule are not persuasive. Ohio State primarily points to the Supreme Court's decision in *Rotkiske v. Klemm*, 140 S. Ct. 355 (2019), a case that addressed the accrual of Fair Debt Collection Practices Act (FDCPA) claims. Unlike Title IX, the FDCPA's text contains a statute of limitations: FDCPA actions must be brought "within one year from the date on which the violation occurs." *Id.* at 358 (quoting 15 U.S.C. § 1692k(d)). The Supreme Court held that the discovery rule did not apply to FDCPA suits. *Id.* at 360–61.

*Rotkiske* is inapposite.  In *Rotkiske*, the Court's analysis both started and ended with the text of the FDCPA, which expressly states that the statute of limitations starts on "the date on which the violation occurs."  *Id.* at 358 (quoting 15 U.S.C. § 1692k(d)).  The Court therefore concluded that importing the discovery rule would amount to "[a]textual judicial supplementation."  *Id.* at 361; *see also id.* at 360 ("We must presume that Congress 'says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992))).  In short, *Rotkiske* was a straightforward case of text-based statutory interpretation.

Thus, *Rotkiske* has no bearing on a case about the accrual of Title IX claims because Title IX's text contains no statute of limitations at all.  *See Lillard*, 76 F.3d at 728.  We agree with the Second Circuit that *Rotkiske*'s reasoning is limited to the FDCPA's text, and that *Rotkiske* does not affect "the continuing propriety of the discovery rule."  *Sohm v. Scholastic, Inc.*, 959 F.3d 39, 50 & n.2 (2d Cir. 2020); *see also Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 760 (S.D. Ohio 2021) (applying the discovery rule in light of pre-*Rotkiske* precedent because "*Rotkiske* has little to say about which [rule] should apply" when statute is silent).  Other circuits have likewise continued to apply the discovery rule in other contexts post-*Rotkiske*.  *See, e.g.*, *Ouellette v. Beaupre*, 977 F.3d 127, 136 (1st Cir. 2020) (applying discovery rule to § 1983 claim); *Johnson v. Chudy*, 822 F. App'x 637, 638 (9th Cir. 2020) (same); *Lupole v. United States*, No. 20-1811, 2021 WL 5103884, at *1 (4th Cir. Nov. 3, 2021) (applying discovery rule to FTCA claim).  And, albeit only in nonprecedential decisions, we have done the same.  *Norton v. Barker*, No. 21-5893, 2022 WL 837976, at *2 (6th Cir. Feb. 16, 2022) (order) (§ 1983 case); *B&P Littleford, LLC v. Prescott Mach., LLC*, No. 20-1449/1451, 2021 WL 3732313, at *7 (6th Cir. Aug. 24, 2021) (Defend Trade Secrets Act case).  No appellate court has held that *Rotkiske* did away with the common-law discovery rule when a statute is silent.

True, we have previously speculated, in dicta, that *Rotkiske* might prompt reconsideration of the discovery rule.  *See Dibrell v. City of Knoxville*, 984 F.3d 1156, 1162 (6th Cir. 2021).[80]  Unfortunately, as is often the case with such musings, our earlier dicta overlooked important

---

[80]To be clear, any discussion of the discovery rule in *Dibrell* is dicta because *Dibrell* stated that it "need not resolve this tension [between the discovery rule and the occurrence rule] now because Dibrell's claims would be untimely either way."  984 F.3d at 1162.

context in *Rotkiske*. *Rotkiske* did not state that "*[a]ny presumption* favoring th[e] discovery rule . . . represents a 'bad wine of recent vintage.'" *Id.* (emphasis added) (quoting *Rotkiske*, 140 S. Ct. at 360). Instead, the "bad wine" discussed in *Rotkiske* was the use of the discovery rule to override clear statutory text. *See Rotkiske*, 140 S. Ct. at 360. As we have recognized, applying the discovery rule as a common-law accrual principle "says nothing" about how to determine the meaning of specific statutory language. *See El-Khalil v. Oakwood Healthcare, Inc.*, 23 F.4th 633, 636 (6th Cir. 2022). The converse is also true.

Nor do *Wallace v. Kato*, 549 U.S. 384 (2006), or *McDonough v. Smith*, 139 S. Ct. 2149 (2019), change our analysis. In these cases, the Supreme Court applied the occurrence rule to § 1983 claims. No party in these cases raised the discovery rule, and the Court did not discuss the issue at all. Because the issue is not jurisdictional, the Court's silence in these two cases does not impact our analysis one way or the other. In fact, binding post-*Wallace* cases—even those cases explicitly relying on *Wallace*—have continued to apply the discovery rule in the § 1983 context. *See, e.g.*, *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) (citing *Wallace* but continuing to apply the discovery rule in the § 1983 context); *D'Ambrosio v. Marino*, 747 F.3d 378, 384 (6th Cir. 2014) (same). Moreover, *McDonough* recognized that "[t]he Court has never suggested that the date on which a constitutional injury first occurs is the only date from which a limitations period may run." 139 S. Ct. at 2160. Ohio State's reliance on *Wallace* and *McDonough* is unavailing.

Likewise, three of our unpublished decisions—*Guy v. Lexington-Fayette Urban County Government*, 488 F. App'x 9 (6th Cir. 2012), *Gilley v. Dunaway*, 572 F. App'x 303 (6th Cir. 2014), and *Giffin v. Case Western Reserve University*, 181 F.3d 100 (6th Cir. 1999) (table)—do not move the needle. *Guy* and *Gilley* interpret Kentucky law, which is of no use to our analysis of when a claim accrues under federal law. And *Giffin* offers no discussion of the discovery rule and no analysis that sheds light on claim accrual.

Ultimately, we conclude that applying the discovery rule aligns with precedent, the rule's purpose, and Title IX's broad remedial purpose. We therefore agree with every other circuit to decide the issue and hold that the discovery rule determines the accrual of Title IX claims.

## 2. The Scope of the Discovery Rule

Having concluded that the discovery rule applies, we next examine the precise scope of the discovery rule. In line with our earlier cases, we hold that, when the discovery rule applies, a claim accrues when a plaintiff knows or has reason to know that the defendant injured them: in other words, they must discover both their injury and its cause.

We have previously explained that, under the discovery rule, a claim accrues "when the reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of that injury." *Bishop*, 618 F.3d at 536 (quoting *Campbell*, 238 F. 3d at 775); *accord Amburgey v. United States*, 733 F.3d 633, 636 (6th Cir. 2013); *Fonesca*, 246 F.3d at 588. This approach is the same as the seven other circuits to address this issue. *See Ouellette*, 977 F.3d at 136; *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998); *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991); *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001); *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006); *Bibeau v. Pac. Nw. Rsch. Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999); *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003).

This approach follows the Supreme Court's lead in *Kubrick*, 444 U.S. 111. In *Kubrick*, the Supreme Court distinguished between "a plaintiff's ignorance of his legal rights," which *did not* affect the accrual date, and a plaintiff's "ignorance of the fact of his injury or its cause," which *did* affect accrual. 444 U.S. at 122. In other words, "the [Supreme] Court was careful to distinguish between ignorance of the facts, including an injury and its cause, and ignorance of the law." *Ouellette*, 977 F.3d at 136 (citing *Kubrick*, 444 U.S. at 122). The "critical facts" that start the clock are "that [the plaintiff] has been hurt and who has inflicted the injury." *Kubrick*, 444 U.S. at 122. If a plaintiff has no reason to know who injured them, their claim has not accrued.

Ignoring *Kubrick*, Ohio State zooms in on a single sentence in *Rotella v. Wood*, in which the Supreme Court stated that it has "been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." 528 U.S. 549, 555 (2000). This language, Ohio State argues, means that a claim accrues once a plaintiff knows or has

reason to know of their injury, regardless of whether they have reason to know who or what caused the injury. But *Rotella*'s very next sentence points to *Kubrick*'s explanation that "the justification for a discovery rule does not extend beyond the injury" because "a plaintiff's ignorance of his legal rights" is different from "his ignorance of the fact of his *injury or its cause*." *Rotella*, 528 U.S. at 555–56 (emphasis added) (quoting *Kubrick*, 444 U.S. at 122). In seamlessly transitioning between knowledge of an "injury" and knowledge of the "injury or its cause," the Supreme Court distinguished both injury and cause from a plaintiff learning of their legal rights. *This* discovery—learning of "legal rights"—includes the "other elements of a claim" that *Rotella* tells us do not affect accrual. In other words, discovering that a defendant caused an injury is *part of* discovering the injury. *Rotella* does not undercut *Kubrick*'s understanding that a plaintiff must have discovered that *the defendant harmed them* for a claim to accrue.

Our precedent supports this understanding of *Rotella* and *Kubrick*. Although we have been clear that discovery refers to both injury and cause, we have also stated that the clock starts "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Hughes*, 215 F.3d at 548; *accord Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015); *Roberson*, 399 F.3d at 794. The Fifth Circuit has done the same. Explaining that "the [limitations] period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured," the Fifth Circuit emphasized that a plaintiff must be able to know "the facts that would ultimately support a claim." *Piotrowski*, 237 F.3d at 576 (internal quotation marks and citations omitted). Thus, "[a] plaintiff's awareness encompasses two elements: (1) [t]he existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions." *Id.* (internal quotation marks and citations omitted). In other words, discovery of injury and cause are both *a part of* discovering the injury that is the basis of the action.

In deciding when a plaintiff discovers the injury that is the basis of their action, "courts look 'to what event should have alerted the typical lay person to protect his or her rights.'" *Johnson*, 777 F.3d at 843 (quoting *Roberson*, 399 F.3d at 794); *accord Cooey*, 479 F.3d at 416; *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997). Individuals cannot

be alerted to protect their rights without knowledge about causation.  For example, a person who suffers a latent injury, knowing that they are sick, cannot reasonably be expected to protect their rights without knowing what caused their sickness.  Just as an employee needs to know that their employer exposed them to toxic materials before they can bring suit, a student must know that their school exposed them to a heightened risk of harassment before they have a viable claim.[81]

Moreover, our requirement that a plaintiff discover "the injury which is the basis of [their] action," *Hughes*, 215 F.3d at 548, necessarily requires us to look at what the basis of their action is.  In a Title IX case, a plaintiff's cause of action is against the school based on the school's actions or inactions, not the actions of the person who abused the plaintiff.  *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) ("[A] recipient of federal funds may be liable in damages under Title IX only for its own misconduct."); *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020) (same).  The *institution's* conduct is therefore the "the act providing the basis of" a plaintiff's legally cognizable Title IX injury.  *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 867 n.8 (6th Cir. 2020) (quoting *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996)); *see Doe ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 466 (6th Cir. 2022) ("[I]n a successful 'before' claim, a school's deliberate indifference to known past acts of sexual misconduct must have caused the misconduct that the student currently alleges.").  In other words, a plaintiff could not have been "alerted . . . to protect his or her rights" through a Title IX suit unless they had reason to believe that the *institution* did something (or failed to do something) that caused their injury.  *See Johnson*, 777 F.3d at 843.

The First Circuit applied similar logic in *Ouellette*.  There, the plaintiff alleged that a police officer sexually abused him decades earlier when the plaintiff was a teenager.  The plaintiff did not know at the time that the police department had received prior complaints that the officer had abused other teenagers.  977 F.3d at 132.  The plaintiff's knowledge that the officer abused him and that his abuser was employed by the police department did not trigger accrual because, as is also true in the Title IX context, "[a] constitutional tortfeasor's

---

[81]Thus, in the context of the discovery rule, "injury" means something more than "harm."  Although injury and harm may sometimes be synonymous, that's not always the case.  Here, "injury" means "[t]he violation of another's legal right" or "[a]nything said or done in breach of a duty not to do it, if harm results."  *Injury*, Black's Law Dictionary (11th ed. 2019).

employment with a municipality or supervision by a superior state officer does not, on its own, give rise to a 'complete and present' § 1983 cause of action." *Id.* at 140. Because there is no respondeat superior liability, "[a]ny knowledgeable attorney that Ouellette consulted around the time of his alleged abuse" would have told him not to file a lawsuit against the city "in the absence of additional information suggesting that they were also a cause of his injury." *Id.* Thus, his claim had not accrued at that time. *Id.*; *see also Barrett v. United States*, 689 F.2d 324, 330 (2d Cir. 1982) ("It is illogical to require a party to sue the government for negligence at a time when the Government's responsibility in the matter is suppressed in a manner designed to prevent the party, even with reasonable effort, from finding out about it.").

We are persuaded by *Ouellette*'s reasoning and adopt it fully. We are also persuaded by two sets of well-reasoned district court opinions that adopt similar logic in the Title IX context. In *Karasek v. Regents of University of California*, the court reasoned that the "'touchstone' of accrual is notice of the 'injury which is the basis of [the plaintiff's] action,'" and that, unlike in cases with direct respondeat superior liability in which a defendant's liability is easily discernable, an assault does not give a plaintiff knowledge of an *institution's* conduct. 500 F. Supp. 3d 967, 979 (N.D. Cal. 2020) (quoting *Stanley*, 433 F.3d at 1136). Thus, the court ultimately "conclude[d] that a plaintiff's Title IX pre-assault claim accrues when the plaintiff knows or has reason to know of the school's policy of deliberate indifference that created a heightened risk of harassment." *Id.* at 978. Similarly, in a series of cases arising from a sex-abuse scandal at Baylor University, the district court reasoned that the plaintiffs' knowledge that their assailants had previously assaulted other women was "insufficient to demonstrate that [they] would have been put on notice to look into *Baylor's* knowledge of [the assailant]'s history or *Baylor's* conduct in administering its football program prior to [the] assault[s]." *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 616–17 (W.D. Tex. 2017) (emphasis added); *see Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 663 (W.D. Tex. 2017); *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 901 (W.D. Tex. 2019). What the plaintiffs knew or had reason to know was an issue of fact: "[w]hile it is plausible that Plaintiffs were aware of their heightened-risk claims at the time of their assaults, it is also plausible that they did not have reason to further investigate those claims until [the allegations became public]." *Doe 1*, 240 F. Supp. 3d at 663. Thus, the court declined to dismiss the pre-assault claims.

These cases illustrate that a pre-assault heightened-risk claim may not accrue until well after a post-assault Title IX claim. A plaintiff will typically know or have reason to know that a school mishandles their own report of an assault close to the time of the school's inadequate response. But that same plaintiff may have no reason to know of a school's deliberate indifference that gave rise to their heightened-risk claim. It would be "unreasonable to conclude . . . that a plaintiff's knowledge that [their] *individual* complaint was mishandled would reveal that the University has a broad de facto policy of deliberate indifference generally." *Karasek*, 500 F. Supp. 3d at 981. This difference distinguishes the plaintiffs' claims from *King-White*, 803 F.3d at 763, in which the Fifth Circuit held that the plaintiffs' *post*-assault claims accrued when their complaints to the school administrations went "unheeded." In short, even if a plaintiff has reason to know that a school responded improperly to their complaint, they may still lack reason to know that others had complained before them or that the school was deliberately indifferent to any prior complaints.

To summarize, we agree with seven of our sibling circuits, and we expressly hold that, pursuant to the discovery rule, a claim accrues when a plaintiff knows or has reason to know that they were injured and that the defendant caused their injury. In the Title IX context, this means that the claim does not accrue until the plaintiff knows or has reason to know that the *defendant institution* injured them.

**C. Accrual of the Plaintiffs' Claims**

We next must decide whether the plaintiffs adequately allege that their claims did not accrue until 2018. We hold that the plaintiffs' allegations are plausible. Thus, the district court erred in dismissing their cases.

Although the plaintiffs need not have known or had reason to know of the *legal* elements of their claims, they must have known or had reason to know of the *facts* underpinning their claims before the statute of limitations begins to run. *Kubrick*, 444 U.S. at 122. Thus, the plaintiffs' claims accrued when they knew or had reason to know that Ohio State was "deliberately indifferent to sexual harassment, of which [Ohio State had] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of

access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.

The plaintiffs' allegations that they lacked reason to know that Ohio State injured them are plausible. It would be difficult for "typical lay person" in the plaintiffs' position to know the underlying facts about Ohio State's alleged deliberate indifference. The plaintiffs allege that none of them knew or had reason to know that Ohio State administrators were on notice of Strauss's abuse.[82] And how could they know? Both Dr. Grace, who was the director of Ohio State's Student Health Services, and Dr. Miller, who was Strauss's direct supervisor, stated that they did not know of "any way" that "any [Ohio State] student" could have known that Ohio State knew about Strauss's abuse and nonetheless failed to get rid of him.[83] And when Ohio State hired Perkins Coie in 2018 to investigate both the allegations of abuse and "whether [Ohio State] had knowledge of such allegations against Strauss," it took $6.2 million and 12 months for Perkins Coie to issue its final conclusions.[84] Ohio State is a vast institution, and the plaintiffs' allegations underscore how difficult it is for a student to know what appropriate persons within the Ohio State administration knew.

A plaintiff's knowledge that he was abused is not enough to start the clock. *See Ouellette*, 977 F.3d at 140 (knowledge of abuse is not the same as knowledge of institutional conduct). Knowledge that Ohio State employed Strauss is not enough. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998) (no respondeat superior claims for Title IX claims of employee-student harassment). Knowledge that other students knew of Strauss's conduct is not enough. *See id.* at 290 (Title IX requires "notice to an 'appropriate person' and an opportunity to rectify any violation" (citing 20 U.S.C. § 1682)). Knowledge that coaches or trainers knew is not enough. *See Kesterson v. Kent State Univ.*, 967 F.3d 519, 528–29 (6th Cir. 2020) (knowledge of abuse by coaches and assistant coaches does not satisfy knowledge requirement of Title IX).

---

[82]*Snyder-Hill* R. 123 (SAC ¶ 267) (Page ID #2035–36); *Moxley* R. 16 (Am. Compl. ¶ 209) (Page ID #242–43).

[83]*Snyder-Hill* R. 123 (SAC ¶¶ 265–66) (Page ID #2035); *Moxley* R. 16 (Am. Compl. ¶¶ 207–08) (Page ID #242).

[84]*Snyder-Hill* R. 123 (SAC ¶¶ 273–75) (Page ID #2037); *Moxley* R. 16 (Am. Compl. ¶¶ 215–18) (Page ID #244).

Instead, the clock starts only once the plaintiff knows or should have known that Ohio State administrators "with authority to take corrective action" knew of Strauss's conduct and failed to respond appropriately. *Gebser*, 524 U.S. at 290.

Should the plaintiffs' snippets of knowledge "have alerted the typical lay person to protect his or her rights" by investigating further? *Johnson*, 777 F.3d at 843 (quoting *Roberson*, 399 F.3d at 794). We cannot say. This is a question of fact—one that is improper to resolve at the motion-to-dismiss stage. *See Lutz*, 717 F.3d at 464 (a motion to dismiss is typically "an 'inappropriate vehicle' for dismissing a claim based upon a statute of limitations").

But the answer to this question may not ultimately matter because the plaintiffs adequately allege that if they had investigated the abuse, they would not have discovered that Ohio State injured them. A plaintiff's duty to investigate does not trigger accrual. Instead, "the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'" *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010). In other words, even if the plaintiffs should have investigated, the clock does not start if the plaintiffs would not have learned that Ohio State injured them. The plaintiffs allege that Ohio State concealed Strauss's abuse and Ohio State's knowledge of it, destroyed records, gave Strauss false performance reviews, and actively misled students by, for example, telling complainants that no one had ever previously complained about Strauss. *See* Section I.A.2, *supra*. The plaintiffs plausibly allege a decades-long cover up. Given these plausible allegations, the plaintiffs adequately allege that they could not have reasonably discovered Ohio State's conduct. This alone provides sufficient grounds to delay the accrual of their Title IX claims.

The above reasons apply to all plaintiffs, and these reasons alone warrant reversal. But the *Moxley* plaintiffs and all but nine of the *Snyder-Hill* plaintiffs adequately allege an additional ground that provides a separate and independent basis for our holding: they did not know they were abused. The district court felt that these allegations were implausible, pointing to other allegations "that Plaintiffs were concerned by Strauss's abuse and felt violated by it, discussed the abuse with teammates, classmates, or family members, reported the abuse themselves, or that the abuse caused them immediate mental and emotional distress." *Garrett*, 561 F. Supp. 3d at

759 n.7.  In the district court's view, the plaintiffs' distress belies their claims that they did not know Strauss's conduct was abuse.

At this early stage, the district court was incorrect to dismiss the plaintiffs' allegations by holding that they were implausible as a matter of law.  The plaintiffs plausibly allege that experiencing distress—even extreme distress—does not mean that they knew or should have known that they were abused.  Strauss gave pretextual medical explanations for his abuse, such as conducting a hernia check or doing an evaluation for sexually transmitted infections.  *See* Section I.A.1, *supra*.  The plaintiffs further allege that physician-patient abuse is particularly difficult to identify because physicians, unlike other professionals, are expected to touch a person's sexual organs, and laypeople lack the training to know whether an examination is medically appropriate.  *Id.*  On top of that, the plaintiffs were young, untrained, and inexperienced, Ohio State gave Strauss its stamp of approval, and trusted adult professionals routinely told the plaintiffs that Strauss's conduct was normal.  *Id.*

Amici shed light on the plausibility of the plaintiffs' claims.  A significant body of literature shows that (1) many people do not recognize that they have been sexually abused, particularly if they were abused by someone on whom they depend; and (2) people suffer serious harms resulting from their abuse, even if they do not recognize it as abuse.  *See* Psychology & Psychiatry Scholars Br. at 10–26.  Example after example highlights the unique difficulties of recognizing whether a physician's conduct is abusive.  *See* National Center for Victims of Crime Br. at 4–18.  And recognizing abuse—especially physician-patient abuse—can be even harder in the context of college athletics because of the insular nature of teams, the immense trust and authority placed in coaches, and the culture of college athletics, including the role of coaches and trainers in setting norms.  *See* National Women's Law Center Br. at 9–23.

Medical procedures, including necessary ones such as colonoscopies, are often uncomfortable.  That does not mean that they are abusive.  As a result, discomfort does not mean that plaintiffs *should know* that they are being abused.  *See Doe v. Pasadena Hosp. Ass'n*, No. 2:18-cv-08710, 2020 WL 1244357, at *6 (C.D. Cal. Mar. 16, 2020) (plaintiffs' failure to discover physician's abuse was reasonable when physician "touch[ed] their legs in a sexual manner, conduct[ed] unexpected vaginal exams, and unnecessary breast exams" because

physician misrepresented "that his 'acts were for a legitimate medical purpose'").  Instead, even if a patient is uncomfortable, whether they knew or should have known that they were abused is an issue of fact for the jury.

Ultimately, we hold that the plaintiffs' claims survive Ohio State's motion to dismiss for three independent reasons.  First, the plaintiffs plausibly allege that they did not know and lacked reason to know that Ohio State caused their injury.  Second, they plausibly allege that even if they had investigated further, they could not have learned of Ohio State's conduct.  Third, most plaintiffs plausibly allege that they did not know that they were abused.  Alone, each of these grounds is sufficient to delay accrual.

## D.  Non-Student Plaintiffs

Finally, Ohio State argues that four non-student plaintiffs in the *Snyder-Hill* case cannot bring a Title IX claim.  John Doe 30 and John Doe 42 were contract referees; John Doe 47 was a fifteen-year-old high-school student visiting Ohio State's campus; and John Doe 49 was a fourteen- or fifteen-year-old high-school student who attended an Ohio State wrestling camp.[85]

Title IX provides that "[n]o *person* . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a) (emphasis added).  "Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' if it had wished to restrict the scope of [Title IX]."  *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982).  It did not limit the statute in this way and thus, Title IX's plain language sweeps more broadly.

Contrary to Ohio State's assertions, we have never limited the availability of Title IX claims to employees or students.  The two cases on which Ohio State relies prove this point.  In *Doe v. University of Kentucky*, 971 F.3d at 558, the court held that "although Doe[] was not enrolled as a student at the University, she has shown that . . . there remain genuine disputes as to whether she was denied the benefits of an 'education program or activity' furnished by the University."  The court pointed to the fact that she paid the University directly for housing in its

---

[85]*Snyder-Hill* R. 123 (SAC ¶¶ 1613, 1812, 1903, 1940) (Page ID #2208, 2236, 2250, 2255).

residence halls, paid for a dining hall and student fees, and alleged that she hoped to enroll at the University after beginning her education at the Community college.  *Id.*  Although we explained that Doe's relationship with the school was akin to a student, this analysis was relevant only because Doe brought a claim for student-on-*student* sexual harassment.  *Id.* at 557–58.  The inquiry was not relevant to whether individuals can bring Title IX claims more generally.

In *Arocho v. Ohio University*, No. 20-4239, 2022 WL 819734, at *3 (6th Cir. Mar. 18, 2022), we recognized that "a nonstudent like [the plaintiffs] may bring a Title IX claim, if [they] w[ere] excluded from or discriminated against under a[n] 'education program or activity.'"  In *Arocho*, the plaintiff did not have a Title IX claim because "the full extent of Arocho's relationship with Ohio University was her participation in career day" and she did "not allege that she intended to partake in any Ohio University education program or activities in the future."  *Id.* at *4.  The barrier to Arocho's suit was *not* that she was a nonstudent; it was instead that she could not point to any education program or activity of which she was denied the benefit.

Because none of these four plaintiffs was a student or regular employee of Ohio State, we must decide whether they were discriminated against under an education program or activity.  We have no binding authority that establishes a framework for this analysis.

*Doe v. Brown University*, 896 F.3d 127 (1st Cir. 2018), persuasively analyzes the issue.  Doe, a student at Providence College, was sexually assaulted by three Brown students on Brown's campus.  *Id.* at 128–29.  She reported the assault, and later alleged that Brown responded inappropriately by abandoning its investigation into the assault.  *Id.* at 129.  The First Circuit read the Supreme Court's decision in *Bell* to "impl[y] that, in order for a person to experience sex 'discrimination under an education program or activity,' that person must suffer unjust or prejudicial treatment on the basis of sex while participating, or at least attempting to participate, in the funding recipient's education program or activity."  *Id.* at 131.  The First Circuit held that Doe failed to state a Title IX claim because she did not experience discriminatory treatment while participating or attempting to participate in any educational program provided by Brown.  *Id.* at 133.

At the same time, the First Circuit recognized that "members of the public" can bring a Title IX claim if they are "avail[ing] themselves of the services provided by educational institutions receiving federal funding," for example by "access[ing] university libraries, computer labs, and vocational resources," or "attend[ing] campus tours, public lectures, sporting events, and other activities at covered institutions." *Id.* at 132 n.6. Similarly, both the Second and Third Circuits have held that something can be considered "an '*education* program or activity' under § 1681(a) if it has 'features such that one could reasonably consider its mission to be, at least in part, educational." *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 555 (3d Cir. 2017) (quoting *O'Connor v. Davis*, 126 F.3d 112, 117 (2d Cir. 1997)).

We adopt the reasoning of the First Circuit and hold that a non-student and non-employee can bring a Title IX claim if they were subject to discrimination "while participating, or at least attempting to participate, in the funding recipient's education program or activity." *Doe v. Brown*, 896 F.3d at 131. We further hold that "education program or activity" is defined broadly and extends to situations in which individuals are, for example, accessing university libraries or other resources, or attending campus tours, sporting events, or other activities.

Under this framework, John Doe 49's claim clearly survives the motion to dismiss. John Doe 49 alleges that he "was at OSU for OSU's summer wrestling camp," which was "an education program or activity offered to young athletes not yet old enough to attend OSU, which was staffed by OSU employees and student-athletes."[86] This camp was an educational program that provided training for young wrestlers. John Doe 49 was participating in it and was denied its benefits when Strauss abused him.

John Does 30 and 42 likewise state Title IX claims. They were contract referees when Strauss abused them.[87] Thus, they were "attending" or participating in "sporting events." *Doe v. Brown*, 896 F.3d at 132 n.6. And Strauss "gave John Doe 47 a long tour of the athletics facilities," and assaulted him "under the guise that he would show John Doe 47 the types of

---

[86]*Snyder-Hill* R. 123 (SAC ¶ 1940) (Page ID #2255).

[87]*Id.* ¶¶ 1613, 1812 (Page ID #2208, 2236).

Nos. 21-3981/3991          *Snyder-Hill, et al. v. Ohio State Univ.*          Page 30

medical exams athletes had to get to be cleared to play for OSU."[88]  Even if this was not a bona fide education activity because it was merely a guise for Strauss's abuse, John Doe 47 was "*attempting* to participate in an education program" because he believed that he was receiving a bona fide tour of Ohio State's facilities, offered by an Ohio State employee.  *Doe v. Brown*, 896 F.3d at 132 (emphasis added).

## III.  CONCLUSION

We **REVERSE** the district court's orders granting Ohio State's motions to dismiss, and we **REMAND** for further proceedings consistent with this opinion.

---

[88]*Id.* ¶¶ 1906–11 (Page ID #2251).

————————————

## DISSENT

————————————

RALPH B. GUY, JR., Circuit Judge, dissenting.  Today's decision effectively nullifies any statute of limitations for Title IX claims based on sexual harassment.  In these two appeals, 110 male plaintiffs (84 plaintiffs in *Snyder-Hill* and 33 plaintiffs in *Moxley*) assert Title IX claims against The Ohio State University.[1]  In the *Snyder-Hill* plaintiffs' 371-page complaint and the *Moxley* plaintiffs' 159-page complaint, each plaintiff describes the obscene details of how Dr. Richard Strauss sexually abused them in the school's locker room or showers, at Strauss's home, or during physical examinations.  All agree that the alleged sexual abuse occurred between 1978 and 1998.  (Maj. Op. 1).  And all agree that plaintiffs' Title IX claims are subject to Ohio's *two-year* statute of limitations for general personal injury claims.  *See, e.g.*, *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996); *see Owens v. Okure*, 488 U.S. 235, 250 (1989); Ohio Rev. Code § 2305.10(A); (Maj. Op. 17).

These two lawsuits were filed in July 2018 and June 2021—more than 20 to 40 years after the alleged sexual abuse occurred (1978 to 1998), more than 20 years after Strauss stopped working at the university (1998), and more than 13 years after Strauss committed suicide (2005).[2]  As Judge Watson correctly concluded, plaintiffs' Title IX claims accrued, and the statute of limitations expired, long ago.

In reversing, the majority opinion does not rely on a tolling doctrine to revive plaintiffs' claims.  It accepts plaintiffs' allegations that their Title IX claims did not *accrue*, and thus the two-year limitations period did not start running, until sometime *after* April 2018—when the university announced it had hired the law firm Perkins Coie to conduct an internal "investigation

———————————————————

[1] After oral argument, some plaintiffs voluntarily dismissed their appeal.

[2] *Snyder-Hill* (R. 123, ¶¶ 2, 268); *Moxley* (R. 16, ¶¶ 2, 210).

into student athletes' allegations of sexual misconduct by Dr. Strauss dating back to the late-1970s."[3]

"Statutes of limitations are not simply technicalities."  *Bd. of Regents v. Tomanio*, 446 U.S. 478, 487 (1980).  Rather, the Supreme Court has repeatedly explained:

> Statutes of limitations are intended to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared."  *Railroad Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 348-49 (1944).  They provide "security and stability to human affairs."  *Wood v. Carpenter*, 101 U.S. 135, 139 (1879).  We have deemed them "vital to the welfare of society," *ibid.*, and concluded that "even wrongdoers are entitled to assume that their sins may be forgotten," *Wilson v. Garcia*, 471 U.S. 261, 271 (1985).

*Gabelli v. SEC*, 568 U.S. 442, 448-49 (2013).  The hard reality is that "there comes a point at which the delay of a plaintiff in asserting a claim is sufficiently likely either to impair the accuracy of the factfinding process or to upset settled expectations that a substantive claim will be barred without respect to whether it is meritorious."  *Tomanio*, 446 U.S. at 487; *see also Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974).  Here, the alleged sexual abuse and alleged failure of the university to take corrective action are egregious and reprehensible.  But that is not a license to ignore well-established principles regarding when certain claims *accrue*.  Because plaintiffs' Title IX claims are time-barred, I would affirm.

## I.

Start with the full picture of what plaintiffs allege.  Plaintiffs recount in graphic detail that Strauss's abuse included:  "fondling their testicles and penises," "often without gloves" for a "prolonged" or "extended period of time";[4] "masturbating [them] to erection[5] and ejaculation";[6]

---

[3] *See, e.g.*, *Snyder-Hill* (R. 123, ¶¶ 153, 270; Appellant Br. 10, 19, 28); *Moxley* (R. 16, ¶¶ 94, 212; Appellant Br. 11, 18, 26 & n.19).

[4] *Snyder-Hill* (R. 123, ¶¶ 309, 647, 651, 733, 787, 1026, 1030, 1392, 1462-65, 1595, 1696, 1875, 1981, 2004, 2082, 2118, 2210, 2337, 2460, 2500, 2516, 2519, 2521); *Moxley* (R. 16, ¶¶ 246, 248, 253, 268, 271, 275, 279, 317, 338, 357, 439, 454, 470-71, 488-89, 504, 520, 535, 537, 613-14, 616, 630-31, 651, 666, 668-69, 687, 691, 694, 697, 713-14, 718, 733, 780, 795, 831, 847, 869).

[5] *Snyder-Hill* (R. 123, ¶¶ 528, 751, 767–72, 951, 1294, 1428, 1571, 1663, 1769, 1926-28, 2138, 2260, 2316, 2356, 2500, 2522, 2540-41); *Moxley* (R. 16, ¶¶ 336, 374-75, 396-97, 415, 558, 575-78, 598, 733-34, 750, 752, 775, 781, 815, 887).

masturbating himself "during or after the exams";[7] "drugging[8] and anally raping them";[9] "unnecessar[ily]" "penetrating their rectums" with his fingers, often for a "prolonged" time and without gloves;[10] and "rubbing his testicles on" or "press[ing] his erect penis against [plaintiffs'] bodies";[11] "touching their bodies in other inappropriate ways, making inappropriate comments about their bodies, and asking improper, sexualized questions." *Snyder-Hill* (R. 123, ¶¶ 3, 138-46, 2561); *Moxley* (R. 16, ¶¶ 3, 79-87, 908). In many cases, plaintiffs experienced a combination of these acts on one or more occasions. But the majority opinion does not mention some of the most obscene sexual conduct that plaintiffs allege occurred.

Nor is the alleged sexual abuse confined to the context of a medical exam (as the majority opinion suggests). The abuse also occurred in the university's locker room, in the showers, or at Strauss's home. For example, the complaints allege: Strauss came into the locker room wearing only a towel and masturbated John Doe 9 (*Snyder-Hill* R. 123, ¶¶ 949-51); Strauss showered with John Doe 17, John Doe 42, and John Doe 98, and masturbated while staring at each plaintiff (*id.*, ¶¶ 1815, 1240; *Moxley* R. 16, ¶ 754); Strauss masturbated while he watched John Doe 8 shower (*Snyder-Hill* R. 123, ¶¶ 907, 910); Strauss entered the sauna nude and masturbated, sometimes while sitting behind John Doe 98 (*Moxley* R. 16, ¶ 756); Strauss gave John Doe 19 a ride home and attempted to kiss him and repeatedly tried to fondle his genitals, took nude photographs of plaintiff at Strauss's home, followed plaintiff into the locker room, began massaging him, and then "kissing John Doe 19's neck and back" (*Snyder-Hill* R. 123, ¶ 1307-10); at Strauss's home, Strauss gave John Doe 70 a massage, penetrated plaintiff's anus with his finger, and then straddled plaintiff's lower back, masturbated, and ejaculated onto plaintiff's back. (*Id.*, ¶¶ 2392-95) This is just a sampling.

---

[6]*Snyder-Hill* (R. 123, ¶¶ 1301, 1492, 1667, 1727, 1730, 1855-56, 2164, 2368, 2386, 2408, 2410, 2414, 2436); *Moxley* (R. 16, ¶¶ 3, 908; *id.*, ¶¶ 298, 396-97, 696).

[7]*Snyder-Hill* (R. 123, ¶¶ 1492, 2395).

[8]*Snyder-Hill* (R. 123, ¶¶ 937, 1751).

[9]*Snyder-Hill* (R. 123, ¶¶ 1946-48, 1959, 1122).

[10]*Snyder-Hill* (R. 123, ¶¶ 309, 609, 710, 752, 770, 1516, 1599-1600, 1681, 1890-91, 2061, 2117, 2213, 2394, 2501); *Moxley* (R. 16, ¶¶ 616, 249-50, 253, 296, 359, 455, 583, 666, 713-14, 753, 776).

[11]*Snyder-Hill* (R. 123, ¶¶ 311, 1076-76, 1492, 2384, 2523, 2360).

## II.

If Congress does not provide a statute of limitations for a federal cause of action, we look to "state law for tolling rules, just as we [do] for the length of statutes of limitations"—but the "accrual date" of the cause of action "is a question of federal law that is *not* resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388, 394 (2007) (claim under 42 U.S.C. § 1983). When it comes to the accrual question, there are two possible answers under federal law: the "injury occurrence rule" (which the university argues applies) or the "injury discovery rule." The court's opinion here, however, adopts an injury-and-deliberate-indifference discovery rule that renders meaningless any limitations provision for Title IX claims.

### 1.

The injury occurrence rule "presumptively" applies. *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019) (§ 1983 claim); *see also, e.g.*, *Gabelli*, 568 U.S. at 448; *Wallace*, 549 U.S. at 388, 391 (§ 1983); *Clark v. Iowa City*, 87 U.S. 583, 20 Wall. 583, 589 (1875). But the majority concludes otherwise, even while stating that the accrual analysis for Title IX claims should be the same as for § 1983 claims. (Maj. Op. 17-18).

Time and again, the Supreme Court has explained that the "time at which a [federal] claim accrues . . . 'conform[s] in general to common-law tort principles.'" *McDonough*, 139 S. Ct. at 2155 (quoting *Wallace*, 549 U.S. at 388). "Under those principles, it is 'the standard rule that accrual occurs when the plaintiff has a complete and present cause of action,' that is, when 'the plaintiff can file suit and obtain relief.'" *Wallace*, 549 U.S. at 388 (cleaned up); *see also Gabelli*, 568 U.S. at 448. As *Wallace* further explains, "[u]nder the traditional rule of accrual . . . the tort cause of action accrues, and the statute of limitations commences to run, *when the wrongful act or omission results in damages*. The cause of action accrues even though the full extent of *the injury is not then known or predictable*." *Wallace*, 549 U.S. at 391 (cleaned up; emphasis added).

By that measure, plaintiffs' claims are untimely. To be sure, the most analogous common-law tort is battery, and a "battery is complete upon physical contact, even though there is no observable damage at the point of contact." Restatement (Second) of Torts § 899,

comment. c (Am. L. Inst. 1979); *accord Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1215-16 (10th Cir. 2014) (Title IX). Despite what this court's opinion says, *Varnell* applied the injury occurrence rule, and thus there is at present a "circuit split." (Maj. Op. 19, 22). Under the injury occurrence rule, each plaintiff's Title IX claim "accrued no later than the last sexual abuse by" Strauss (1978 to 1998). *Varnell*, 756 F.3d at 1216-17.

But even taking the elements of a Title IX claim at face value, the result is the same. After all, the cognizable *injury* or *damages* is "sexual harassment . . . that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students [were] effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). That is, the "Injury" element under Title IX is "the deprivation of 'access to the educational opportunities or benefits provided by the school.'" *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 622 (6th Cir. 2019) (quoting *Davis*, 526 U.S. at 650); *see also Foster v. Bd. of Regents*, 982 F.3d 960, 965 (6th Cir. 2020) (en banc); *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) (Title IX hostile-environment claim). Plaintiffs indeed seek "damages" for *inter alia* the "sexual abuse" and loss of "educational opportunities" that occurred between 1978 and 1998.[12]

Accordingly, under the injury occurrence rule, plaintiffs' Title IX claims are time-barred because their claims accrued no later than the last occasion that they were harmed by Strauss (1978 to 1998). *See Varnell*, 756 F.3d at 1216-17. To conclude otherwise, would put "the supposed statute of repose in the sole hands of the party seeking relief." *Wallace*, 549 U.S. at 391.

2.

The injury discovery rule applies only in a few well-defined situations. This case is not one of them. The so-called injury discovery rule "arose in fraud cases as *an exception to the general limitations rule*," and the Supreme Court has held that it applies "where a plaintiff has been *injured by fraud* and remains in ignorance of it without any fault or want of diligence or

---

[12]*Snyder-Hill* (R. 123, PgID 2357); *Moxley* (R. 16, PgID 361).

care on his part," *Merck & Co. v. Reynolds*, 559 U.S. 633, 644-45 (2010) (citations omitted; emphasis added); *see also Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019); *Gabelli*, 568 U.S. at 449-50; *Bailey v. Glover*, 88 U.S. 342, 21 Wall. 342, 347-50 (1875). But this is not a fraud case.

The discovery rule also applies when "Congress has enacted statutes that expressly include the language . . . setting limitations periods to run from the date on which the violation occurs *or the date of discovery of such violation.*" *Rotkiske*, 140 S. Ct. at 361 (citing statutes); *see also, e.g.*, *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2047, 2050 (2017) (discovery rule); *Merck*, 559 U.S. at 637, 644-48 (discovery rule). On the other hand, where, as here, Congress does not provide a statute of limitations that expressly includes "discovery" rule language, the Court applies the "standard" injury occurrence rule. *See, e.g.*, *Rotkiske*, 140 S. Ct. at 358, 360; *Gabelli*, 568 U.S. at 448-49, 454; *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1969 (2014); *Wallace*, 549 U.S. at 388, 391 (§ 1983); *McDonough*, 139 S. Ct. at 2155-56 (§ 1983).

Congress omitted any statute of limitations in Title IX. Thus, it did not silently intend to adopt a discovery rule—"a question that, on everyone's account, [Congress] never faced." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017). The Court has reiterated that adopting a discovery rule is "particularly inappropriate" because "Congress has shown that it knows how to adopt the omitted language *or provision.*" *Rotkiske*, 140 S. Ct. at 361 (emphasis added). "[R]eading in a provision stating that [a] limitations period begins to run on the date an alleged [federal law] violation is discovered," *id.*, is an "expansive approach to the discovery rule [and] is a 'bad wine of recent vintage.'" *Id.* (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia, J., concurring in the judgment)).

It is thus improper to implant a discovery rule into Title IX merely "because Title IX's text contains no statute of limitations at all." (Maj. Op. 20). This is "[a]textual judicial supplementation" all the same. *See Rotkiske*, 140 S. Ct. at 361. If anything, it is more problematic given that we are dealing with a "judicially implied" cause of action. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284-85 (1998). Title IX is not a blank page for politically unaccountable judges to write in whatever rule seems to further "the remedial purposes of Title IX." (Maj. Op. 19). "Indeed, it is quite mistaken to assume . . . that 'whatever'

might appear to 'further the statute's primary objective must be the law.'" *Henson*, 137 S. Ct. at 1725 (cleaned up). "Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage, and no statute yet known 'pursues its stated purpose at all costs.'" *Id.* (cleaned up).

No less than twice the Supreme Court has told courts what to do when there is no federal statute of limitations at all. *Wallace*, 549 U.S. at 388-91 (false arrest claim under § 1983); *McDonough*, 139 S. Ct. at 2155-56 (malicious prosecution claim under § 1983 based on fabricated evidence). The majority opinion admits that in both *Wallace* and *McDonough* "the Supreme Court applied the occurrence rule to § 1983 claims." (Maj. Op. 21-22). In both cases, the Court explained in detail how the occurrence rule applied and the reasons why. *Cf. Ramos v. Louisiana*, 140 S. Ct. 1390, 1404 & n.54 (2020); *see also Direct Mktg. Ass'n v. Brohl*, 814 F.3d 1129, 1148 (10th Cir. 2016) (Gorsuch, J., concurring). But because the Court did not "discuss" the discovery rule or mention whether a party advocated for the discovery rule, the majority opinion takes the view that the Court's application of the occurrence rule was a mere suggestion that "does not impact our analysis." (Maj. Op. 22). It is a mistake, however, to require the Court to explicitly state that the discovery rule does not apply to cases under § 1983 or Title IX.

To the extent this court has applied the injury discovery rule to § 1983 claims, *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984), this court recently questioned whether "our cases imbibing this 'bad wine' warrant reconsideration in light of the Supreme Court's recent teachings," *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1162 (6th Cir. 2021). *Dibrell* decided not to "resolve this tension" because plaintiff's § 1983 claims were untimely under both accrual rules. *Id.* With this in mind, we should not import the same "bad wine" into the new context of Title IX claims.

Other than "the historical exception for suits based on fraud," the Court has "deviated from the traditional rule and imputed an injury-discovery rule to Congress on only one occasion." *TRW*, 534 U.S. at 37 (Scalia, J., concurring in the judgment) (citing *Urie v. Thompson*, 337 U.S. 163, 169-71 (1949) (involving pulmonary silicosis caused by inhaling coal dust)). The Court did so in *Urie* because the Court "could not imagine that legislation as 'humane' as the Federal Employers' Liability Act" (FELA) "would bar recovery

for latent medical injuries." *Id*. Because *Urie* refused to count "each inhalation of silica dust" as "a separate tort giving rise to a fresh 'cause of action,'" *Urie* held that "the afflicted employee can be held to be 'injured' only when the accumulated effects of the deleterious substance manifest themselves." 337 U.S. at 169-70 (citation omitted). "[I]n one other case [the Court] simply observed (without endorsement) that several Courts of Appeals had substituted injury-discovery for the traditional rule in medical-malpractice actions under the Federal Tort Claims Act" (FTCA). *TRW*, 534 U.S. at 37 n.2 (Scalia, J., concurring in the judgment) (citing *United States v. Kubrick*, 444 U.S. 111, 120 & n.7 (1979)). "[I]n two other cases" involving civil RICO actions, the Court "observed (without endorsement) that lower federal courts 'generally apply' an injury-discovery rule." *Id.* (citing *Rotella v. Wood*, 528 U.S. 549, 555 (2000); *Klehr v. A. O. Smith Corp.*, 521 U.S. 179, 191 (1997)). This case is not akin to any of those cases.

Yet the court's opinion here relies on FTCA and FELA cases to justify adopting a discovery rule. (Maj. Op. 18, 23). This case is not like one of the "medical-malpractice cases [under the FTCA] in which the plaintiff has little reason to suspect anything other than natural causes for his injury." *Amburgey v. United States*, 733 F.3d 633, 637 (6th Cir. 2013) (cleaned up); *see also Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998); *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991). Nor does this case involve claims for "latent" injuries or diseases under FELA. *See, e.g.*, *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 773 (6th Cir. 2001); *Fonseca v. CONRAIL*, 246 F.3d 585, 586, 589 (6th Cir. 2001); *Hicks v. Hines Inc.*, 826 F.2d 1543, 1544 (6th Cir. 1987).[13] Even in FELA cases, we have held that "if greater than de minimus harm is discernable at the time of the tortious event," the "time of event rule" (i.e., injury occurrence rule) applies. *Fonseca*, 246 F.3d at 588 (quoting *Hicks*, 826 F.2d at 1544).

---

[13]This court stated the injury-*and-cause* discovery rule in *Bishop v. Children's Center for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010), a § 1983 case. But *Bishop* is quoting *Campbell*, 238 F.3d at 775, a FELA case involving bone joint injuries allegedly caused by using certain equipment for over two decades. *Id.* at 773-74. *Bishop* does not offer any explanation for doing so, and the causation part of the rule that is unique to our FELA and FTCA cases played no part in the court's brief analysis. *See Bishop*, 618 F.3d at 537 ("Plaintiffs' claims accrued . . . when they knew that CB had been expelled from [school] . . . . [R]edress was available at the time of the injury.").

The court's opinion here, however, makes the leap in logic that a Title IX claim is like a "latent injury" claim, asserting that "[j]ust as an employee needs to know that their employer exposed them to toxic materials before they can bring suit, a student must know that their school exposed them to a heightened risk of harassment before they have a viable claim." (Maj. Op. 25). But a Title IX *injury* is not the result of "the accumulated effects of [a] deleterious substance" that only becomes "manifest" decades later. *Urie*, 337 U.S. at 169-70 (citation omitted).

Given there is no textual or historical reason to graft a discovery rule onto the implied right of action under Title IX, I would decline to do so.

### 3.

Even assuming the "injury discovery rule" applies, plaintiffs' claims are untimely. Under the injury "discovery rule," the statute of limitations will begin to run "only when the *injury* is or reasonably could have been discovered." *Gabelli*, 568 U.S. at 451 (emphasis added); *accord Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015). The trigger date is the "event" that "should have alerted the typical lay person to protect his or her rights." *Johnson*, 777 F.3d at 843 (citation omitted). This is a simple, "objective inquiry." *Id.*

By that standard, plaintiffs' claims accrued when plaintiffs admittedly knew Strauss *injured* them between 1978 and 1998. How can it be otherwise? Plaintiffs claim that a cognizable Title IX "injury" occurred by virtue of being subjected to "sexual harassment . . . that is so severe, pervasive, and objectively offensive, and that so undermine[d] and detract[ed] from the [their] educational experience, that the [plaintiffs were] effectively denied equal access to [the university]'s resources and opportunities" between 1978 and 1998. *Davis*, 526 U.S. at 651; *see also Kollaritsch*, 944 F.3d at 622.[14] Plaintiffs cannot, and indeed do not, simultaneously claim that at the time of Strauss's misconduct they did not know or have "reason to know of the *injury* which is the basis of [their] action." *Johnson*, 777 F.3d at 843 (citation omitted; emphasis added). The majority opinion does not solve this enigma.

---

[14] *Snyder-Hill* (R. 123, ¶¶ 2576, 2588); *Moxley* (R. 16, ¶¶ 923, 935).

Lest there is any doubt, plaintiffs allege they were subjected to obscene sexual abuse in the school's locker room or showers, at Strauss's home, or during physical exams. *Supra* Section I. At least 28 plaintiffs fled from the situation and/or later refused to be examined by Strauss or be anywhere near Strauss.[15] At least 25 plaintiffs allege that they complained to university administration, coaches, trainers, health center staff, and/or other physicians about Strauss's conduct.[16] Of the 2 plaintiffs who complained to physicians, one physician replied, "That seems really odd . . . It's not normal." *Snyder-Hill* (R. 123, ¶¶ 382-83). The other physician responded, "Dr. Strauss' actions were inappropriate and not medically necessary," and the physician wrote a note "to excuse John Doe 9 from further physicals by Dr. Strauss." (*Id.*, ¶¶ 939-40).

Remarkably, 104 plaintiffs claim Strauss's abuse has *caused* decades of suffering and many other tragedies in life (e.g., drugs, alcohol abuse, emotional disorders, relationship problems, intimacy issues, divorce, and attempted suicide).[17] And they seek damages for these harms. *Id.*

It is beyond debate that plaintiffs knew of their "injury" between 1978 and 1998. *Gabelli*, 568 U.S. at 451; *Johnson*, 777 F.3d at 843. Because the facts on the face of the complaint show that plaintiffs' claims are untimely, "dismissing the claim[s] under Rule 12(b)(6) is appropriate.'" *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 786 (6th Cir. 2016) (citation omitted); *see also* Fed. R. Civ. P. 12(b)(6); *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008).

---

[15]*Snyder-Hill* (R. 123, ¶¶ 562-63, 810, 1003, 1152, 1579, 1713, 2217, 2296-97, 2329, 2358); *Moxley* (R. 16, ¶¶ 253, 273-80, 318-19, 340, 361, 377, 398, 430, 538, 541, 552, 598, 616-17, 634, 682, 781, 789, 805, 816, 833, 882).

[16]*Snyder-Hill* (R. 123, ¶¶ 314-20, 347-51, 360-62, 382-86, 409-11, 414-16, 501-03, 572-73, 589-90, 690, 792, 814-17, 822-23, 883-84, 1086, 1095, 1226-30, 1311-12, 1429, 1832-33, 1894, 1949-51, 2085-86, 2472); *Moxley* (R. 16, ¶¶ 273, 361, 579, 618, 715, 872).

[17]*Snyder-Hill* (R. 123, ¶¶ 339, 369, 396, 425, 456, 486, 548, 630, 641, 664, 680, 698, 723, 743, 763, 782, 800, 843, 969-72, 1044-45, 1069, 1107, 1140, 1167, 1199, 1257, 1283, 1325, 1358, 1382, 1407, 1452, 1478, 1504, 1540, 1591, 1611, 1626, 1658, 1675, 1691, 1708, 1721, 1739, 1762, 1780, 1794, 1811, 1825, 1868, 1885, 1902, 1939, 1959, 1995, 2041, 2057, 2076, 2095, 2112, 2131, 2153, 2177, 2231, 2254, 2276, 2291, 2330, 2347, 2379, 2402, 2423, 2446, 2468, 2510, 2534); *Moxley* (R.16, ¶¶ 262, 289, 308, 327, 353, 369, 391, 408-09, 430-32, 482, 499, 552, 569, 592, 607, 626, 645, 661, 682, 707, 727, 744, 789-90, 805, 826, 841, 863, 882).

Yet the court's opinion concludes that all 110 plaintiffs' Title IX claims are not time-barred for "three independent reasons." (Maj. Op. 34).

*First*, the majority is willing to say that only 9 *Snyder-Hill* plaintiffs "allege that they did know that Strauss's conduct was abuse," (Maj. Op. 9-10, 32), but that is only because these 9 plaintiffs concede in their brief that they "knew Strauss abused them." *Snyder-Hill* (Appellant Br. 28 n.15). The opinion otherwise accepts the bald allegation of the other 75 *Snyder-Hill* plaintiffs and all 34 *Moxley* plaintiffs that, because they "were not trained in medicine and did not know what was medically appropriate," they "did not understand or believe that Dr. Strauss had *sexually abused*" them until sometime *after* the university publicized its investigation in April 2018.**[18]** (Emphasis added); *see* (Maj. Op. 32-34 ("[P]eople suffer serious harms resulting from their abuse, even if they do not recognize it as abuse.")). As stated, nowhere do plaintiffs allege they did not know they were "injured," nor could they.

This conflates "injury" with what qualifies as "sexual abuse." Under the discovery rule, it is irrelevant whether plaintiffs labeled Strauss's conduct as "sexual abuse." It is "discovery of the *injury*" alone that "starts the clock." *Rotella*, 528 U.S. at 555 (emphasis added). For example, "identifying professional negligence may also be a matter of real complexity, and its discovery is not required before the statute starts running" for a medical malpractice claim. *Rotella*, 528 U.S. at 556 (citing *Kubrick*, 444 U.S. at 122, 124). The same goes for any other legal label for conduct, e.g., excessive force, defamation, or sexual abuse. The "'accrual' of a claim" does not "await awareness by the plaintiff that his injury was . . . inflicted" in a way that constitutes sexual abuse. *Kubrick*, 444 U.S. at 123. Plaintiffs, "armed with the facts about the *harm* done to [them], can protect [themselves] by seeking advice in the medical and legal community. To excuse [them] from promptly doing so by postponing the accrual of [their] claim[s] would undermine the purpose of the limitations statute[.]" *Id.* (emphasis added); *see also Rotella*, 528 U.S. at 555-56.

**[18]***See, e.g., Snyder-Hill* (R. 123, ¶¶ 153-60, 267, 270-72, 390, 448, 454, 480, 484, 514, 518, 542, 546, 588, 591; Appellant Br. 10, 19, 28); *Moxley* (R. 16, ¶¶ 94-101, 209, 212-14, 256, 260; Appellant Br. 11, 18, 26 & n.19).

Just as the individual "suffering from inadequate treatment is thus *responsible for determining within the limitations period then running whether the inadequacy was malpractice*," here the limitations period started running decades ago and plaintiffs had two years to determine whether Strauss's conduct was sexual abuse and whether the university was deliberately indifferent. *Rotella*, 528 U.S. at 556 (emphasis added).

The majority then points to the statement that "[g]enerally, a motion under Rule 12(b)(6) . . . is an 'inappropriate vehicle' for dismissing a claim based upon a statute of limitations." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013). From this, it is inaccurate to summarily conclude that "whether [plaintiffs] knew or should have known that they were abused is an issue of fact for the jury." (Maj. Op. 31, 34).

That conclusion is also erroneous for another reason, even assuming plaintiffs must recognize the misconduct as "sexual abuse." Plaintiffs detailed and obscene allegations belie their assertion that they did not know Strauss's misconduct was sexual abuse. Only "factual allegations in the complaint" are taken as true; "conclusory statements" and "legal conclusions," even if "couched as a factual allegation," are "not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 681 (2009) (cleaned up). Judges cannot throw "judicial experience and common sense" out the window simply because plaintiffs assert that they did not know Strauss's conduct was, by definition, *sexual abuse*. *Id.* at 679. If that were enough, the statute of limitations would be extended indefinitely because the issue would always be consigned to a jury trial. "Repose would hinge on speculation about what the [plaintiffs] knew, when [they] knew it, and when [they] should have known it." *Gabelli*, 568 U.S. at 452; *see Jones*, 549 U.S. at 215.

*Second*, the court's opinion stitches out a new injury-and-deliberate-indifference discovery rule: "[T]he clock starts only once *the plaintiff knows* or should have known *that Ohio State administrators 'with authority to take corrective action' knew* of Strauss's conduct and failed to respond appropriately." (Maj. Op. 31-32) (emphasis added). Recall that the institution must somehow make this showing to invoke the statute of limitations defense. How exactly is that possible at any stage in litigation, especially decades after the critical events? And even if a plaintiff will "know or have reason to know that a school mishandle[d] their own report of an assault," that will not be enough to trigger accrual for a "heightened-risk claim," so long as the

plaintiff claims that they did not "know that others had complained before them or that the school was deliberately indifferent to any prior complaints." (Maj. Op. 28-29).

*Third*, and relatedly, the opinion adds that even if a plaintiff was alerted to investigate further, that will "not ultimately matter," so long as the plaintiff claims "that if they had investigated the abuse, they would not have discovered" the institution's deliberate indifference. (Maj. Op. 31-32). But when will that not be the case? With that, the opinion concludes that all 110 plaintiffs plausibly allege that they did not "know the underlying facts about Ohio State's alleged deliberate indifference." *Id.* at 30, 34.

But the Supreme Court was emphatically clear: "[I]n applying a discovery accrual rule, we have been at pains to explain that discovery of the *injury*, not discovery of the other elements of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555 (emphasis added). *Rotella* reminds us yet again that even in the context of "medical malpractice, where the cry for a discovery rule is loudest," the "discovery rule does not extend beyond the injury." *Id.* At issue in *Rotella* was the accrual of civil claims under the Racketeer Influenced and Corrupt Organizations Act (RICO). *Id.* at 551. The Court rejected plaintiff's (and this circuit's then-prevailing) "injury and pattern discovery rule," "under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and a pattern of RICO activity." *Id.* at 551, 553 (collecting cases).

Civil "RICO has a unique pattern requirement" to state a claim. *Rotella*, 528 U.S. at 556.[19] And "a pattern of predicate acts may well be complex, concealed, or fraudulent," "and involve harm to parties wholly unrelated to an injured plaintiff." *Rotella*, 528 U.S. at 555, 559. Even so, *Rotella* refused to adopt plaintiff's "less demanding" discovery rule. *Rotella*, 528 U.S. at 557. "A RICO plaintiff's ability to investigate *the cause of his injuries* is no more impaired by his ignorance of the underlying RICO pattern than a malpractice plaintiff is thwarted by ignorance of the details of treatment decisions or of prevailing standards of medical practice." *Id.* at 556-57 (emphasis added). As such, *Rotella* held that the limitations period began at the

---

[19]To state a civil RICO claim, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

"the point of injury or its reasonable discovery"—not when the plaintiff reasonably "discovered the pattern of predicate acts" for his civil RICO claim. *Id.* at 558-59.

*Rotella*'s rationale governs here (assuming the discovery rule applies). An institution's deliberate indifference is one of "the other elements" of a Title IX claim, not the "injury" element that "starts the clock." *Rotella*, 528 U.S. at 555; *see, e.g.*, *Kesterson v. Kent State Univ.*, 967 F.3d 519, 527 (6th Cir. 2020); *Kollaritsch*, 944 F.3d at 619-22. Causation is yet another element. *Kollaritsch*, 944 F.3d at 622; *see also e.g.*, *Connick v. Thompson*, 563 U.S. 51, 59 n.5 (2011) (noting that a plaintiff who has "satisfied the deliberate indifference requirement" does not automatically "satisfy the causation requirement"); *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404-05 (1997).

It makes no difference that an institution's policy or practice of deliberate indifference to prior acts of sexual harassment "might well be complex, concealed, or fraudulent, and involve harm to parties wholly unrelated to an injured plaintiff." *See Rotella*, 528 U.S. at 559. Of course, the "difficulty in identifying" such conduct is "inherent" in deliberate indifference claims. *See id*. These matters often (if not always) involve secret conduct, private disciplinary meetings, inaccessible personnel files, and conduct that may not be recorded at all. But that "only reinforces" the reasons for refusing to inject the "complexity" of deliberate indifference into the injury discovery rule. *See id.* To hold otherwise, "would bar repose, prove a godsend to stale claims, and doom any hope of certainty in identifying potential liability." *Id.*

On that score, plaintiffs' Title IX claims accrued between 1978 and 1998 when each plaintiff possessed the "critical facts that he has been hurt and who has inflicted the injury." *Twersky v. Yeshiva Univ.*, 579 F. App'x 7, 9-10 (2d Cir. 2014) (quoting *Kubrick*, 444 U.S. at 122). Namely, "they were unquestionably aware of (1) their injuries, (2) their [abuser's] identit[y], and (3) their [abuser's] prior and continued employment at [the university]." *Id.*

*Rotella* also put to rest plaintiffs' objection that without evidence of the university's deliberate indifference, plaintiffs could not file suit at the time of the abuse because they "could not overcome Rule 11, let alone Rule 12(b)(6)."[20] The Court acknowledged that RICO claims

---

[20]*Snyder-Hill* (Appellant Br. 49); *Moxley* (Appellant Br. 44).

often involve fraud and therefore must be pleaded with "particularity" under Rule 9(b)—unlike plaintiffs' Title IX claims—and yet the Court saw no reason to expand the injury discovery rule. *Rotella*, 528 U.S. at 560. And as in *Rotella*, plaintiffs' argument "ignores the flexibility provided by Rule 11(b)(3), allowing pleadings based on evidence reasonably anticipated after further investigation or discovery." *Id.*

   In fact, plaintiffs took advantage of Rule 11 in filing suit here. The university announced its investigation in April 2018. At that time, plaintiffs knew nothing more about the university's deliberate indifference than they *allegedly* did for the past several decades. And yet the *Snyder-Hill* plaintiffs managed to file suit in July 2018. Under the majority's reasoning, however, plaintiffs' claims still had yet to accrue. After all, it was not until 12 months later, in May 2019, that the Perkins Coie report publicly aired the university's dirty laundry.[21]

   If there were any lingering doubt that Title IX and § 1983 deliberate indifference claims will never accrue until the plaintiff says so decades later, the majority opinion justifies its rule because the First Circuit did just that with a § 1983 claim against a city in *Ouellette v. Beaupre*, 977 F.3d 127, 130, 139-40 (1st Cir. 2020). (Maj. Op. 27 ("We are persuaded by *Ouelette*'s reasoning and adopt it fully.")).

   But contrary to the majority opinion's suggestion, "seven of our sibling circuits" have not adopted an injury-and-deliberate-indifference discovery rule. (Maj. Op. 23, 29). *Ouellette* stands alone—the other six cases cited do not even discuss the accrual of deliberate indifference claims. Nor does the opinion mention the circuits that have refused "to adopt a 'delayed accrual' rule" for Title IX and § 1983 claims against an institution, even though "the claims against [the institution] are necessarily based on official 'policies or customs'" or deliberate indifference to prior misconduct "that could not have been known at the time of [plaintiff's] abuse." *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 763 (5th Cir. 2015) (Title IX and § 1983); *see Twersky*, 579 F. App'x at 9-10 (Title IX); *Lawson v. Rochester City Sch. Dist.*, 446 F. App'x

---

[21] *See, e.g.*, *Snyder-Hill* (R. 123, ¶¶ 271-75; *id.*, ¶ 25 n.10 (citing Michael V. Drake, *A Message from President Drake: Strauss Investigation Report*, The Ohio State University (May 17, 2019), https://president.osu.edu/ presidents/drake/news-andnotes/2019/strauss-investigation-report-campus-wide-email html)).

327, 329 (2d Cir. 2011) (§ 1983); *see also Tengood v. City of Philadelphia*, 529 F. App'x 204, 210 & n.5 (3d Cir. 2013) (§ 1983).

III.

The court's opinion then goes on to expand the *scope* of Title IX.  Although the university argues that four plaintiffs—John Doe 30, John Doe 42, John Doe 47, and John Doe 49—fail to state a Title IX claim because they were "neither students nor employees" of the university, and they were not denied the benefits of any "education program or activity" of the university, *Snyder-Hill* (Appellant Br. 51), today's decision rejects that argument.

This court has explicitly held that the right to bring suit under Title IX is limited to "those circumstances where a plaintiff is so closely tied to a university that the individual is essentially a student of that university." *Doe v. Univ. of Ky.*, 971 F.3d 553, 559 n.4 (6th Cir. 2020).  In the majority opinion's view, that rule is "not relevant" because that case involved student-on-student sexual harassment and this is a case about employee-on-student harassment.  (Maj. Op. 35).  But that does not change Title IX's coverage.  Title IX does not distinguish between students and teachers as harassers:  The statute prohibits "discrimination *under any education* program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a) (emphasis added).

Satisfied that it is freed from the bonds of precedent, the majority opinion concludes that "'members of the public' can bring a Title IX claim" if they are subject to discrimination when they are, "for example, accessing university libraries or other resources, or attending campus tours, sporting events or other activities."  (Maj. Op. 37).  That conclusion rests on dictum from a footnote in *Doe v. Brown University*, 896 F.3d 127, 132 n.6 (1st Cir. 2018), a case in which the court *rejected* a Title IX claim brought by "a freshman at Providence College, [who] was sexually assaulted by three students of Brown University . . . on Brown's campus."  *Id.* at 128.

Here, John Doe 30 and John Doe 42 were contract referees paid by the university, and they experienced a single instance of sexual harassment before or after they had refereed a wrestling match.  *Snyder-Hill* (R. 123, ¶¶ 75, 87, 1612-13, 1812).  John Doe 49 was a high school student attending a summer wrestling camp at the university.  (*Id.*, ¶¶ 94, 1940).  John Doe 47 was a high school student and "was on [the university]'s campus visiting his aunt, a

university employee." (*Id.*, ¶ 1903). "*While hanging around the athletics department by himself*, John Doe 47 was approached by Dr. Strauss," who "gave John Doe 47 a long tour of the athletics facilities and subjected him twice during that day to sexually abusive 'medical exams.'" (*Id.*, ¶¶ 1904-06) (emphasis added).

Even if any of these four plaintiffs were sufficiently tied to the university, none of them alleges that they were "den[ied] . . . equal access to an educational program or activity." *Davis*, 526 U.S. at 652; *see also Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021). That is, plaintiffs do not allege that they quit refereeing, quit the wrestling camp or intended to attend again but did not do so, or had planned to attend the university and decided not to do so. *Arocho v. Ohio University*, 2022 WL 819734, at *3-4 (6th Cir. 2022) (dismissing Title IX claims even though a university officer "sexually assaulted [a high school student] during his 'work hours and at work-related locations,' and in his Ohio University police cruiser"). Nor have the four plaintiffs even alleged that Strauss's abuse seriously "undermine[d] and detract[ed] from" their experience participating in any university activity. *Davis*, 526 U.S. at 651; *see also Kollartisch*, 944 F.3d at 622 (noting examples of an impaired experience).

"Emotional harm standing alone is not a redressable Title IX injury." *Kollartisch*, 944 F.3d at 622; *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1569, 1576 (2022).

\*     \*     \*

In the end, this court's opinion grants the plaintiffs what the democratic process has effectively denied them. In 2019, Ohio legislation was proposed to grant the right to "bring a civil action against a land grant university to recover damages for any injury . . . proximately caused by sexual misconduct against the victim that was committed between January 1, 1978, and December 31, 2000, by a physician who was an employee of the university during that period of time." H.B. 249, 133rd Gen. Assemb., Reg. Sess. (Ohio. 2019). The proposal specifically provided that "there is no period of limitations for a civil action brought by [such] a victim." *Id*. But H.B. 249 failed to pass the introduction stage. Michigan, under similar

circumstances, has enacted more measured legislation, and additional legislation is being considered.[22]

       I respectfully dissent.

---

[22] *See* 2018 Mich. Pub. Act No. 183, §§ 5805(2)-(6), 5851b(1)-(3) (codified as amended at Mich. Comp. Laws §§ 600.5805, 600.5851b); *see also* H.B. 5962, 101st Leg., Reg. Sess. (Mich. 2022); H.B. 4306, 101st Leg., Reg. Sess. (Mich. 2021).

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 21-3981/3991

STEVE SNYDER-HILL; RONALD MCDANIEL; DAVID
MULVIN; WILLIAM BROWN; KURT HUNTSINGER;
WILLIAM RIEFFER; STEVE HATCH; KELLY REED;
MELVIN ROBINSON; DOUGLAS WELLS; JAMES
KHALIL; JERROLD L. SOLOMON; JOSEPH BECHTEL;
MICHAEL MURPHY; JOHN DAVID FALER; MATT
MCCOY; GARY AVIS; ROBERT SCHRINER; MICHAEL
MONTGOMERY; JOHN DOES 1–22, 25, 27, 29–37, 39–47,
49, 52, 54, 56–60, 62–64, and 66–77 (21-3981); TIMOTHY
MOXLEY; RYAN CALLAHAN; JOHN JACKSON, JR.;
JAMES CARROLL; JEFFREY ROHDE; PATRICK
MURRAY; EVERETT ROSS; JOHN DOES 78–95 and 97–
105 (21-3991),

     Plaintiffs - Appellants,

     v.

THE OHIO STATE UNIVERSITY,

     Defendant - Appellee.

> **FILED**
> Sep 14, 2022
> DEBORAH S. HUNT, Clerk

Before: GUY, MOORE, and CLAY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk