# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: December 14, 2022

Mr. David John Barthel
Mr. Timothy Raymond Bricker
Mr. Michael Hiram Carpenter
Carpenter, Lipps & Leland
280 N. High Street, Suite 1300
Columbus, OH 43215

Ms. Marissa Benavides
Ms. Debra L. Greenberger
Mr. Ilann Margalit Maazel
Emery Celli Brinckerhoff Abady Ward & Maazel
600 Fifth Avenue, Tenth Floor
New York, NY 10020

Ms. Alexandra Zoe Brodsky
Ms. Adele P. Kimmel
Public Justice
1620 L. Street, N.W., Suite 630
Washington, DC 20036

Mr. Andrew J. Clopton
Mr. Stephen Joseph Cowen
Ms. Amanda Kelly Rice
Jones Day
150 W. Jefferson Avenue, Suite 2100
Detroit, MI 48226

Mr. Roger A. Cooper
Ms. Sarah Braude Gutman
Ms. Charity E. Lee
Mr. Mitchell A. Lowenthal
Cleary, Gottlieb, Steen & Hamilton
One Liberty Plaza
New York, NY 10006

Mr. James Patrick Davy
Law Office
P.O. Box 15216
Pennsylvania, PA 19125

Mr. Michael L. Dillard Jr.
Arnold Clifford
115 W. Main Street, Fourth Floor
Columbus, OH 43215

Mr. Konrad Kircher
Rittgers & Rittgers
12 E. Warren Street
Lebanon, OH 45036

Mr. David A. Lebowitz
Kaufman Lieb Lebowitz & Frick
18 E. 48th Street, Suite 802
New York, NY 10017

Mr. Seth Massey
Ms. Alexandra Rose
Ms. Caroline Zalka
Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153

Mr. James Robert Saywell
Jones Day
901 Lakeside Avenue, E.
Cleveland, OH 44114

Ms. Arianna M. Scavetti
Weil, Gotshal & Manges
2001 M Street, N.W., Suite 600
Washington, DC 20005

Mr. Scott E. Smith
Scott Elliot Smith
5003 Horizons Drive, Suite 101
Columbus, OH 43220

Mr. Tad Thomas
Thomas Law Offices
9418 Norton Commons Boulevard, Suite 200
Louisville, KY 40059

Re: Case Nos. 21-3981/21-3991, *Snyder-Hill, et al. v. The Ohio State University*
Originating Case No. : 2:18-cv-00736

Dear Counsel,

The attached order designated for full-text publication was filed today in this case.

Yours very truly,

Deborah S. Hunt, Clerk

Laurie A Weitendorf, Opinions Deputy

cc: Mr. Richard W. Nagel

Enclosure

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0266p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

STEVE SNYDER-HILL; RONALD MCDANIEL; DAVID
MULVIN; WILLIAM BROWN; KURT HUNTSINGER;
WILLIAM RIEFFER; STEVE HATCH; KELLY REED;
MELVIN ROBINSON; DOUGLAS WELLS; JAMES KHALIL;
JERROLD L. SOLOMON; JOSEPH BECHTEL; MICHAEL
MURPHY; JOHN DAVID FALER; MATT MCCOY; GARY
AVIS; ROBERT SCHRINER; MICHAEL MONTGOMERY;
JOHN DOES 1–22, 25, 27, 29–37, 39–47, 49, 52, 54, 56–
60, 62–64, and 66–77 (21-3981); TIMOTHY MOXLEY;
RYAN CALLAHAN; JOHN JACKSON, JR.; JAMES
CARROLL; JEFFREY ROHDE; PATRICK MURRAY;
EVERETT ROSS; JOHN DOES 78–95 and 97–105 (21-
3991),

> Nos. 21-3981/3991

                  *Plaintiffs-Appellants*,

    *v.*

THE OHIO STATE UNIVERSITY,

              *Defendant-Appellee*.

On Petition for Rehearing En Banc

United States District Court for the Southern District of Ohio at Columbus;
Nos. 2:18-cv-00736 (21-3981); 2:21-cv-03838 (21-3991)—Michael H. Watson, District Judge.

Decided and Filed:  December 14, 2022

Before:  GUY, MOORE, and CLAY, Circuit Judges.

———————————

### COUNSEL

**ON PETITION FOR REHEARING EN BANC:**  Michael H. Carpenter, Timothy R. Bricker,
David J. Barthel, CARPENTER, LIPPS & LELAND, LLP, Columbus, Ohio, for Appellee.  **ON
RESPONSE:**  Ilann M. Maazel, Debra L. Greenberger, Marissa R. Benavides, EMERY CELLI
BRINCKERHOFF ABADY WARD & MAAZEL LLP, New York, New York, Adele P.

Kimmel, Alexandra Z. Brodsky, PUBLIC JUSTICE, P.C., Washington, D.C., Scott E. Smith, SCOTT ELLIOT SMITH, LPA, Columbus, Ohio, for Appellants.  **ON BRIEF:**  James R. Saywell, JONES DAY, Cleveland, Ohio, Stephen J. Cowen, Amanda K. Rice, Andrew Clopton, JONES DAY, Detroit, Michigan, for Amicus Curiae.

The panel issued an order denying the petition for rehearing en banc.  MOORE, J. (pp. 3–10), delivered an opinion concurring in the denial of rehearing en banc.  THAPAR (pg. 11) and READLER, JJ. (pp. 12–28), delivered separate opinions dissenting from the denial of the petition for rehearing en banc, in which BUSH, J., joined the latter.

————————————

**ORDER**

————————————

The court received a petition for rehearing en banc.  The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case.  The petition then was circulated to the full court.  Less than a majority of the judges[*] voted in favor of rehearing en banc.

Therefore, the petition is denied.

Judge Guy would grant rehearing for the reasons stated in his dissent.

---

[*]Judge Murphy recused himself from participation in this ruling.

---

## CONCURRING IN THE DENIAL OF REHEARING EN BANC

---

KAREN NELSON MOORE, Circuit Judge, concurring in the denial of rehearing en banc. The dissent from denial of rehearing recycles the same arguments put forth in the panel dissent to accuse this court of ignoring Supreme Court precedent in order to expand the scope of Title IX when, in fact, the panel's decision was firmly rooted in both this court's and the Supreme Court's long-standing precedents. Despite the en banc petition's and the dissent's claims to the contrary, the panel's opinion did *not* eliminate the statute of limitations for Title IX claims, nor did it improperly broaden the reach of Title IX. Instead, this court straightforwardly applied the discovery rule to the plaintiffs' claims, in line with both our precedent and the plain language of Title IX. The panel correctly decided this case for the reasons explored at length in our original opinion. I write separately to reiterate that our decision conformed with Supreme Court precedent, our precedent, the precedents of our sibling circuits, and the text of Title IX.

In *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686 (6th Cir. 2022), this court held that the plaintiffs' Title IX claims against the Ohio State University were not barred by the statute of limitations because the plaintiffs adequately alleged that they did not know, and could not have reasonably known, that they were injured by Ohio State until 2018. *Id.* at 690. This case arose from the allegations that Dr. Richard Strauss, a university physician and athletic team doctor at Ohio State, abused hundreds of young men between 1978 and 1998 under the guise of performing medical examinations. *Id.* at 689. The allegations became public only in 2018, following Ohio State's commissioning of an independent investigation undertaken by the law firm Perkins Coie, which substantiated the plaintiffs' allegations of abuse. *Id.* at 691. After the allegations became public, the plaintiffs filed Title IX suits against Ohio State, alleging that Ohio State was deliberately indifferent to their heightened risk of abuse. *Id.* at 689–90. Because the plaintiffs, in the context of a motion to dismiss, plausibly alleged that Ohio State engaged in a decades-long cover up regarding Strauss's behavior, which prevented them from reasonably being able to discover Ohio State's actions in enabling their abuse, this court held that their Title

Nos. 21-3981/3991          *Snyder-Hill, et al. v. Ohio State Univ.*          Page 4

IX claims against Ohio State did not accrue until 2018, and that the claims therefore were not barred by the two-year statute of limitations.  *Id.* at 690, 705–06.

All of the plaintiffs have plausibly alleged that they could not have known about Ohio State's responsibility for their abuse, because they had no "reason to know that others had previously complained to Ohio State about Strauss's conduct, let alone how Ohio State had responded to any previous complaints."  *Id.* at 694.  Indeed, two physicians employed by Ohio State "stated that they did not know of 'any way' that 'any Ohio State student' could have known that Ohio State knew about Strauss's abuse and nonetheless failed to 'get rid of' him."  *Id.*  That is because Ohio State administrators engaged in a long-standing cover up of Strauss's behavior by hiding what they knew about his abuse, falsifying Strauss's performance reviews, destroying medical records, shredding files relating to Strauss's abuse, and actively misleading students about Strauss and Ohio State's knowledge of his abuse.  *Id.* at 692–94, 705.

Some plaintiffs alleged yet more specific instances of concealment:  Snyder-Hill alleged that the director of Ohio State's Student Health Services "sent him a letter falsely stating that Ohio State had never before received a complaint about Strauss," even though the administration had "received multiple complaints, including one just three days earlier."  *Id.* at 695.  The director then "agreed to inform Snyder-Hill about any future complaints" about Strauss but never did so.  *Id.*  The director also "falsely told Snyder-Hill that all complaints would be kept in Strauss's personnel file," but the file "had no record of Snyder-Hill's or any other complaint."  *Id.*  In short, although the plaintiffs argue that Ohio State administrators knew about Strauss's abuse as it was occurring, the plaintiffs also "allege that *they* did not know until 2018 that Ohio State administrators knew or that they enabled and perpetrated the abuse."  *Id.*  And because Ohio State's conduct was the cause of the plaintiffs' injury under Title IX, their claims did not accrue until they reasonably could have discovered that conduct.  *Id.* at 705–06.

Even though Ohio State may have mishandled the plaintiffs' individual reports of Strauss's abusive conduct, until 2018 the plaintiffs had no reason to know that the mishandling of their reports was part of a much broader policy of deliberate indifference towards Strauss's abuse.  *Id.* at 704.  Because the plaintiffs bring their Title IX claims on a theory of deliberate indifference, Ohio State's prolonged cover up and enabling of Strauss's severe, pervasive, and

ongoing sexual assaults of students, which put the plaintiffs at heightened risk of abuse, constituted the cause of their injury under Title IX. *See id.* Thus, the plaintiffs had no reason to know that Ohio State injured them until Ohio State's conduct became public. This court accordingly held that the plaintiffs' claims survived Ohio State's motion to dismiss "for three independent reasons." *Id.* at 707. In sum, this court concluded that:

> First, the plaintiffs plausibly allege that they did not know and lacked reason to know that Ohio State caused their injury. Second, they plausibly allege that even if they had investigated further, they could not have learned of Ohio State's conduct. Third, most plaintiffs plausibly allege that they did not know that they were abused. Alone, each of these grounds is sufficient to delay accrual.

*Id.* The panel therefore provided several independently adequate grounds for its holding.

The panel's application of the discovery rule fully comports with our precedent and Supreme Court precedent. This court has held that "[t]he general federal rule is that 'the statute of limitations begins to run when the reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of that injury.'" *Bishop v. Child.'s Ctr. for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010) (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)). In other words, the "discovery rule" applies absent a statutory directive to the contrary. Because "Title IX does not contain its own statute of limitations," *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 728 (6th Cir. 1996), our precedent dictates that the discovery rule determines when a Title IX claim will accrue. The panel's opinion thus straightforwardly applied this general federal rule to the facts of this case. As the panel explained, "we have long held that the discovery rule applies in the § 1983 context." *Snyder-Hill*, 48 F.4th at 698 (collecting cases). And "every other circuit to have considered the matter in a published opinion has concluded that Title IX is subject to the same limitations period as § 1983." *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759 (5th Cir. 2015) (collecting cases).

The dissent's reliance on *Rotkiske v. Klemm*, 140 S. Ct. 355 (2019), is misplaced, for the reasons explained in depth in the panel opinion. *Rotkiske* involved the accrual of claims under the Fair Debt Collection Practices Act ("FDCPA"), the text of which—unlike Title IX—contains a statute of limitations. 140 S. Ct. at 358. It therefore has no bearing on the application of the

discovery rule when a statute is silent as to accrual, and no circuit has applied *Rotkiske* to Title IX. *See, e.g.*, *Ouellette v. Beaupre*, 977 F.3d 127, 136 (1st Cir. 2020); *Sohm v. Scholastic Inc.*, 959 F.3d 39, 50 & n.2 (2d Cir. 2020); *Johnson v. Chudy*, 822 F. App'x 637, 638 (9th Cir. 2020); *Lupole v. United States*, No. 20-1811, 2021 WL 5103884, at \*1 (4th Cir. Nov. 3, 2021). As the panel opinion noted, "[n]o appellate court has held that *Rotkiske* did away with the common-law discovery rule when a statute is silent." *Snyder-Hill*, 48 F.4th at 700. Had the panel adopted the reading of *Rotkiske* urged by the dissent, it would have made our circuit the outlier and risked creating a circuit split where there currently is none.

The dissent relies on *Dibrell v. City of Knoxville*, 984 F.3d 1156 (6th Cir. 2021), to claim that the panel disregarded this court's precedent in applying the discovery rule. But *Dibrell* plainly declined to decide which rule applied to the accrual of the plaintiff's § 1983 claim, because his claim was untimely under either rule. 984 F.3d at 1162 ("We need not resolve this tension now because Dibrell's claims would be untimely either way."). Any other commentary in *Dibrell* regarding whether *Rotkiske* altered our application of the discovery rule was therefore mere dicta, and it overlooked the fact that *Rotkiske*'s complaint about "bad wine" instead referred to "the use of the discovery rule to override clear statutory text," as was the case with the FDCPA. *Snyder-Hill*, 48 F.4th at 700. Because the text of Title IX is silent as to both the statute of limitations and the accrual of claims, the application of the discovery rule to Title IX claims does not run afoul of *Rotkiske*'s command.

Our sibling circuits also apply the discovery rule in Title IX cases. *See, e.g.*, *King-White*, 803 F.3d at 762; *Doe v. Howe Mil. Sch.*, 227 F.3d 981, 988 (7th Cir. 2000); *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006). The dissent dismisses these cases as irrelevant post-*Rotkiske*, but as the original panel opinion and our sibling circuits have explained, there is no reason to believe that *Rotkiske* changes our analysis of which rule applies to claims pursuant to a statute that is silent as to accrual, as Title IX is. There is therefore also no reason to believe that *Rotkiske* invalidated the logic of our sibling circuits' pre-*Rotkiske* decisions. The sole case cited by the dissent as purportedly following a different rule in fact simply declined to decide whether the discovery rule could apply to the plaintiff's § 1983 and Title IX claims, for much the same reason as *Dibrell*—the claims were untimely either way. *Varnell v. Dora Consol.*

*Sch. Dist.*, 756 F.3d 1208, 1216 (10th Cir. 2014) ("[E]ven if the discovery rule applies to her § 1983 claim, Plaintiff knew long before she filed suit all the facts necessary to sue and recover damages."). No circuit split exists on this issue. The panel's decision on this point was therefore firmly grounded in the precedent of this circuit, other circuits, and the Supreme Court. The panel embraced no other purpose than staying faithful to existing precedent.

One final point on the panel's decision to apply the discovery rule: the dissent appears to misunderstand our law in claiming that the panel "overr[ode] a limitations period selected by a state legislature." Dissenting Op. at 28. Everyone agrees that Ohio's two-year statute of limitations for personal injury claims applies here. *Snyder-Hill*, 48 F.4th at 698. The discovery rule simply determines when a Title IX claim accrues, which is when the two-year limitations period starts to run. This is firmly in line with our precedent, which holds that, although state law determines the length of the limitations period, "federal standards govern when the statute begins to run." *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003).

Next, the dissent quarrels with the panel's formulation of the discovery rule, contending that the panel applied an accrual rule "unique to deliberate indifference claims." Dissenting Op. at 23. This is flat wrong. Both this court and the Supreme Court have long held that, under the discovery rule, a claim accrues when a plaintiff knows both their injury and the cause of that injury. *See Bishop*, 618 F.3d at 536 (quoting *Campbell*, 238 F.3d at 775); *United States v. Kubrick*, 444 U.S. 111, 122 (1979). The panel simply applied this standard formulation of the discovery rule to the specific contours of a Title IX deliberate-indifference claim. As the panel explained, "[i]n a Title IX case, a plaintiff's cause of action is against the school based on the school's actions or inactions, not the actions of the person who abused the plaintiff." *Snyder-Hill*, 48 F.4th at 702. Thus, a Title IX plaintiff does not know the cause of their injury until they have knowledge of the institution's action or inaction.

In the context of deliberate indifference, a plaintiff's awareness that their own complaint may have been mishandled does not necessarily give the plaintiff a reason to know that the university has a broader policy of deliberate indifference towards such complaints, which constitutes the cause of the injury in a pre-assault heightened-risk claim. *See Karasek v. Regents of Univ. of Cal.*, 500 F. Supp. 3d 967, 981 (N.D. Cal. 2020). This is what distinguishes the

plaintiffs' claims here from *King-White*, which the dissent suggests reached a different conclusion on analogous facts. But the logic of *King-White* does not conflict with the panel's reasoning. *See Snyder-Hill*, 48 F.4th at 704. *King-White* concluded that accrual occurs under the discovery rule upon the plaintiff's awareness of their injury and "causation, that is, the connection between the injury and the defendant's actions." 803 F.3d at 762 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001)). *King-White* therefore applied the same formulation of the discovery rule as the panel did here. The difference is that *King-White* dealt with *post*-assault, not pre-assault, claims, *id.* at 756–57, and thus the *King-White* plaintiffs did become aware of the cause of their injury when their complaints went unheeded by the school administration, *id.* at 762. Thus, again, there is no conflict with our sibling circuits. Instead, the panel applied the standard formulation of the discovery rule to the particular facts of this case.

Although the dissent claims that the panel majority dropped the "reasonable person" portion of the discovery-rule inquiry and never addressed whether the plaintiffs ought to have investigated further, the panel opinion in fact covered both of these points. Quoting the Supreme Court for the proposition that the limitations period began to run when "a *reasonably* diligent plaintiff would have discovered 'the facts constituting the violation,'" *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (emphasis added), the panel opinion explained that "even if the plaintiffs should have investigated, the clock does not start if the plaintiffs would not have learned that Ohio State injured them." *Snyder-Hill*, 48 F.4th at 705. And because the plaintiffs plausibly alleged that Ohio State engaged in a decades-long cover up by concealing the abuse and their knowledge of it, destroying records, giving Strauss false performance reviews, and actively misleading students, the panel concluded that the plaintiffs could not have reasonably discovered Ohio State's conduct even if they had investigated further. *Id.*

Finally, the dissent incorrectly contends that the panel expanded the scope of Title IX by holding that non-student plaintiffs could bring claims under Title IX. The panel's decision on this point was clearly dictated by the text of Title IX itself. The panel simply held that Title IX means what it says: "[n]o *person* . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a) (emphasis added).

Indeed, the Supreme Court has concluded that "Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' if it had wished to restrict the scope of [Title IX]." *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982). Congress did not do so. As the panel explained, "Title IX's plain language sweeps more broadly." *Snyder-Hill*, 48 F.4th at 707. To have held otherwise would have conflicted with our precedent, and that of our sibling circuits and the Supreme Court. *See, e.g.*, *Bell*, 456 U.S. at 521; *Doe v. Claiborne County*, 103 F.3d 495, 513–14 (6th Cir. 1996) (holding that "Title IX's application should be accorded a 'sweep as broad as its language'" (citation omitted)); *Doe v. Brown Univ.*, 896 F.3d 127, 132 n.6 (1st Cir. 2018); *Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.*, 693 F.3d 1303, 1311 (10th Cir. 2012) (Gorsuch, J.). The panel's interpretation of Title IX was mandated by the dictates of both Congress and the Supreme Court.

The panel then turned to the final step of the inquiry under Title IX: whether the non-student plaintiffs were discriminated against under an education program or activity. *Snyder-Hill*, 48 F.4th at 707–08. Because there is "no binding authority that establishes a framework for this analysis," *id.* at 708, the panel appropriately turned to our sibling circuits for guidance. The First Circuit has held that a person may bring a Title IX claim if they suffer covered discrimination "while participating, or at least attempting to participate, in the funding recipient's education program or activity." *Doe v. Brown Univ.*, 896 F.3d at 131. A person can participate or attempt to participate by "avail[ing] themselves of the services provided" by covered institutions, such as by "access[ing] university libraries, computer labs, and vocational resources," or "attend[ing] campus tours, public lectures, sporting events, and other activities." *Id.* at 132 n.6. In the absence of contrary authority, the panel found the First Circuit's reasoning persuasive and adopted this framework, applying it to the non-student plaintiffs' claims.

The dissent asks what education program or activity John Doe 47 was attempting to participate in, a question answered by the panel majority's opinion. John Doe 47 plausibly alleged that Strauss gave him "a long tour of the athletics facilities," and assaulted him "under the guise that [Strauss] would show John Doe 47 the types of medical exams athletes had to get to be cleared to play for OSU." *Snyder-Hill* R. 123 (2d Am. Compl. ¶¶ 1906–11) (Page ID #2251). As the panel explained, "[e]ven if this was not a bona fide education activity because it

was merely a guise for Strauss's abuse, John Doe 47 was '*attempting* to participate in an education program' because he believed that he was receiving a bona fide tour of Ohio State's facilities, offered by an Ohio State employee." *Snyder-Hill*, 48 F.4th at 708–09 (quoting *Doe v. Brown Univ.*, 896 F.3d at 132). The panel thus applied the framework provided by the First Circuit to the specific facts alleged by each non-student plaintiff to determine whether they were able to raise Title IX claims against Ohio State.

Ultimately, the panel's decision already considered fully and rejected fairly all of the arguments now re-urged by the dissent. A majority of this court thus correctly determined that no compelling reasons exist to justify rehearing this case en banc. The panel's opinion did not conflict with our precedent, nor with the precedent of our sibling circuits or the Supreme Court. In fact, had the panel held otherwise, it would have risked *creating* a circuit split. And the holding desired by the dissent would have ignored Title IX's plain language and eviscerated Title IX's purpose by creating a perverse incentive for institutions to run out the clock on the limitations period by covering up sexual abuse. For the reasons explained more fully in the panel majority opinion, this case involved simply a straightforward application of precedent to a highly fact-bound case, and thus this court appropriately declined en banc review. Accordingly, I concur in the denial of rehearing en banc.

---

### DISSENTING FROM THE DENIAL OF REHEARING EN BANC

---

THAPAR, Circuit Judge, dissenting from the denial of rehearing en banc.  Because of the tension between Sixth Circuit and Supreme Court precedent about when a claim accrues, I would have granted rehearing en banc.  *See Dibrell v. City of Knoxville*, 984 F.3d 1156, 1162 (6th Cir. 2021); *see also infra*, at 15–21 (Readler, J., dissenting from denial of reh'g en banc); *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 711–15 (6th Cir. 2022) (Guy, J., dissenting).

---

## DISSENTING FROM THE DENIAL OF REHEARING EN BANC

---

CHAD A. READLER, dissenting from denial of rehearing en banc. This year marks the 50th anniversary of Title IX's enactment. Over five decades, that groundbreaking law has effectuated many changes in campus life. And with a half-century of history and experience to consider, Congress might fairly contemplate extending the law's reach.

But why wait for Congress? In reversing a decision dismissing a Title IX suit filed against the Ohio State University, our Court took legislative matters into its own hands: it both extended Title IX's scope and effectively lengthened the time a plaintiff has to file suit for purported violations. *See generally Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686 (6th Cir. 2022). Over a vigorous dissent, the majority opinion in *Snyder-Hill* held that Title IX claims tracing back as far as four decades were nonetheless timely according to the "discovery rule" for claim accrual. In reaching that conclusion, the majority opinion leaned on the discovery "rule's purpose" as well as "Title IX's broad remedial purpose." *Id.* at 701. The majority opinion then extended Title IX's application to athletics referees, teenagers visiting campus, and others with no intention of being educated or employed by Ohio State. *Id.* at 708–09.

For many reasons, that decision should not stand. Start with its inattention to Supreme Court precedent. As Judge Guy recognized in dissent, "[n]o less than twice the Supreme Court has told courts what to do" for claim accrual purposes "when there is no federal statute of limitations at all," as is the case for Title IX: apply the occurrence rule, not the discovery rule. *Id.* at 713 (Guy, J., dissenting); *see also Wallace v. Kato*, 549 U.S. 384, 388 (2007) (describing the occurrence rule as "the standard rule that accrual occurs when the plaintiff . . . can file suit and obtain relief." (cleaned up)). That command deserves particular attention in the context of an implied cause of action, where separation of powers concerns are at their apex. *See Egbert v. Boule*, 142 S. Ct. 1793, 1809 (2022) (Gorsuch, J., concurring). Yet the majority opinion ignored the Supreme Court's instructions, an all too common practice in our Circuit. *See Shoop v. Cunningham*, 598 U.S. — (2022), slip op. at *13 (Thomas, J., dissenting from denial of cert.).

*Snyder-Hill* next distorted Title IX in ways no other circuit has licensed. First, it crafted an accrual rule unique to Title IX deliberate indifference claims. 48 F.4th at 703–04 (majority op.). Then, it read Title IX to cover virtually anyone who sets foot on campus, no matter the reason. *Id.* at 708–09. Even the 100,000 fans attending a Buckeyes football game, it appears. In that respect, the majority opinion is less a "construction of a statute" than it is "an enlargement of it by the court." *See Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) (quotations omitted).

Those errors are likely to multiply. Cases arising out of any federal statutory scheme lacking an explicit accrual date risk being tainted by the majority opinion's adoption of the wrong default rule. And if this case is any indicator, those cases may reach back to conduct over 40 years old, older than some members of our Court. Regrettably, the majority opinion has saddled the federally funded educational institutions in our circuit with this distorted application of Title IX. It is thus no surprise that amici universities with a collective enrollment of over 200,000 students—the University of Michigan, Purdue University, and others—asked us to hear the case en banc. That is on top of the Ohio State University, which itself enrolls 65,000 students. In that way, the majority opinion brought together in shared opposition collegiate rivals that rarely see eye to eye. To those universities' minds, to mine, and, most importantly, to the Supreme Court's, we are to apply the occurrence rule in this and similar settings. As that message was lost on the majority opinion, the Supreme Court should say so yet again, before more jurisprudential damage is done.

## I.

The underlying events have been well-documented in the national media and by the majority opinion. *See, e.g.*, Rick Maese, *Ohio State Team Doctor Sexually Abused 177 Students Over Decades, Report Finds*, Wash. Post (May 17, 2019); Artemis Moshtaghian, *Nearly 30 New Alleged Abuse Victims Sue The Ohio State University*, CNN (July 2, 2021); *Survivors of Former Ohio State Team Doctor Richard Strauss Plead for Different Response from University*, ESPN (Nov. 18, 2021). For today's purposes, I accept as true the allegations in plaintiffs' complaint. They tell a disturbing tale.

For over two decades, Ohio State employed Dr. Richard Strauss as an athletic team doctor. He was also a serial sex abuser. During his tenure, Strauss committed roughly 1,500 sexual assaults against nearly 200 patients, most of them Ohio State students. Those acts ranged from fondling to masturbating to anal rape. A few examples make the point. Strauss digitally penetrated and pressed his erect penis against one plaintiff; groped and pulled another's penis for twenty minutes before asking him if "it ever get[s] hard"; twice attempted to perform oral sex on another; repeatedly attempted to kiss and fondle another; and told yet another that he needed to massage and "milk" the patient's penis "to make sure everything was working properly," before masturbating him until ejaculation. Some victims were well below the age of majority.

Word of Strauss's behavior spread quickly. Ohio State received complaints about Strauss from the very start, a theme that remained constant over the ensuing decades. Coaches, trainers, and administrators often discussed Strauss's abuse, with many having witnessed Strauss shower alongside athletes, ogle them, and make comments about their bodies in the locker room. "At least one coach threatened athletes with having to see Dr. Strauss if they did not listen to the coach."

Strauss's victims also well-understood the nature of his conduct. Athletes would tell their teammates "to watch out for" Strauss, comparing his examinations to "being 'hazed.'" But watching out would not do much good, it seems. After all, as the complaint alleges, "if the [athletes] wanted to keep their scholarships or continue playing for OSU, they had to go to" Strauss.

The University's response was far from heroic. It denied to complaining athletes that others had voiced similar complaints, and it destroyed Strauss's patients' records. No University official reported Strauss to the state medical board, let alone the police. Instead, the University continued to tolerate Strauss's behavior. He was allowed to retain his faculty appointment. And with the exception of the fencing team—which was assigned a new doctor after the coach forced the issue in 1994—Strauss was allowed to continue to treat Ohio State athletes. It was not until 1996 that the University ultimately removed Strauss as a treating physician after receiving three formal complaints. In 1998, Strauss retired voluntarily. He committed suicide a few years later. In 2018, over two decades after Strauss's removal as a treating physician, the University

commissioned an independent investigation and report into Strauss's conduct, which served as the impetus of this lawsuit.

## II.

A. From this account, two observations must cross the mind. One, the conduct at issue was alarming—Strauss and Ohio State deserve no praise, and the victims our deepest sympathies. Two, having been gravely harmed by Strauss and Ohio State, and oftentimes aware that others had received similar abuse, the victims nonetheless waited decades to come forward with their civil claims. By the time they did, Ohio's two-year limitations period for personal injury claims had long since expired. *See* Ohio Rev. Code § 2305.10; *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996) (applying the personal injury limitations period to assault actions pursued under Title IX). With their dated claims foreclosed, plaintiffs invoked a novel theory of Title IX liability. The district court, as one might expect, dismissed the suit as untimely. To resuscitate plaintiffs' action, the majority opinion, over Judge Guy's dissent, crafted a new accrual rule to govern plaintiffs' claims, shunning numerous precedents along the way.

1. Ordinarily, such stale claims would fail from the start. By way of background, a fundamental aim of our civil legal regime is to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Gabelli v. SEC*, 568 U.S. 442, 448–49 (2013) (quoting *R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944)). To achieve those aims, legislatures and courts employ a limitations period for virtually every kind of civil suit. Even, it bears noting, when the underlying conduct is reprehensible. *See, e.g.*, *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 758 (5th Cir. 2015) (holding that claims arising out of the repeated sexual abuse of a high school student by a school dance instructor were barred by the statute of limitations); *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 808–09 (M.D. Tenn. 2016) (holding that a rape-based Title IX claim was untimely where it was pursued after the one-year limitations period expired).

The claims before us are creatures of judicial fiat, not express legislative authorization. *See Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979). Yet even where we deem the legislative branch to have implied a statutory cause of action, we are not at liberty to conclude that Congress also implied an unending statute of limitations for those claims. *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 77–78 (1992) (Scalia, J., concurring). Our marching orders, in fact, are to the contrary.

When dealing with federal statutes that lack an explicit limitations period, we begin by looking to state law to determine the period's length. *See Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 484 (1980). We do the same for assessing what circumstances may justify tolling that period. *Id.* at 485. Federal law also comes into play. To determine a claim's accrual date, we look to federal law, as informed by "common-law tort principles." *Wallace*, 549 U.S. at 388. Sometimes, Congress is explicit about a claim's accrual date. In Title IX, however, it was silent. In that instance, we turn to the "standard rule" at common law, also known as the occurrence rule: the limitations period begins to run "when 'the plaintiff can file suit and obtain relief.'" *Id.* (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)); *see also Everly v. Everly*, 958 F.3d 442, 460 (6th Cir. 2020) (Murphy, J., concurring) ("The . . . 'occurrence rule' . . . begins the limitations period on the . . . first day the plaintiff could assert a cause of action for that violation in court."). That instruction is well worn—the Supreme Court has repeated it many times, including just three years ago. *See Rotkiske*, 140 S. Ct. at 360 ("Congress legislates against the 'standard rule that the limitations period commences when the plaintiff has a complete and present cause of action.'" (quoting *Graham Cnty. Soil & Water Conserv. Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 418–19 (2005))); *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019) (setting the "presumptive[]" time of accrual as "when the plaintiff has a complete and present cause of action" (quotations omitted)).

Viewed through this lens, plaintiffs' claims are untimely. With Strauss's behavior an open secret around campus, plaintiffs, at the time they were abused, could have filed suit against Ohio State for its indifference to Strauss's conduct. *See, e.g.*, *Peguero v. Meyer*, 520 F. App'x 58, 60 (3d Cir. 2013) ("Peguero's cause of action accrued in 2005, when he was allegedly

injured by the defendants' deliberate indifference to safety procedures[.]"); *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d at 808–09 (rejecting an argument that pre-assault deliberate indifference claims could not have been brought as of the date of assault). At that point, the underlying events would have allowed plaintiffs to "file suit and obtain relief" based upon the University's disregard of a known, pervasive problem affecting student athletes. But as more than two years passed before plaintiffs pursued them, those claims, the Ohio General Assembly tells us, are untimely. *See* Ohio Rev. Code § 2305.10; *Wallace*, 549 U.S. at 388; *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1162 (6th Cir. 2021); *Snyder-Hill*, 48 F.4th at 710 (Guy, J., dissenting).

2. The majority opinion had other ideas. It first dismissed the Supreme Court's instruction that federal courts apply the "standard rule" in this setting as not explicit enough. *Snyder-Hill*, 48 F.4th at 700 (majority op.); *id.* at 713 (Guy, J., dissenting) ("[T]he majority opinion takes the view that the Court's application of the occurrence rule was a mere suggestion that 'does not impact our analysis.'"). It then unabashedly employed a disfavored manner of judging to guide the opinion's interpretive course—it embraced Title IX's purported remedial purposes to expand access to its implied cause of action. *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) (observing that we have "abandoned" the understanding that courts should "provide such remedies as are necessary to make effective the congressional purpose expressed by a statute" (citations omitted)). Title IX's remedial purpose, the majority opinion surmised, is to "provide[] relief broadly to those who face discrimination on the basis of sex in the American education system." *Snyder-Hill*, 48 F.4th at 699 (majority op.) (quoting *Doe v. Univ. of Ky.*, 971 F.3d 553, 557 (6th Cir. 2020)). To serve that judge-found purpose, the majority opinion deployed the discovery rule to govern the accrual date for plaintiffs' claims. That gambit allowed the majority opinion to delay the commencement of the limitations period for those claims until a "reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of his injury." *Id.* at 701 (quoting *Bishop v. Children's Ctr. for Dev'l Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010)). And as the majority opinion deemed that "discovery" date to have occurred after 2018, when Ohio State commissioned a law firm to investigate and report on historical practices at the University, plaintiffs' decades-old claims were once again timely. *Id.* at 694–95.

The majority opinion's path to that result left multiple lines of Supreme Court authority in its wake. From *Wallace* to *McDonough* to *Rotkiske*, the Supreme Court has made plain that the common law principles governing federal actions that lack express limitations periods almost invariably require accrual at the moment a plaintiff can file suit and obtain relief. *See Rotkiske*, 140 S. Ct. at 360 (reaffirming the default rule for claim accrual in the absence of contrary congressional direction). We deviate from those principles only when Congress makes clear it had another rule in mind. *See id.*

But deviate the majority opinion did. To shore up its predilection for the discovery rule, the majority opinion brushed aside three Supreme Court decisions, any one of which foreclosed plaintiffs' claims. Application of the occurrence rule in both *Wallace* and *McDonough* has no "impact" on the "analysis" here, we learn, because no party thought to advance the unusual reading of the common law favored by the majority opinion here. And *Rotkiske* likewise "has no bearing" because it involved interpreting the Fair Debt Collection Practices Act, a statute with its own accrual rule. *See Snyder-Hill*, 48 F.4th at 699–700 (majority op.) ("*Rotkiske* has no bearing on a case about the accrual of Title IX claims because Title IX's text contains no statute of limitations at all."). That latter assertion is particularly hard to stomach. After all, before it turned to interpreting the FDCPA, *Rotkiske* made undeniably clear that, in the absence of an unambiguous statutory accrual rule, we do not depart from common law principles, as the majority opinion did here. 140 S. Ct. at 360 ("Congress legislates against the standard rule that the limitations period commences when the plaintiff has a complete and present cause of action." (cleaned up)). That instruction is particularly salient in the context of an implied cause of action, where Congress, by definition, has not spoken in an express, unambiguous manner. *See Gwinnett Cnty.*, 503 U.S. at 78 (Scalia, J., concurring) ("[C]auses of action that came into existence under the *ancien regime* should be limited by the same logic that gave them birth. . . . [W]hatever the merits of 'implying' rights of action may be, there is no justification for treating congressional silence as the equivalent of the broadest imaginable grant of remedial authority." (brackets omitted)). Again, those common law principles require us to apply the standard occurrence rule in all instances save for some fraud cases. *Snyder-Hill*, 48 F.4th at 712 (Guy, J., dissenting); *Rotkiske*, 140 S. Ct. at 361 (characterizing the discovery rule as "fraud-specific"); *id.* at 364 (Ginsburg, J., dissenting) ("[T]he fraud-based discovery rule . . . . is an exception to the

standard rule that a claim accrues when the plaintiff has a complete and present cause of action." (citations and quotations omitted)).  And not even the majority opinion attempts to paint the claims here as sounding in fraud.  *See Snyder-Hill*, 48 F.4th at 712 (Guy, J., dissenting).

Our case law too fell victim to the majority opinion's antipathy to precedent.  Consider our decision in *Dibrell*, 984 F.3d 1156.  There, the parties disputed the accrual date of the plaintiff's false arrest and imprisonment claims under § 1983.  *Dibrell* began by acknowledging that "[t]he 'standard' accrual 'rule' for federal claims starts the limitations period 'when the plaintiff has a complete and present cause of action' that can be raised in court."  *Id.* at 1162 (quoting *Rotkiske*, 140 S. Ct. at 360).  Our circuit, *Dibrell* acknowledged, historically had defaulted to the discovery rule for accrual when Congress had not directed us otherwise.  *See id.* But, as *Dibrell* emphasized, the Supreme Court has made plain that a "presumption favoring that discovery rule" is "bad wine of recent vintage."  *Id.* (quoting *Rotkiske*, 140 S. Ct. at 360).

With Dibrell's claims untimely under either rule, nothing more needed to be said.  *Id.* But *Dibrell* is not a lone voice.  Elsewhere, we have similarly recognized that the Supreme Court has "squelched this circuit evolution [towards the discovery rule], criticizing the expansive approach to the discovery rule as a bad wine of recent vintage."  *See Everly*, 958 F.3d at 460–61 (Murphy, J., concurring) (cleaned up).  Instead, the Supreme Court has "reaffirmed that Congress legislates against the standard rule that the limitations period commences when the plaintiff has a complete and present cause of action."  *Id.* (cleaned up); *see also El-Khalil v. Oakwood Healthcare, Inc.*, 23 F.4th 633, 636 (6th Cir. 2022) (citing *Dibrell* for the proposition that there is tension between our former § 1983 approach and "several Supreme Court decisions"); *Benzemann v. Houslanger & Assocs.*, 924 F.3d 73, 81 n.42 (2d Cir. 2019) ("[W]e have previously observed that federal courts generally employ the discovery rule.  There might be reason to question this presumption." (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 27 (2001), and noting the pendency of *Rotkiske*)).

How did the majority opinion treat *Dibrell*, the *Everly* concurrence, and other likeminded cases?  It dismissed their conclusions as mere "musings."  *Snyder-Hill*, 48 F.4th at 700 (majority op.).  It then colored those musings as having "overlook[ed] important context," in particular, in how these cases utilized the "bad wine" analogy from *Rotkiske*.  *Id.*  The majority opinion ties

that phrase to the Supreme Court's condemnation of the "atextual judicial supplementation" advocated for in *Rotkiske*. *Id.* at 699–700 (citing *Rotkiske*, 140 S. Ct. at 360). In truth, that analogy came directly from Justice Scalia's concurrence in *TRW*, 534 U.S. at 37 (Scalia, J., concurring). And Justice Scalia's pen rarely left the context unclear. In *TRW*, Justice Scalia began by acknowledging that, in the underlying proceeding, the "Court of Appeals [had] based its decision on what it called the 'general federal rule . . . that a federal statute of limitations begins to run when a party knows or has reason to know that she was injured.'" *Id.* at 35. Although the Supreme Court reversed that determination, Justice Scalia criticized the majority opinion for declining to "say whether that expression of the governing general rule is correct." *Id.* To his well-trained eyes, there was "little doubt that it is not." *Id.* at 36. After all, he noted, the Supreme Court "held, a mere four years ago, that a statute of limitations which says the period runs from 'the date on which the cause of action arose' 'incorporates *the standard rule* that the limitations period commences when the plaintiff has a complete and present cause of action.'" *Id.* (citation omitted) (emphasis in original). To buttress the point, Justice Scalia colorfully observed that the "injury-discovery rule applied by the Court of Appeals is bad wine of recent vintage. Other than our recognition of the historical exception for suits based on fraud, we have deviated from the traditional rule and imputed an injury-discovery rule to Congress on only one occasion." *Id.* at 37 (citation omitted). How one could read the context there in any other fashion is lost on at least this reader.

The majority opinion could be forgiven for momentarily drinking from this fount of bad wine. But viewing the opinion as a whole, something more appears to be afoot. Take, for instance, the majority opinion's claim that using the occurrence rule here "would create an unnecessary circuit split." *Snyder-Hill*, 48 F.4th at 699. The circuit decisions the majority opinion cites all predate *McDonough* and *Rotkiske*, leaving them with questionable value. *Id.* (citing *King-White*, 803 F.3d at 762; *Doe v. Howe Mil. Sch.*, 227 F.3d 981, 988 (7th Cir. 2000); *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006)). Other circuits, it bears noting, have charted a different course. With an eye on binding Supreme Court precedent, for example, the Tenth Circuit, in *Varnell v. Dora Consolidated School District*, applied the occurrence rule, not the discovery rule, for both § 1983 and Title IX claims. 756 F.3d 1208, 1215–17 (10th Cir. 2014) (recognizing *Wallace* as requiring that approach). The majority

opinion dismissed *Varnell* as "declining to decide" the issue. *Snyder-Hill*, 48 F.4th at 699. Not so. *Varnell* expressly recognized that the occurrence rule serves as the default rule, adding that "even if" the plaintiff was correct in claiming that the discovery rule applied, she would still lose. 756 F.3d at 1216; *see also Snyder-Hill*, 48 F.4th at 711–12 (Guy, J., dissenting). All things considered, the majority opinion, far from avoiding a circuit split, instead only deepened one. *Compare Varnell*, 756 F.3d at 1215–17; *MSPA Claims 1, LLC v. Tower Hill Prime Ins. Co.*, 43 F.4th 1259, 1265 (11th Cir. 2022) ("Put more directly, in the absence of a clear Congressional directive or a self-concealing violation, the court should not graft a discovery rule onto a statute of limitations." (cleaned up)), *with Ouellette v. Beaupre*, 977 F.3d 127, 139 (1st Cir. 2020) ("[A] § 1983 claim will accrue once a plaintiff is armed with the necessary factual predicate to file suit, including knowledge of both an injury and the injury's likely causal connection with the putative defendant.").

Not only that, but the majority opinion also managed to confound more than one branch of government. By employing its preferred accrual rule over the default one, the majority opinion both supplanted its view for that of Congress, which did not impose a discovery rule for Title IX claims, and ignored plain direction from the Supreme Court. *See Egbert*, 142 S. Ct. at 1810 (Gorsuch, J., concurring). Those transgressions are not without consequence. In this case, they served to drastically extend the time in which plaintiffs can bring Title IX actions. And going forward, the majority opinion seemingly binds us to do the same in other statutory settings, all, it is no exaggeration to say, at justice's expense. *Gabelli*, 568 U.S. at 448–49 (quoting *R.R. Telegraphers*, 321 U.S. at 348–49).

B. If there is any lingering doubt over the outcome-oriented nature of the majority opinion, consider its application of the discovery rule. Assuming that rule did apply here, under the rule's traditional formulation, accrual occurs "when the reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of his injury." *Bishop*, 618 F.3d at 536. In an analogous case—so much so that it was relied upon by the majority opinion in elevating the discovery rule over the occurrence rule—the Fifth Circuit held that claims similar to those here were untimely under the discovery rule. *King-White*, 803 F.3d at 759, 762–63. "'[A]wareness' for accrual purposes," the Fifth Circuit explained, requires the

existence of "circumstances [that] would lead a reasonable person to investigate further." *Id.* at 762–63. There, the plaintiffs' claims were deemed untimely as the plaintiffs were "sufficiently aware of the facts that would ultimately support their claims" well before they were filed, in part due to the fact that "a reasonable person . . . who had already lodged complaints with administrators that had gone unheeded, would have investigated further." *Id.* (quotations omitted); *see also Doe v. Univ. of Tenn.*, 186 F. Supp. 3d at 808–09.

For today's plaintiffs, however, the majority opinion had other ideas. To its mind, "a pre-assault heightened-risk claim" like the kind asserted here "may not accrue until well after a post-assault Title IX claim," the more traditional grounds for asserting Title IX liability. *Snyder-Hill*, 48 F.4th at 704 (majority op.). Assuming that could ever be the case, how would a reasonable person, after becoming aware that university coaches and administrators were ignoring complaints against Strauss, as plaintiffs' complaint alleges, not think to "investigate further" into Ohio State's pre-assault conduct? *Cf. King-White*, 803 F.3d at 759, 762–63. Rather than offering an answer, the majority opinion rewrites the question. First, it quietly drops the "reasonable person" component of the inquiry. *See Snyder-Hill*, 48 F.4th at 705 ("[T]he clock starts only once the plaintiff knows or should have known that Ohio State administrators 'with authority to take corrective action' knew of Strauss's conduct and failed to respond appropriately."). Then, it smuggles into the accrual analysis tolling and estoppel considerations, an entirely separate inquiry altogether (one, it bears reminding, that is governed by state, not federal, law). *See Wilson v. Garcia*, 471 U.S. 261, 269 (1985) ("[Q]uestions of tolling and application[] are to be governed by state law." (footnote omitted)). By so overhauling the discovery rule, the majority opinion in essence exempted deliberate indifference plaintiffs from the due-diligence requirement inherent in the rule. *Snyder-Hill*, 48 F.4th at 703–04. Under the majority opinion's formulation of that rule, the limitations period does not commence until the plaintiffs discover all aspects of the institution's intentional misconduct. For in the mind of the majority opinion, any delay in filing can be justified simply by the plaintiffs alleging that, even if they were diligent, they would not have been able to discover the misconduct at the time. *Id.* at 705–06.

For all its ingenuity, devising an accrual rule unique to deliberate indifference claims raises more questions than it purports to answer. Among them, why should we differentiate between Title IX causes of action for accrual purposes? That is not how we treat § 1983 actions, for example. In that setting, we customarily use one "simple, broad characterization of all" claims under that statute in view of the "federal interests in uniformity, certainty, and the minimization of unnecessary litigation" surrounding statutes of limitations. *Wilson*, 471 U.S. at 272, 275; *see Owens v. Okure*, 488 U.S. 235, 242–43 (1989); *see also Jackson v. City of Cleveland*, 925 F.3d 793, 811–12 (6th Cir. 2019) (extending *Wilson* to survival actions and elaborating on how § 1983 claims should be treated). For those same reasons we should treat these plaintiffs as we would any others pursuing Title IX claims.

## III.

The above errors, if corrected, would resolve this case. But the majority opinion's flawed conclusion propelled it to commit perhaps an even more invasive error: drastically expanding Title IX's reach.

"No person," Title IX instructs, "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Title IX's text authorizes federal agencies to promulgate regulations that, if flouted, allow those agencies to deny federal disbursements and grants to recipient institutions. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 514–15 (1982) (discussing 20 U.S.C. § 1682). By implication, Title IX also authorizes private rights of action. *See, e.g.*, *Cannon*, 441 U.S. at 709.

How broadly does Title IX's statutory prohibition sweep? The Supreme Court has generally defined the law's contours. A "person" includes everyone not "expressly nor impliedly exclude[d] . . . from its reach," "unless other considerations counsel to the contrary." *Bell*, 456 U.S. at 521; *see, e.g.*, *id.* (employees); *Cannon*, 441 U.S. at 709 (applicants); *Doe v. Univ. of Ky.*, 971 F.3d at 558–59 (de facto students). Federally funded institutions run afoul of Title IX by excluding a person from participation in, denying a person the benefits of, or subjecting a person to discrimination under their educational program or activity on the basis of sex, as well as, in

some cases, by failing to act to prevent or stop such behavior.  *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639–40 & 648 (1999); *see also id.* at 639–40 & 642 (applying Title IX's prohibitions to one's deliberate indifference to severe harassment of a "person").  And an "education program or activity" for Title IX purposes is defined to include "all of the operations of a college, university, or other postsecondary institution, or a public system of higher education."  20 U.S.C. § 1687; *see also Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 271 (6th Cir. 1994) (reading "education program or activity" to include competitive athletic programs).

Plaintiffs asked the panel to extend the law's reach.  Their complaint construed Title IX to encompass virtually anyone visiting a university campus, from a referee officiating a sporting event to a teenager with no stated intent of becoming a student.  The majority opinion complied.  *See Snyder-Hill*, 48 F.4th at 708 (holding that all "situations in which individuals are, for example, . . . attending campus tours, sporting events, or other activities" are protected by Title IX).

Interpreting Title IX in this unending fashion has obvious flaws.  As a starting point, it misreads the statutory text.  Participating or benefitting from an institution's "education program or activity" has natural limits.  As a textual matter, the impacted person must "participate" (meaning "take part") in or "benefit" (meaning "receive help or an advantage") from, *see* Merriam Webster (last visited Nov. 29, 2022), an institution's education program or activity, which Title IX defines as the institution's "operations," 20 U.S.C. § 1687.  It is difficult to see how an institution's football fans or others who pass through now and again fall within the law's reach.

Equally true, reading the law in that respect runs up against the understanding that we are not to expand upon implied causes of action absent express congressional direction.  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855–56 (2017); *see also Miller v. Bruenger*, 949 F.3d 986, 991–92 (6th Cir. 2020) (following *Ziglar*); *Ohlendorf v. United Food & Com. Workers Int'l Union, Local 876*, 883 F.3d 636, 640–41 (6th Cir. 2018) (same).  This is no passing fancy.  The Supreme Court has repeatedly rejected calls to provide or expand independent causes of action for violations of statutes without express remedies or the clear and unambiguous implication of a

remedy.  *See Nestlé USA v. Doe*, 141 S. Ct. 1931, 1938–39 (2021); *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018); *id.* (Gorsuch, J., concurring in part); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1015–16 (2020); *cf. Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308 (2020) (interpreting the Affordable Care Act's language that the United States "shall pay" as a congressional implication of a cause of action).  Yet the majority opinion did exactly that.

It is difficult to square that approach with the modern-day abandonment of "the expansive rights-creating approach" of days past.  *See Gwinnett Cnty.*, 503 U.S. at 77 (Scalia, J., concurring).  But the majority opinion made little effort to harmonize its holding with Supreme Court authority or Title IX's text.  More persuasive, it seems, was another circuit's dicta.  *See Snyder-Hill*, 48 F.4th at 708 (citing *Doe v. Brown Univ.*, 896 F.3d 127, 132 n.6 (1st Cir. 2018)).  In *Doe v. Brown University*, the First Circuit held that a non-student who was drugged at a bar, brought to campus, and sexually assaulted was not able to allege that "she participated or even would have participated in any of Brown's educational programs or activities."  896 F.3d at 133.  That was so, the First Circuit observed, because a person claiming sex discrimination under Title IX must be "a participant, or at least have the intention to participate, in the defendant's educational program or activity."  *Id.* at 131–32 (discussing *Bell*, 456 U.S. at 521).  Although the case was decided on this basis, the First Circuit remarked in a footnote that "members of the public are either taking part or trying to take part [in] a funding recipient institution's educational program or activity" when they access "libraries, computer labs, and vocational resources and attend campus tours, public lectures, sporting events, and other activities at covered institutions."  *Id.* at 132 n.6.

By and large, that footnote was all it took for the majority opinion to avoid dismissing even one claim against Ohio State.  *Snyder-Hill*, 48 F.4th at 708–09.  Take, for example, John Doe 47, a fifteen-year-old high school student who had no express interest in attending Ohio State.  According to the complaint, on a visit to see his aunt (a University employee who had spoken positively about Ohio State), the teenager went to "hang[] around the [Ohio State] athletics department."  As he did, Strauss came along and told him he "would show him 'what you have to go through to be an athlete' at OSU."  Strauss then subjected him to "the types of

exams that he did for different athletes on the various sports teams"—including grabbing his penis, spreading his butt apart, and rubbing his anus and genitals.

Why Title IX would apply to John Doe 47 is entirely unclear. To start, he arguably is not a "person" who can bring a Title IX action. While that term is encompassing in nature, "other considerations" can guide us to a narrower conclusion. *Bell*, 456 U.S. at 521. For a plaintiff claiming he was deprived of university services on account of his sex, a necessary consideration is whether the plaintiff had any intention of availing himself of those services. *See, e.g.*, *Conviser v. DePaul Univ.*, 532 F. Supp. 3d 581, 583 (N.D. Ill. 2021) ("Plaintiffs do not have Title IX statutory standing, because they are neither employees of an educational program or activity nor deprived of access to an educational program or activity."); *Oldham v. Pa. State Univ.*, No. 4:20-cv-02364, 2022 WL 1528305, at *18 (M.D. Pa. May 13, 2022) ("[P]laintiffs who are not the direct beneficiaries of programs covered by Title IX or who are deprived of only an economic benefit lack statutory standing to sue under Title IX." (cleaned up)); *Williams v. Pinellas Park Elementary Sch.*, No. 8:21-cv-1559, 2021 WL 4125764, at *3 (M.D. Fla. Aug. 24, 2021) ("Title IX extends statutory standing to two classes of plaintiffs: (1) employees of an education program or activity; and (2) those who are denied access to an education program or activity."). Otherwise, Title IX seemingly knows no bounds, its text notwithstanding. If a teenager with no intent to form a connection with a university is not excluded from Title IX, is anybody?

It also bears asking what education program or activity John Doe 47 was trying to participate in or enjoy the benefits of. Nothing in the complaint suggests he was considering becoming an Ohio State student or student-athlete. If so, then nothing in the complaint could suggest that Strauss's abuse caused the type of harm Title IX addresses, that is, discrimination in or deprivation of educational opportunity on the basis of sex. Two of the three panel members in today's case recognized that very point earlier this year: "a plaintiff cannot simply assert that a federally-funded educational program discriminated against him or her on the basis of sex and automatically meet[] the 'under any education program or benefit' requirement. Rather, a plaintiff must assert not only that the defendant provided educational programs or activities, but also that the *plaintiff was denied* access to or participation in those programs or activities."

*Arocho v. Ohio Univ.*, No. 20-4239, 2022 WL 819734, at *3 n.2 (6th Cir. Mar. 18, 2022) (brackets and citations omitted) (emphasis in original). What was true then should be true now. Otherwise, if someone with no intention of availing himself of university services is not prevented from claiming discrimination in or deprivation of educational opportunity on the basis of sex, who is?

In this way, the majority opinion transformed Title IX into a one-size-fits-all right of action. Who, to the majority opinion's mind, is foreclosed from bringing a Title IX suit other than one who is drugged and dragged onto campus? *See Doe v. Brown Univ.*, 896 F.3d at 133. If John Doe 47 was approached at a bar by a student who wanted to show him her campus dorm, only to be assaulted, would he have a potential Title IX action? By the majority opinion's logic, he would. *Cf. Arocho*, 2022 WL 819734, at *3 n.2. So too for contract athletics referees and anyone else "attending" "sporting events." *Snyder-Hill*, 68 F.4th at 708 (including referees). *Cf. Conviser*, 532 F. Supp. 3d at 583. And likewise for vendors, friends and family who frequent campus, and every person that descends on campus each fall on football Saturdays. Does Ohio State need to police Ohio Stadium to ensure that no gendered language is used in severely harassing ways, say, to heckle an opposing team or its fans? Does every fan, win or lose, go home with a Title IX claim against the University for being indifferent to crude spectators?

Other than the majority opinion, no circuit has read Title IX's purpose to be so sweeping. Nor could one, if its interpretive method centered on a fair reading of Title IX's text. A statute's purpose is to be found by examining its text. *See Gundy v. United States*, 139 S. Ct. 2116, 2124 (2019). Here, the "traditional tools of statutory interpretation" confirm that Title IX extends only to those persons participating in an education program or activity, not to anyone who has ever stepped foot on school grounds. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). Individuals so plainly outside Title IX's "zone of interests" are not proper plaintiffs under that law. *See id.* at 130–31.

In that respect, the majority opinion is a classic example of legislating by non-legislators. It should go without saying that "the Legislature," not the judiciary, "is in the better position to consider if the public interest [is] served by imposing a new substantive legal liability." *Ziglar*, 137 S. Ct. at 1857 (cleaned up). Given the delicate balancing involved in weighing those policy

considerations, we expect—indeed require—that Congress be explicit in identifying those who may bring suit when their federal statutory rights have been violated. *Id.* at 1856–57; *Ohlendorf*, 883 F.3d at 640–41 ("If Congress wishes to create new rights enforceable under an implied private right of action, it must do so in clear and unambiguous terms." (brackets omitted) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002))).  We will not do Congress's work for it.  *See Snyder-Hill*, 48 F.4th at 713 (Guy, J., dissenting) (refusing to treat Title IX as "a blank page for politically unaccountable judges to write in whatever rule seems to further the [law's] remedial purposes," even if those purposes are well-meaning (quotations omitted)).  The court's pen, in other words, should not replace the legislature's.

\* \* \*

The majority opinion is a vivid reminder that the choices one makes often "depend[] a good deal on where you want to get to." Lewis Carroll, *Alice's Adventures in Wonderland* 53 (Sterling Pub. Co. 2015).  The destination here seemingly was never in doubt.  But the majority opinion's path was not easy.  What all did it require?  Overriding a limitations period selected by a state legislature.  Embracing a law's purported purpose, not its text.  Dismissing an unbroken line of cases from the Supreme Court.  Rejecting our own colleagues' conclusions as mere musings.  Favoring a sister circuit's decision only to snub that decision at the first opportunity, thereby ensuring that every last plaintiff can circumvent the statute of limitations.  Penalizing a university for commencing a fresh look into past misdeeds.  And wielding a law furthering educational gender equality to propel lawsuits by those with no connection to an educational program.  All of this to revive claims no one bothered to pursue for decades.

A more straightforward path would have led to the right conclusion: affirming the district court's dismissal of plaintiffs' complaint.

ENTERED BY ORDER OF THE COURT

_____

Deborah S. Hunt, Clerk